No. 4:13–cv–506

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FT. WORTH DIVISION

_____

ERICK DAVILA,

*Petitioner,*

v.

RICK THALER,

Director,
Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the Criminal District Court No. 1 of Tarrant
County

_____

**PETITION FOR WRIT OF HABEAS CORPUS**

_____

**SETH KRETZER**
SBN: 24043764
The Lyric Center
440 Louisiana Street; Suite 200
Houston, TX 77056
(713) 775-3050 (office)
(713) 224-2815 (fax)
*email: seth@kretzerfirm.com*

**JONATHAN LANDERS**
SBN: 24070101
2817 W. T.C. Jester
Houston, Texas 77018
(713) 301-3153 (office)
(713) 685-5020 (fax)
*e-mail: jlanders.law@gmail.com*

Court-Appointed Attorneys for Petitioner Erick Davila

1

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, **ERICK DAVILA**, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice. This application follows his conviction and death sentence in the Criminal District Court No. 1 of Tarrant County, cause number 1108359d, styled *State v. Erick Davila*.

Davila is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in cause number F08–01020–VJ styled *State v. Erick Davila*. (See, Exhibit "A").

2

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, ERICK DAVILA, certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Erick Davila | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | The Lyric Center 440 Louisiana Street Suite 200 Houston, TX 77002 (713) 775-3050 (direct) (713) 224-2815 (fax) | Appointed attorney for current federal habeas |
| Mr. Jonathan Landers | Jonathan Landers 2817 W. T.C. Jester Houston, Texas 77018 (713) 301-3153 – (phone) (713) 685-5020 – (fax) | Appointed attorney for current federal habeas |
| Mr. Robert Ford | **DECEASED** | Trial Counsel |
| Ms. Joetta Keene | 204 S Mesquite St. Arlington, TX 76010 | Trial Counsel |
| Mr. David Richards | David Richards 204 West Central Avenue Ft. Worth, TX 76164 (817) 332-5567 (Phone) | state writ lawyer |
| Ms. Mary Thornton | 3901 Race Street Fort Worth, Texas 76111 | State direct appellate lawyer |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |
| Mrs. Katherine Hayes | Office of the Attorney General<br>Capital Litigation Division<br>P.O. Box 12548,<br>Capitol Station<br>Austin, TX 78711-2548<br>(512) 936-1600 (voice)<br>(512) 320-8132 (fax) | Asst. Attorney General |
| *Judges* | | |
| Honorable Sharen Wilson | Tim Curry Justice Center<br>5th Floor<br>401 W. Belknap<br>Fort Worth, TX 76196-7213<br>(817) 884-1351 (Office)<br>(817) 884-1191 (Fax) | Trial and Habeas Judge |
| | | |
| | | |

## DESIGNATION OF ABBREVIATIONS and EXPLANATION OF THE TRIAL RECORD

"RR" refers to the reporter's record from the state trial court. "CR" refers to the clerk's record from state trial court.

4

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments four, five, six, eight, and fourteen, of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## DAVILA'S AEDPA DEADLINE WAS SATISFIED

Davila was convicted of capital murder in February of 2009. He filed a direct appeal in the Texas Court of Criminal Appeals, which affirmed the conviction and sentence on January 26, 2011. *Davila v. State*, AP–76, 105, 2011 WL 303265 (Tex. Crim. App. Jan. 26, 2011), *cert. denied*, 132 S. Ct. 258, 181 L. Ed. 2d 150 (U.S. 2011). He filed a petition for writ of certiorari to the Supreme Court, which it denied on October 3, 2011. *Davila v. Texas*, 132 S. Ct. 258, 181 L. Ed. 2d 150 (2011). Thus, his conviction became final for the purposes of his federal writ on October 3, 2011. *See, e.g.*, *Giesberg v. Cockrell*, 288 F.3d 268, 270 (5th Cir. 2002); *Crutcher v. Cockrell*, 301 F.3d 656 (5th Cir. 2002).

"The time during which a properly filed application for State post-conviction . . . claim is pending shall not be counted toward any period of limitation." 28 U.S.C. § 2244(d)(2). Davila filed his state writ on August 29, 2011, before the Supreme Court denied his petition for certiorari. The Court of Criminal Appeals denied his writ on April 17, 2013. *Ex Parte Davila*, WR–75, 356–01, 2013 WL

5

1655549 (Tex. Crim. App. Apr. 17, 2013). Davila's federal habeas clock began to tick on this date; this writ must therefore be filed by Thursday, April 17, 2014.

However, this Court has entered an order allowing Davila to amend his writ with a version to be filed in May.

### EXHAUSTION

Davila asserts that most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[1] The exceptions are *Trevino* claims alleging that the state writ lawyer, David Richards, rendered ineffective assistance at the state writ hearing.

Also, Davila has identified potential *Brady* claims that were not presented to the state courts, but which are not defaulted because Davila will be able to show cause and prejudice for failing to raise these claims in his upcoming amended writ.

### Summary of Arguments

[A summary of all arguments will be provided in the amended writ.]

---

[1]The burden is on Respondents to demonstrate that Davila failed to exhaust a particular claim. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

## PROCEDURAL HISTORY

### A.    Procedural History in State Court

In the superseding indictment filed June 18, 2008, Erick Davila was charged with the offense of capital murder (two murders during the same criminal transaction). Tex. Penal Code § 19.03 (7)(A). 1 CR 1–3. On February 10, 2009, Davila pleaded not guilty before a jury. 14 RR 9–10. Nine days later, on February 19, 2009, after hearing evidence from the State and the defense, the jury found Davila guilty of capital murder. 9 CR 1947–49; 20 RR 55. After hearing additional testimony from witnesses called by both sides, the jury answered Special Issue Number One (whether there is a reasonable probability that Davila would commit criminal acts of violence that would constitute a continuing threat to society) "yes" and Special Issue Number Two (whether there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment) "no." 9 CR 1947–49; 26 RR 5–7. Accordingly, the trial court sentenced Davila to death by lethal injection on February 27, 2009. 9 CR 1947–49; 26 RR 7–8. *See* Tex. Code Crim. Proc. Art. 37.071 § 2(g). On March 2, 2009, Davila's conviction and sentence of death were automatically appealed to the Texas Court of Criminal Appeals.  9 CR 1952.

**B.** **Procedural History in Federal Court**

On June 21, 2013, the state habeas lawyer filed a motion for appointment of federal writ counsel.  Doc. No. 1.  In July of 2013, this Court appointed Seth Kretzer and Jonathan Landers.  Doc. No. 4.  On March 19, 2014, this Court granted Davila permission to amend his writ within one month of filing a writ meeting the AEDPA deadline.  Doc. No. 9.  All potential claims have been included in this timely writ, but Davila intends to further develop these claims in his upcoming amended writ.

<u>STATEMENT OF FACTS</u>

**Introduction**

On April 7, 2008, Erick Davila shot at a gang rival named Jerry Stevenson. Unfortunately, a grandmother and a little girl died, whom Davila did not know and had no animus towards, but happened to be near Stevenson, died.

**I.** **Guilt and innocence, a question of intent, and an improper jury charge**

In Texas, a person can be found guilty of capital murder for intentionally killing more than one person during the same criminal transaction. Tex. Penal Code § 19.03.  Importantly, one must have the specific intent to murder at least two people to be guilty of this offense; it is not enough that a person attempted to

murder a single person, and accidently killed two. *See Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008).

Davila's defense argued from the start that the most important issue for the jury would be intent. 14 RR 16. Specifically, in their opening statement, defense counsel asked the jury to pay close attention to whether or not "Erick had the specific intent to kill these two folks, intentionally or knowingly." *Id.* at 17. The defense theme continued through closing, when defense counsel once again argued that Erick was attempting to shoot only Jerry Stevenson, with whom he had previous confrontations, rather than anyone else. *See, e.g.*, 20 RR 22.

### A.    The shooting

On April 6, 2008, 47-year-old Annette Stevenson, hosted a birthday party for her granddaughter Nautica, at her residence in Village Creek Apartments, located at 5701 Anderson Street in Fort Worth, Texas. 14 RR 19–21; 15 RR 42–44. Nautica's sister, Cashmonae, their two brothers, and several of their young cousins and friends attended the party. 14 RR 20–22; 15 RR 40, 43–44. Annette's son, Jerry Stevenson, his five-year-old daughter Queshawn and his three-year-old son were in attendance. 14 RR 21, 24; 15 RR 44, 48, 54–55. Also present were Jerry's sister Tamesha, the mother of Nautica and Cashmonae, and his sister Talisha; these siblings and their children all resided with Annette. 14 RR 19–20; 15 RR 41, 44.

9

Jerry Stevenson (aka Dunna, or Big Boy Dooney) was the only adult male at the house. 15 RR 42–43.

The scene of shooting was in a part of Fort Worth known at the time as "Blood" territory. *See*, *e.g.*, 14 RR 189. It was also undisputed that that Erick Davila was a member of the Truman Street Bloods gang. 16 RR 54–64. Jerry Stevenson testified that he was not a gang member, but that he hung around many gang members. 15 RR 92–95. Specifically, he had friends who were "Polywood Crips," but he denied being a Crip himself. *Id.* at 72. Stevenson also recognized that the house where he lived (the same house where the shooting took place), was probably identified as a Crip house. *Id.* at 92–95. He understood it could lead to problems when Crips and Bloods lived in the same area of town. *Id.*

Indeed, there had been trouble just a few weeks before the shooting. Jerry, little Garry (Jerry's nephew), and Jeremy (Jerry's brother) were at Jerry's mother's house. *Id.* at 73. All of the men were in their 20s. *Id.* at 74. Two other men were also present at the house; they had been in an altercation with little Garry. *Id.* at 75. At one point, one of the two other men had threatened to shoot him. *Id.* at 75. Jerry intervened in the argument and separated the parties. *Id.* at 75–76. Jerry recognized one of the two men arguing with his cousin as "Mike-Mike," but he did not recognize the other person (and did not believe Davila was present at the

argument).  *Id.* at 76–77.  He did, however, recognize that Mike-Mike and the other man were associated with the Blood gang.  *Id.* at 76–77.

Unlike Jerry Stevenson, Detective Johnson of the Fort Worth Police Department did have information that Crips lived at 5701 Anderson; he also thought the shooter was possibly a Blood.  17 RR 280.

Ms. Stephens-Mosley also testified about the argument that took place at 5701 Anderson in the weeks before the shooting.  Ms. Stephens-Mosley was a security officer who worked for the apartment complex, and she recalled the incident as taking place on 13th of March.  *Id.* at 62.  She remembered being called to 5701 Anderson and finding six gentlemen in a conversation, and two of those gentlemen were Garry and Dunna (aka Dooney, or Jerry Stevenson). *Id.* at 63.  Ms. Stephens-Mosley recalled two men being on one side of the conversation and four being on the other; she recalled a really intense conversation.  *Id.* at 64–65.  She asked the parties to leave the complex.  *Id.* at 65–67.  Ms. Stephens-Mosley was concerned somebody would get a gun.  *Id.* at 69.  Importantly, Ms. Stephens-Mosley specifically remembered that Erick Davila was one of the people arguing with Jerry Stevenson, and according to her, Stevenson told her that Erick or his companion had pulled a gun during the argument.  *Id.* at 69–70.

On the evening of April 6, there was another birthday party going on at the apartment complex.  14 RR 55, 122–23, 241. Yvonne Watts, who lived one street

over on Luther Court, also in the Village Creek Apartments, held the party for her daughter. 14 RR 241. Kent Reed, his wife Arlette Keys, her 15-year-old brother Eghosa Ogierumwense, and Arlette's mother Charlene Ogierumwense, along with several other teenagers and children, celebrated inside and outside the Watts' residence. 14 RR 55, 59–60, 122–23, 126, 240–42.

At approximately 7:30 p.m., Kent, Arlette, and Eghosa saw a black Mazda 626 automobile with dark tinted windows, custom vents, and racing wheels drive up and abruptly park in an awkward position on Luther Court. 14 RR 61, 68–69, 123–25, 242–43; 16 RR 53–56. All three watched as Davila exited from the vehicle with a rifle equipped with a red laser sight. 14 RR 61–65, 127–28, 242–44; 16 RR 71–72, 110–11, 123–31; 18 RR 140–42. Immediately after Davila exited the car, another individual moved into the driver's seat and sped away (this person was Garfield Willis Thompson, whose capital murder charge was ultimately dismissed when he plead to a different aggravated robbery). 14 RR 61, 140. As he toted the weapon at his side, Davila walked past Kent and Eghosa toward the home of a woman known as "Miss Sheila." 14 RR 63, 76, 130–31, 246. When no one responded to his knock, Davila proceeded in the direction of the Stevenson party. 14 RR 66, 131–40, 246.

Eghosa followed Davila. *Id.* at 132–34. Eghosa testified that he watched Davila stop at the corner of house across the street from 5701 Anderson. *Id.* at

12

134–136. There were kids outside of the house, Granny (Annette Stevenson) was on the porch, and Dooney (Jerry Stevenson) was outside. *Id.* at 136–37. Eghosa initially saw the red beam from the rifle shinning on Dooney, at which point Dooney turned around and went into the house. *Id.* at 138. Then Davila started shooting the gun. *Id.* There were women and children outside when Davila started shooting, but Eghosa never saw the beam on any of them. *Id.* Davila then ran to the middle of the street, shot again, and jumped in a car and drove off. *Id.* at 140– 141. On cross examination, Eghosa explained that after Dooney walked into the house, the shooter started shooting at the house. *Id.* at 157. Shots were going everywhere. *Id.*

Eghosa, along with many other people, ran inside the Stevenson residence. 14 RR 26, 142. Arlette, a registered nurse, also went inside to offer her assistance. *Id.* at 80–82, 248–49. Annette and Queshawn Stevenson had both been fatally shot. 14 RR 142–43; 18 RR 265–78. Cashmonae, Nautica, Brianna Scott, and Sheila Moblin all suffered non life-threatening injuries. 14 RR 26–28; 15 RR 257, 259.

## B. Davila's Bad Eyesight

Davila was not wearing glasses at the time of the shooting. 14 RR 120. His girlfriend explained that he did not have glasses at the time of shooting, but that he needed them to see. 16 RR 97. Davila presented testimony from an optometrist who evaluated him after the shooting, and he confirmed Davila's poor eyesight. 19

13

RR 91–92, 97–99. Specifically, the prescription for Davila's right eye was 20/140, and 20/80 for the left eye. *Id.* Pictures were taken from 40 feet to show the jury the effects of such poor eyesight. *Id.* at 93–94, 100–101; Defense Ex. 101, 100. The shooting had taken place at distances of 84 feet and nearly 100 feet from the house. 15 RR 152, 19 RR 124.

### C. Jury seized on "intent" argument, but was given a misleading jury charge

After the close of evidence in the guilt and innocence phase, the Court held the customary charge conference with the parties. 19 RR 137–159. All agreed that Davila was entitled to an instruction for the lesser included charge of murder. *Id.* at 141–43. The Court instructed the jury on the lesser included offenses of murder for both Queshawn Stevenson and Annette Stevenson. *CR* at 1923–29. The defense also requested a manslaughter charge, which was given over an objection from the state. 19 RR 147–48; *CR* at 1923–1929.

Quite strikingly, the State never requested a transferred intent instruction as allowed by Texas Penal Code § 6.04. 19 RR 137–159. As there was no transferred intent instruction, the jury was given the following instruction related to capital murder:

> Now, If you find from the evidence beyond a reasonable doubt, that Erick Daniel Davila, In Tarrant County, Texas, on or about the 6th day of April 2008, did intentionally or knowingly cause the death of an individual, Queshawn Stevenson, by shooting her with a deadly

weapon, to wit: a firearm, and did Intentionally or knowingly cause the death of an Individual, Annette Stevenson, by shooting her with a deadly weapon, to wit: a firearm, and both murders were committed during the same criminal transaction, then you will find the defendant guilty of the offense of capital murder.

CR at 1924.  The charge was given to the jury at the beginning of the day on February 19, 2009.

In the middle of the afternoon, after the jury had been deliberating for four hours, the jury sent the following note to the judge:  "In a capital murder charge, are you asking us did he intentionally murder the specific victims, or are you asking us did he intend to murder a person and in the process took the lives of 2 others."  *Id.* at 1931.  The judge responded with an incorrect instruction, which did not clarify that Davila must have intended to kill two distinct people before he could be convicted of a capital murder:

The Court responded with the following additional charge on the law:

"A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that: a different person was injured, armed, or otherwise affected."

CR at 1933.  The defense objected to this charge, but the objection was overruled. 20 RR 53.

After receiving the incorrect charge, the jury quickly returned a guilty verdict for capital murder.  CR at 1934.

15

Shockingly, Davila's direct appellate counsel failed to raise this incorrect jury charge argument on direct appeal.

### D.     Evidence adduced at the punishment phase

During the penalty phase, the State presented evidence of Davila's prior crimes and an attempted jail escape while Davila was awaiting trial.  The state admitted evidence of an armed robbery which, according to the victims, Davila had participated in.  20 RR 58–108.  The state also introduced evidence of another shooting which had taken place shortly before the shooting at the birthday party. 21 RR 19–20, 68–92.  Essentially, the testimony was that Davila shot a crack dealer named Tricky, or Lamont, prior to the shooting on Anderson.  *Id.* at 68–92. Davila gave a confession for this shooting, his fourth confession in eight hours, claiming he had been threatened at gunpoint by the deceased earlier in the day. *See* State's Ex. 237.  A pair of Arlington Police Officers also testified about a time when they stopped Davila for a traffic offense, and found him to have a fully loaded 9 mm handgun in the car.  22 RR 31–59.  He had been rude to the arresting officers during the arrest.  *Id.*  One jailer explained that Davila had been disruptive and refused to get off a phone call while locked up in the Tarrant County Jail.  *Id.* at 100–109.  Finally, the State presented extensive evidence showing that Davila had been involved in an attempted escape from the Tarrant County Jail while

awaiting trial.  *See, e.g.*, *Id.* at 154–198.  Two guards were beaten badly during the escape attempt.  *Id.*

The defense called Davila's father, Mario Davila to testify.  23 RR 219.  He was serving the nineteenth year of 20-year sentence for murder.  *Id.* at 220.  Mario explained that he was 28 years old when he met Erick's mother, Sheila, and she was only 13 when she became pregnant with Erick.  *Id.* at 230.  Erick was also born when she was 14 years old.  *Id.* at 230–31.  He explained that he had been in prison for almost the entire time that Erick and his sister Emily had been alive.  *Id.* at 230–240.  He drank a lot, and the duty to raise the kids fell on Sheila.  *Id.*  On cross-examination, Mario explained that he and Sheila were good parents.

Erick's sister, Emily, was called to testify the following day.  24 RR 11.  Emily explained that her mother had kicked her out of the house at 16, and she had been taken in by her future mother in law.  *Id.*  Emily further explained that she and Erick had found out that their stepdad, Santos, was not their biological father when they were 13.  *Id.* at 20–30.  She explained Erick had been kicked out of the house when he was 15 years old, and that he was dating a lady in her mid 30s at that time.  *Id.*  She explained that she and her mom had been in physical fights before, and that she disagreed with her mom's treatment of her younger sisters.  *Id.*  Finally, she explained that the area they were from was full of gangs and violence.  *Id.* at 31–42.

17

Erick's mother, Shelia Olivas, also testified. *Id.* at 48. She explained that she had seven children and that Erick was the oldest and only boy. *Id.* at 48–60. She claimed to have been sold to Mario, and additionally claimed that Mario had raped her. *Id.* She was a virgin when she was sold to Mario. *Id.* She explained that she was poor when she was teenage mother, and that her sister would help to support her. *Id.* 60–70. She explained that Erick had never seen his dad before and that he had grown up around domestic violence.

According to Shelia, Eric had been diagnosed with ADHD and had bad eyesight, but she did not like him to take any Ritalin because it made him like a zombie. *Id.* at 70–80. She claimed that she never knew her son was involved in gangs. *Id.* She thought she was an overprotective mother. *Id.* She admitted, however, that she never went to see her son in jail until six months after his arrest. She claimed that she was attempting to find out who his attorneys were and had no idea they had been looking for her. *Id.* at 80–91. She explained that she was simply too busy to meet with the attorneys because she was starting her own church, but she had agreed to meet the trial attorneys for 30 minutes at Starbucks. The reason she did not return calls was that her phone was messed up, but she did confirm she got the text from trial attorney Keene explaining she would be arrested if she did not show up for court and testify. *Id.* at 91–94.

On cross-exam, Sheila explained that she did everything she could for her kids. *Id.* at 97. She knew that all of the problems her son had in school came from the fact "you had to touch him for him to focus." *Id.* at 99. Once again, she explained she was indeed an overprotective mom. *Id.* at 104.

Sheila's sister, Deborah Jones, testified that that Sheila got pregnant while she was young, and that Erick had come to live with her when he was 14 because Sheila thought it could help him get away from gangs. *Id.* at 111–124. Angela Jones, another sister of Sheila's, also testified for the defense, but she did not add much additional evidence. *Id.* at 134–154.

The main defense mitigation witness was Dr. Emily Fallis. *Id.* at 184–261; 25 RR 41. She was hired to do the social history of Erick. 24 RR 184. She explained that although Sheila was only 13 years old when Erick was conceived, and 14 when he was born, the birth was normal. *Id.* at 190–91. He had met the development milestones one would expect for a healthy child. *Id.* However, he had behavior problems in the first grade and the school he was attending threatened to expel him. *Id.* at 191–92. Dr. Fallis explained that Sheila had lied to her about Erick playing sports as a kid, and not having problems in school. *Id.* at 193–200. Erick struggled in school, made poor grades, and had borderline IQ scores. *Id.* at 200–210. She explained that during his prior prison stay, Erick did not have any real discipline problems. *Id.* at 219.

19

It was Dr. Fallis' belief that Sheila neglected her children's education by not making Erick wear glasses or take his ADHD medicine. *Id.* at 231–32. Essentially, Fallis testified that Erick was put in a disadvantageous position from the start.

### E.       The state writ proceedings were contaminated with IAC *ab initio*

Erick's state writ started with a whimper, as the state writ attorney, David Richards, allowed the deadline for filing the writ to pass without filing a writ or an extension.  Writ CR at 358–60.  Luckily, the Court of Criminal Appeals allowed Richards an additional 180 days from March 2nd, 2011, to file the writ. *Id.* at 361–62.  Richards filed the 18–page state writ on August 29, 2011, and attached to it a mitigation report compiled by Mitigation Investigator Toni Knox.  Mrs. Knox had identified many potential witnesses who would have testified at Davila's trial had they been asked to, but because none of the witnesses were called to testify at the state writ hearing, it appears the judge discounted their potential testimony. 1 Writ *CR*

The state trial court held a hearing on the *Wiggins* ineffective assistance of counsel claim raised by Richards.  The writ hearing was held on July 2, 2012. *See* 2 Writ RR 1.  According to a recently obtained affidavit from the mitigation

investigator Toni Knox, Richards did not contact her concerning the hearing until late June 2012. *See* Appendix B, Affidavit of Knox. When they spoke on the phone on June 24, Richards did not have a copy of her report (which had been attached to the writ he filed.) *Id.* Knox did not feel Richards was prepared for the hearing. *Id.* at 2.

The first time that Knox met with Richards in preparation for the hearing was on the date of the hearing. *Id.* They met for one hour, much of which was spent with Knox speaking with the prosecutors and Richards ordering lunch. *Id.* Knox believed that Richards was not familiar with her report, and that he made no effort to call any of the potential mitigation witnesses she had discovered as part of her investigation. *Id.* Finally, Knox believed that Richards had been having health issues around the time he was working on Davila's writ, and that his physical impairment diminished his ability to represent Davila. *Id.*

Davila asserts that Richards was ineffective in both the way he presented the *Wiggins* claim, and by not raising other clearly meritorious claims.

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW IN TEXAS

The following is an overview of capital punishment law in Texas. This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty.   To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder.  For instance, kidnapping and then killing a person is a capital offense.  So is killing two people, rather than one, which happened in the present case.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys.  One of the lawyers is the lead attorney; the other is the second chair attorney.  Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions.  The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge. Death penalty jurisprudence is thick with constitutional and statutory issues.  All unsettled challenges to death penalty procedures must be raised.  Failing to raise an issue means that it is waived on direct appeal.  Moreover, because the Supreme Court has insisted that effective

assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense. The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts. Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors. Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700. Many jurors exercise certain allowable rights not to serve; others cannot be found. On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel. Either side may ask for the jury to be shuffled at this point. Jurors will be seated randomly in numerical order. Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service. In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues that might disqualify a juror. The judge may excuse some jurors but not others. At this

23

stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench. Frequently, the lawyers for both sides will agree to excuse a juror for some reason. There is a certain Texas statutory provision that allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult, day-long affair. Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination. Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately 45 minutes to question the juror. After the juror leaves, each side is permitted to challenge for cause. If granted, the juror is finally excused and deleted from the pool. If challenges for cause are denied, the juror remains in the pool and, subject to a peremptory challenge, becomes part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges. For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied. This is sometimes called the sequential method of selecting the jury. The State goes first. If the State strikes the juror, the juror is gone. If the State declines to strike the

juror, then the right passes to the defense.  If the defense strikes the juror, the juror is eliminated.  If the defense does not strike the juror, then the juror joins the twelve-member petit jury.  This process is repeated until twelve jurors and two alternates are seated.  Each side has ten peremptory challenges.

Once the jury is selected and sworn, trial proceeds in the usual fashion.  If the defendant is found guilty of capital murder, the sentencing phase begins.  In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues.  The questions have varied over the years.  In Davila's case, only two questions were asked: the future dangerousness question and the mitigation question.

The method of answering the special issues is complicated.  If the jurors unanimously answer both questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically.  If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes.  It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue.  If this occurs, then the defendant is sentenced automatically to life in prison.  There is

25

no retrial.  Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case.  The result is always either a life sentence or a death sentence.  Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence.  Unanimity is required for a death sentence.  A life sentence is the result otherwise, and can be the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor.  Again, the answer is that the defendant receives an automatic life sentence.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's Article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

# ARGUMENT AND AUTHORITIES

## Overview of Claims for Relief

CLAIM ONE: THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN DAVILA'S CONVICTION FOR THE OFFENSE OF CAPITAL MURDER UNDER 19.03(A)(7) BECAUSE THE STATE FAILED TO PROVE THAT DAVILA INTENDED TO KILL MORE THAN ONE PERSON.

CLAIM TWO: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.

CLAIM THREE: DAVILA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS DIRECT APPEAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY APPELLATE COUNSEL'S FAILURE TO RECOGNIZE, AND RAISE THE CLAIM, THAT HE WAS CONVICTED BY AN IMPROPER STATEMENT OF LAW IN THE JURY INSTRUCTIONS.

CLAIM FOUR: STATE HABEAS COUNSEL RENDERED INEFFECTIVE ASSISTANCE COUNSEL.

CLAIM FIVE: THE TRIAL COURT ERRED IN OVERRULING DAVILA'S MOTION TO SUPPRESS HIS THREE WRITTEN STATEMENTS ADMITTING TO THE COMMISSION OF THE OFFENSE OF CAPITAL  MURDER PURSUANT TO FRANKS V. DELAWARE, 438 U.S. 154, 98 S. CT. 2674 (1978) IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

CLAIM SIX: THE TRIAL COURT ERRED IN OVERRULING DAVILA'S MOTION TO SUPPRESS HIS STATEMENT ADMITTING TO THE COMMISSION OF AN EXTRANEOUS MURDER OFFENSE PURSUANT TO *FRANKS V DELAWARE*, 438 U.S. 154, 98 S. CT. 2674 (1978) IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

CLAIM SEVEN: THE TRIAL COURT ERRED IN OVERRULING DAVILA'S MOTION TO SUPPRESS HIS THREE WRITTEN STATEMENTS ADMITTING TO THE COMMISSION OF THE OFFENSE OF CAPITAL MURDER PURSUANT TO THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

CLAIM EIGHT: THE TRIAL COURT ERRED IN OVERRULING DAVILA'S MOTION TO SUPPRESS HIS STATEMENT ADMITTING TO THE COMMISSION OF AN EXTRANEOUS MURDER OFFENSE PURSUANT TO THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

CLAIM NINE: THE TRIAL COURT ERRED IN OVERRULING DAVILA'S MOTION TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION AND DECLARE TEX. CRIM. PROC. CODE 37.071 UNCONSTITUTIONAL ON THE GROUNDS THAT TEXAS LAW ALLOWS FOR A DEATH SENTENCE WITHOUT GRAND JURY REVIEW OF THE PUNISHMENT SPECIAL ISSUES.

CLAIM TEN: THE TRIAL COURT ERRED IN OVERRULING DAVILA'S OBJECTION TO THE CONSTITUTIONALITY OF TEXAS'S SO-CALLED "10-12 RULE."

CLAIM ELEVEN: THE TRIAL COURT ERRED IN OVERRULING DAVILA'S MOTION TO INSTRUCT THE JURY THAT THE SENTENCING BURDEN OF PROOF ON THE MITIGATION ISSUE LIES WITH THE STATE.

CLAIM 12:   DAVILA'S TRIAL WAS CONTAMINATED BY IMPROPER INFLUENCE THAT AFFECTED THE DELIBERATIONS PROCESS.

CLAIM 13: DAVILA'S CONVICTION AND SENTENCE WERE OBTAINED IN VIOLATION OF BRADY.

## DETAILED ARGUMENTS

## I.   CLAIM ONE: THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN DAVILA'S CONVICTION FOR THE OFFENSE OF CAPITAL MURDER UNDER 19.03(A)(7) BECAUSE THE STATE FAILED TO PROVE THAT DAVILA INTENDED TO KILL MORE THAN ONE PERSON

**EXHAUSTION:** **This Claim was raised as point of error one in Davila's direct appeal to the Court of Criminal Appeals.  It was addressed on its merits by that Court.** ***See Davila v. State***, **AP–76,105, 2011 WL 303265 (Tex. Crim. App. 2011).**

## SUMMARY OF THE ARGUMENT

The evidence presented at trial was legally insufficient to support Davila's conviction for the offense of capital murder because he lacked the requisite intent to kill more than one person.  Stated another way, the evidence raised at trial showed that Davila intended to shoot only Jerry Stevenson, the only adult male present at the scene of the shooting, and no one else.  In order to assess the legal sufficiency of the evidence, a court must consider whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 308 (1979).  As Davila was charged with capital murder for causing the death of two individuals, one essential element in his case was that he had the specific intent to kill at least two individuals.  *Davila*, 2011

WL 303265 at 12–13 (*citing Roberts v. State,* 273 S.W.3d 322, 331 (Tex. Crim. App. 2008)).  As the Court of Criminal Appeals has explained:

> Transferred intent may be used as to a second death to support a charge of capital murder that alleges the deaths of more than one individual during the same criminal transaction only if there is proof of intent to kill the same number of persons who actually died, e.g., with intent to kill both Joe and Bob, the defendant killed Joe and Lou. It may also be used if, intending to kill both Joe and Bob and being a bad shot, the defendant killed Mary and Jane.

*Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008).  However, *Roberts* made clear that Texas' transferred intent doctrine cannot be used to increase murder to capital murder on the grounds that the defendant, while intending to kill a single person, actually kills two.  *Id.*

Just as the evidence was legally insufficient to support Davila's capital murder conviction in *Roberts*, on the element of specific intent, the same is true in the case at bar. The motive developed at trial to explain Davila's actions, and the only scenario that passes the common sense test, was that Davila, a Truman Street Blood, had a grudge against Jerry Stevenson, a member of the Polywood Crips. Three weeks before this offense, Jerry and Davila had been involved in a separate verbal altercation, again presumably due to their oppositional gang affiliations. 19 RR 61–80. Throughout the trial, the prosecution enthusiastically and repeatedly emphasized to the jury the bitter enmity between the Bloods and the Crips. 16 RR 136–38, 146–70; 18 RR 31–70. The State's eyewitness, Eghosa Ogierumwense,

watched as Davila specifically targeted only Jerry Stevenson with his laser sight. 14 RR 138, 144–45. One of the wounds sustained by Annette Stevenson was intermediate, meaning that it had struck other targets before entering her body. 18 RR 265–73. The weapon utilized in this offense was described as high-powered. 18 RR 158–59. With the ammunition used in it, the muzzle velocity was great. *Id.* Extrapolating from the testimony of the forensic firearms examiner, the bullets used in the rifle at the approximate range where Davila was standing were capable of traveling through outside walls. Additional evidence developed at trial revealed that Davila's far away vision was exceedingly poor. 19 RR. 96–102.

It is apparent, in light of the State's developed motive for this shooting, that Davila's sole intent was to kill Jerry Stevenson. The gangland dispute was with him. Davila aimed his laser sight at Jerry alone. When Jerry stepped inside the residence before Davila could get off his initial shot, Davila fired solely at him, expecting his bullets to penetrate the outside wall and strike Jerry. Though motive itself is not an element that the prosecution is required to prove, Texas courts have held that "evidence of motive is one kind of evidence [that aids in] establishing proof of an alleged offense." *See Crane v. State*, 786 S.W. 2d 338, 349–50 (Tex. Crim. App. 1990); *see also Pollard v. State*, 255 S.W. 3d 184, 188 (Tex. App.— San Antonio 2008) *pet granted and aff'd*, 277 S. W. 3d 25 (Tex. Crim. App. 2009).

Davila had no dispute with any other person present at the party. Davila fired at Jerry; unfortunately, he was a bad shot with bad eyesight and two innocent people were killed by accident. The facts presented at trial were simply legally insufficient to support a charge of capital murder pursuant to Tex. Penal Code 19.03(7)(a).[1]

### CLAIM 2: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

**Exhaustion: This claim granulates into tightly interrelated subsections. The first two subsections briefed below were raised in the state writ. However, other vital aspects of the trial counsels' ineffectiveness were not raised solely because habeas counsel was ineffective in his preparation and presentation of the state writ. This claim was raised as the first point of error in the state writ.**

There are two venerable elements to an ineffective assistance of counsel claim. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (2003). Under *Strickland*, in order to show prejudice, a "defendant must show that there is a reasonable

---

1 Although Direct Appellate Counsel did raise the sufficiency issue, she completely failed to identify the fact that the trial court incorrectly instructed the jury regarding Texas' transferred intent law as it applied to capital murder. Cl. R at 1933. The Charge given allowed the jury to convict for capital murder if Davila intended to kill one person, but more than one person was actually killed. *Id.* This issue will be raised in the Ineffective Assistance of Direct Appeal Section below.

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  As noted in *United States v. Bagley*, the prejudice test for Strickland is identical to the materiality test for *Brady* claims.  473 U.S. 667, 682 (1985).

As the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) and their Texas counterparts demonstrate, the unpresented evidence during both phases of Erick's trial constitutes precisely the type that competent counsel is required to investigate and find in a capital case.[2]  It is well recognized that counsel cannot make a reasonable strategic decision without first conducting an adequate investigation. *See, e.g.*, *Wiggins*, 539 U.S. at 534 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'" (quoting *Strickland*, 466 U.S. at 690–691)).

---

2 See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines for Capital Counsel"), 31 Hofstra L. Rev. 913, 1055 (2003). Guideline 10.11(A) ("As set out in Guideline 10.7(A), counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."); 10.11 Commentary, pp. 1059-1070 ("Counsel is entitled to impress upon the sentencer through evidence, argument, and/or instruction that the client will either never be eligible for parole, will be required to serve a lengthy minimum mandatory sentence before being considered for parole, or will be serving so many lengthy, consecutive sentences that he has no realistic hope of release. In at least some jurisdictions, counsel may be allowed to present evidence concerning the conditions under which such a sentence would be served." (noted omitted)) (emphasis added); 10.11 (F)(3) ("In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following: Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served") (emphasis added); 10.7 (A) ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."). See also State Bar of Texas Guidelines and Standards for Texas Capital Counsel Guideline 11.7 (F)(3) (same as ABA Guidelines for Capital Counsel 10.11 (F)(3) (published in 69 TEXAS BAR JOURNAL 966, 974 (2006) (available at www.texasbar.com) (last checked Oct. 29, 2008)).

### a.     Trial Counsel Were Ineffective by Failing to Render a Minimally Sufficient Mitigation Investigation

Davila's defense at the punishment stage began on Day 23 of trial, February 24. Davila's estranged father, Mario Davila, was called to testify. On the following day, February 25, the defense called five family members. Emily Davila, Erick's sister, testified first.  24 RR 11–42.  Next, Sheila Olivas, Erick's mother, testified under subpoena.

> Q:  But you did get the text when I said that I would get a warrant out for your arrest to be here if you didn't show up?
>
> A:  Actually, that was later.  Yeah, I got it later.

*Id.* at 94.

However, defense counsel failed to investigate, and failed to call, numerous other family members who would have testified to the extent of Davila's childhood of severe neglect, raised by a mother who was impregnated at age 13. Davila's mother resented her children, and she subjected Davila to monstrous mental and physical abuse. While there was evidence admitted at punishment to show that Davila was raised in difficult circumstances, the trial team failed to present evidence of the mental and physical abuse that Erick Davila was subjected to by his mother.  According to the ABA Guidelines, the defense team should find and

interview the client's family, "extending at least three generations back, and those familiar with the client."

Counsel's failure to locate any of several avenues to the truth, and to guide the jury there, was inexcusable and completely ineffective.

### 1. No AEDPA Deference to Specific Issues Within The IAC Claim Because The State Court's Adjudication of This Claim Was Only Partial

If the state court does not adjudicate a component of the Petitioner's federal claim, that component is reviewed de novo in federal court. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis"); *Potter v. McCollum*, 558 U.S. 30 *** (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Henderson v. Cockrell*, 333 F.3d 592, 601–02 (5th Cir. 2003) (first *Strickland* prong (deficient performance) reviewed *de novo* by the federal court where state court only addressed second prong of petitioner's *Strickland* claim (prejudice)).

Post-*Richter*, courts have continued to apply the principle established in *Wiggins* that "[w]hen a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the Strickland prong not relied upon by the state court." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

### 2. For Certain Key Witnesses, The FFCL Only Addressed S*trickland*'s Second Prong

The problem is that in the FFCL, the state court's analysis of the failure of Davila's trial counsel to locate certain witnesses completely ignored the first prong and instead skipped directly to the "prejudice" prong. For example, Paragraphs 32–34 are identically worded, changing only the name of the witness in question:

> Much of the information Knox obtained during her interview with [Sandra Vargas; Linda Mireles; Elizabeth Olivas] was already known to the Applicant's trial team and presented to the jury through testimony provided by different trial witnesses.

FFCL; Paragraphs 32–34.

In its Conclusions of Law (FFCL; p. 13–17), the state district court similarly eluded the "performance" prong with regard to these potential witnesses:

> This Court specifically concludes the evidence attributed by Knox to Rosa Nash, Sandra Vargas, Linda Jones Mireles, and Elizabeth Olivas would not have made a quantitative difference to the jurors in this case given the similarity of other evidence already presented at trial.

FFCL; Paragraph 14, p. 15.

With regard to these witnesses, the state district court simply made no finding that there was any valid or strategic reason not to call them.

It necessarily follows that this court must review the "performance" prong de novo.

###### 3. Even If Afforded AEDPA Deference, No Reasonable Jurist Could Conclude That Trial Counsels' Performance Rose to the Level of Competent Professional Norms

###### A. The Unoffered Testimonies Were Not Cumulative

In *Richards v. Quarterman*, the Fifth Circuit found trial counsel ineffective, despite the fact that portions of the excluded evidence (the victim's own account of the attack) were presented to the jury three different times through two witnesses. The court determined that the presentation of this evidence was insufficient given the importance of other evidence not admitted, explaining, "even applying a strong presumption to the contrary and giving appropriate deference to the state court's factual findings, [trial counsel's] failure to bring in this evidence was objectively unreasonable under prevailing professional norms and was not the product of a 'conscious and informed decision on trial tactics and strategy.'" 566 F.3d 553, 567 (5th Cir. 2009).

Similarly, in the case *sub judice*, the state district court excused trial counsel's failure to locate and call various family members and other witnesses on the grounds that "much of the information Knox obtained during her interview . . . was presented to the jury through different trial witnesses."

*Richards* and numerous other cases make clear that the fact that there exists "some overlap" among the excluded testimony and what came out at trial does not preclude relief under Section 2254. *See Harrison v. Quarterman*, 496 F.3d 419,

426 (5th Cir. 2007); *see also United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) (*citing Stewart v. Wolfenbarger*, 468 F.3d 338, 359 (6th Cir. 2006)) (finding additional testimony was not cumulative where it "would have added a great deal of substance and credibility" to the defendant's defense).

To wit, while Emily Davila testified to the hardscrabble childhood she and Erick shared in their home, and while Sheila Olivas testified to the difficulties she faced by becoming a mother at age 13, the jury did not hear strong testimony about the physical and mental abuse Erick Davila endured. For example, Linda Jones Mereles would have testified:

> Erick and Emily had to stand in the corner for hours. Sheila would tell Erick and Emily that she hated them. I believe that Sheila took out her anger and hostility toward Mario on Erick and Emily. I actually saw the tear streaks down the wall where Erick and Emily had been standing for so long.

Knox Affidavit, p. 24.

## B.    The FFCL Contains Factual Inaccuracies

The FFCL completely ignores large portions of Davila's writ. For example, in Paragraph 24, the district court writes:

> In preparing for trial, Keene attempted to meet and interview Ethel "Faye Faye" Jones, an aunt of the Applicant; Jones refused to cooperate with the Applicant's trial attorneys and said she did not want to testify at the Applicant's trial. 2 WRR 113–14; Keene affidavit p. 4.

To the contrary, an affidavit written by Ethel Jones is attached to Davila's writ at Exhibit 8.  Jones's affidavit runs to 25 paragraphs.  In other words, the district court concluded that Jones "refused to cooperate" when she had, in fact, actively cooperated with the habeas proceedings.

The state judge similarly ignored the affidavit of Lynda Mireles, which is included as Exhibit 9.

These glaring omissions accentuate the unreasonableness of the state district court's conclusions as to *Strickland*'s first prong.

### C.   No Reasonable Jurist Could Conclude That Trial Counsels' Deficient Performance Was Not Prejudicial

The state district court's legal conclusion as to "prejudice" is presented in Paragraphs 13–15 of the "Conclusions of Law as to Ineffective Assistance":

> This Court specifically concludes the evidence attributed by Knox to Rosa Nash, Sandra Vargas, Linda Jones Mireles, and Elizabeth Olivas would not have made a quantitative difference to the jurors in this case given the similarity of other evidence already presented at trial.

FFCL; at ¶14.

Davila contends that this legal reasoning is merely a rehashed version of the FFCL's refrain that "much of the information Knox obtained during her interview . . . was presented to the jury through different trial witnesses." The problem remains that the mere fact that there is "some overlap" among the excluded

testimony and what came out trial does not render the evidence cumulative. *Harrison v. Quarterman*, 496 F.3d 419, 426 (5th Cir. 2007).

The Supreme Court has specifically observed that "the graphic description of [a defendant's] childhood, filled with abuse and privation . . . might well have influenced the jury's appraisal of his moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

Similarly problematic is that the state district court focused on prejudice to the jury as a whole, rather than the effect on an individual juror whose holdout vote would have precluded imposition of capital punishment:

> This Court is not persuaded that any death-qualified capital murder jury in Tarrant County would look at the Applicant's "new" evidence and conclude it was sufficient to overcome the specific aggravating facts of the underlying crime and the aggravating facts attendant to Applicant's attempted escape from the Tarrant County Jail while awaiting his capital murder trial.

FFCL; at ¶14.

This conclusion of law is completely opposite to and irreconcilable with to the Supreme Court's instruction in *Wiggins* that "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that **at least one juror** would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (emphasis added).

**b.  Trial Counsel Were Ineffective for Failing to Retain A Mitigation Expert As Required By The ABA Guidelines For A Capital Case.**

Defense counsel admitted in its request for expert funding that an expert was necessary for the proper defense of this case: "The present case involves mitigation issues that are highly complex and such that an expert is necessary to assist defense counsel in preparation of an effective defense under the Sixth and Eighth Amendments of the United States Constitution[.]" 1 *CR* 43. The order was granted, and the defense team hired Dr. Emily Fallis, a psychiatrist, not a mitigation specialist. *Id.* at 45.  The American Bar Association guidelines for effective death penalty representation declares that a qualified mitigation specialist is indispensable for every capital case. The guidelines' commentary makes clear that this is not discretionary. "The defense team should include at least two attorneys, a fact investigator, and a mitigation specialist. …The team described in the foregoing paragraph is the minimum."  ABA Guidelines for Death Penalty Representation, guideline 10.4 commentary.  Additionally, every person on a capital defense team should attend training. A "mitigation specialist" is lengthily defined by the ABA, and this integral position on the defense team is **not** the same as another required member of the defense team, defined as "at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments[.]" *Id.* at guideline 10.4. Dr. Fallis was thus qualified to

fill the latter role, but was not a qualified mitigation specialist, which, again, the ABA requires for the most minimal of effective capital representation.

### c. Additional ways in which trial counsel were ineffective

1. Counsel failed to conduct an adequate pretrial investigation into the State's case and the potential defenses available to Petitioner, including, but not limited to, defenses involving Petitioner's psychological and neurological mental state before, during, and after the murders for which he was charged. There is a reasonable probability that these defenses, if properly raised, would have been able to overcome the government's contention that Petitioner possessed the requisite mental state to intentionally and with premeditation kill the victims and that would supported the defenses of lack of mental responsibility and lack of a specific intent to kill, based on the combined effects of organic brain damage and Petitioner's traumatic childhood;

2. Counsel failed to develop and present compelling mitigation evidence available to Petitioner, including, but not limited to, evidence of Petitioner's history of psychological, physical, and emotional abuse and neglect, a disruptive and chaotic family history, a long history of mental health problems, including organic brain damage, and humanizing evidence of Petitioner's good character and positive personality traits. Had such evidence been presented, there is a reasonable probability that Petitioner would not have been sentenced to death;

3.   Counsel failed to seek the appointment of proper experts and investigators, including a mitigation specialist, a trauma expert, and others, to evaluate Petitioner's psychological, educational, neurological and social history, as well as that of his family. Further, trial counsel failed to have the proper neurological testing completed in spite of the fact that trial counsel was aware that Davila showed signs of frontal lobe damage;

4. Counsel failed to develop and provide to its own mental health expert the available records and information regarding Petitioner's family and his psychological, educational, neurological and social history which were necessary to perform a thorough and accurate evaluation;

5. Counsel failed to adequately prepare for the sentencing phase of the trial and failed to ensure the presence of necessary witnesses for Petitioner's mitigation presentation;

6. Counsel failed to adequately prepare the witnesses he did call to the stand during Petitioner's mitigation presentation;

7.   Counsel failed to request the appropriate jury instructions at the guilt/innocence and penalty phases and failed to object to erroneous instructions given by the trial court, including, but limited to, trial counsel's insufficient objection to the inappropriate transferred intent jury charge (to the extent the objection did not properly preserve the issue for direct appeal) *See* 20 RR 53;

8. Counsel failed to adequately investigate Petitioner's medical and mental health history and status. Counsel also failed to ensure that Petitioner was afforded a competent mental health evaluation, which would have conclusively revealed that Petitioner suffered from organic brain damage and trauma throughout his life and at the time of the crimes, which impaired Petitioner's ability to form the requisite intent to convict on the murder charges and would have mitigated his culpability for the offenses;

9. Counsel failed to ensure that appropriate diagnostic testing was performed by its mental health experts;

10. Counsel failed to develop and present evidence which would have indicated that Petitioner was remorseful for his crimes and had accepted responsibility for his actions.

11. Counsel was ineffective for failing to develop evidence that Davila lacked the requisite intent necessary for capital murder. Specifically, counsel failed to develop and present evidence that Jerry Stevenson was a rival gang member, and that Stevenson alone was the target of the Davila.

12. Davila was prejudiced by these failures, and is entitled to Habeas Relief.

**CLAIM THREE:  DAVILA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS DIRECT APPEAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY APPELLATE COUNSEL'S FAILURE TO RECOGNIZE, AND RAISE THE CLAIM, THAT HE WAS CONVICTED BY AN IMPROPER STATEMENT OF LAW IN THE JURY INSTRUCTIONS**

Davila contends that appellate counsel owes him a duty of competent representation. This is particularly true in a capital case, because "there is a significant difference between the death penalty and the lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637 (1980).  The constitutional standard for judging the effectiveness of counsel under the Sixth Amendment is a two-prong test, requiring that the petitioner show: (i) counsel's performance was so "deficient," that counsel did not provide "reasonably effective assistance," and (ii) that counsel's errors prejudiced the defense by depriving the defendant of a fair trial whose result is reliable.  An attorney is ineffective if he or she "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  The right to effective assistance of counsel at the appellate level is rooted in the Sixth Amendment right to effective assistance of counsel.  *Evitts v. Lucey*, 105 S.Ct. 830 (1985).

As explained in the fact section, the State of Texas never requested a transferred intent instruction, which is specifically allowed by Tex. Pen. Code §

6.04. 19 RR 137–159. As there was no transferred intent instruction, the jury was given the following instruction as to capital murder:

> Now, If you find from the evidence beyond a reasonable doubt, that Erick Daniel Davila, In Tarrant County, Texas, on or about the 6'" day of April 2008, did intentionally or knowingly cause the death of an individual, Queshawn Stevenson, by shooting her with a deadly weapon, to wit: a firearm, and did Intentionally or knowingly cause the death of an Individual, Annette Stevenson, by shooting her with a deadly weapon, to wit: a firearm, and both murders were committed during the same criminal transaction, then you will find the defendant guilty of the offense of capital murder.

CR at 1924. Clearly, the charge as given did not permit the jury to convict Davila of capital murder unless he had the specific intent to harm both Queshawn and Annette Stevenson. The charge was given to the jury at the beginning of the day on February 19, 2009.

In the middle of the afternoon, after the parties had closed and the jury had been deliberating for four hours, the jury sent the following note to the judge: "In a capital murder charge, are you asking us did he intentionally murder the specific victims, or are you asking us did he intend to murder a person and in the process took the lives of 2 others." *Id.* at 1931. The note clearly suggested that the jury believed Davila had intended to kill one person, and did not know if this level of intent was sufficient for a capital murder when the allegation was that two people were killed.

46

The judge sent out an incorrect instruction, which did not clarify that Davila must intend to kill two distinct people before he could be convicted of a capital murder:

The Court gives the additional charge on the law as follows:

"A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that: a different person was injured, armed, or otherwise affected."

CR at 1933.  The defense objected to this charge, but the objection was overruled. 20 RR 53.

After receiving the incorrect charge, the jury quickly returned a guilty verdict for capital murder.  CR at 1934.

The additional charge given was incorrect because it failed to recognize that in Texas one must have the specific intent to murder *at least two people to be guilty of capital murder*; it is not enough that a person attempted to murder a single person, and accidently killed two. *See Roberts v. State,* 273 S.W.3d 322, 330 (Tex. Crim. App. 2008).  The charge given, on the other hand, suggested that all that mattered was that the actor had the intent kill at least one person, as long as two people ultimately died.

There can be no doubt that this issue should have been raised on appeal, and had it been raised, Davila's death sentence would have been reversed.  In Texas,

"[t]he manner in which appellate courts analyze jury charge error is prescribed in article 36.19 of the Code of Criminal Procedure." *Heins v. State*, 157 S.W.3d 457, 460 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (*citing Arline v. State,* 721 S.W.2d 348, 351 (Tex. Crim. App.1986) (*citing Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).   A reviewing court first determines whether error exists in the charge, and then must determine whether any error caused harm sufficient to require reversal.  *Id.*  As explained above, error existed in the charge.

The Court of Criminal Appeals concisely explained charge error harm analysis for Texas in *Murphy v. State*:

> A defendant is entitled to be convicted upon a correct statement of the law. When the trial court fails to correctly charge the jury on the applicable law, "the integrity of the verdict is called into doubt." Cases involving preserved charging error will be affirmed only if no harm has occurred. "Some harm" under the *Almanza* analysis means any harm. Presence of any harm, regardless of degree, which results from preserved charging error, is sufficient to require reversal of a defendant's conviction.

44 S.W.3d 656, 665–66 (Tex. App.—Austin 2001, no pet.).  Clearly, an erroneous jury charge that precludes a defendant's sole defense—in this case, that Davila lacked the necessary intent to be guilty of capital murder—harms a defendant. Davila's case would likely have been reversed had this issue been raised on appeal.

However, even if the objection lodged by the defense counsel was not sufficient to specifically cover this issue, relief would still have been given had the

issue been raised on appeal.  In Texas, failure to properly preserve jury charge error does not preclude review, but changes the degree of harm necessary for reversal.  *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).  If charging error was not preserved at the trial court level, a greater degree of harm, egregious error, is required. *Id.*  However, the egregious harm standard is met in cases like Davila's were the jury charge error goes "to the basis of the case and vitally affecting appellant's defensive theory."  *Heins v. State*, 157 S.W.3d 457, 461 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (*citing Almanza*, 686 S.W.2d at 172).

For these reasons, appellate counsel was ineffective for failing to raise a claim related to the improper jury charge given by the judge at Davila's trial.  Had this claim been raised, Davila's conviction for capital murder would have necessarily been reversed.

## CLAIM FOUR: STATE HABEAS COUNSEL RENDERED INEFFECTIVE ASSISTANCE COUNSEL

### A.    Introduction and Core Legal Principles

Recently, in *Trevino v. Thaler*, the Supreme Court held that the holding of *Martinez v. Ryan* applies to Texas:

> "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."

*Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309 (2012)).

Davila submits that his State Habeas Counsel, David Richards, was ineffective for failing to subpoena any of the witnesses (other than Toni Knox) to testify at the hearing on writ. He was further ineffective for failing to gain anything more than a passing familiarity with the facts, hoping instead to "wing it" by parroting Ms. Knox's report. Indeed, Richards managed to put all of one sentence about Ms. Knox's report in the state writ (which was the sum total of all argument about the actual facts of Davila's case).

**B.     The State Writ Contains All Of One Sentence About the Mitigation Evidence Available to Davila's Trial Counsel, and All That Did Was Refer the Reader to Knox's Report**

Richards did not know anything about the facts of Davila's case other than waiving around Knox's report as a feint of understanding. Specifically, the grand total of Richards' argument in the writ reads:

> The mitigation evidence discovered by Mitigation Partners in their post-conviction investigation- evidence of a highly abusive childhood with an extremely dysfunctional      family- is overwhelming and, if known by defense counsel at trial, would likely have been presented to and considered by the jury in connection with the mitigation special issue.

State Writ, at p.14.

There are two elements to an ineffective assistance of counsel claim. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (2003). Prejudice is shown by showing, *supra,* that the state district court rejected Davila's IAC claims because the family members quoted in Knox's report were not asked to give live testimony.

In the event this court finds that state habeas counsel could have brought these witnesses by exercising due diligence, it seems axiomatic that counsel was constitutionally deficient.

## C.    Professional Standards

The State Bar of Texas has identified the "Duties of Habeas Corpus Counsel" in the State Bar of Texas' Guidelines and Standards for Texas Capital Counsel.[3] The Texas State Bar, in identifying the duties of capital habeas counsel, identified one duty as follows:

> Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record

---

3 http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/TexasCapitalGuidelines.pdf).

presents either a complete or accurate picture of the facts and issues in the case.

*Id.* at 30.   Further, the State Bar has also stated that state habeas "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place."   *Id.*   The problem is that state habeas counsel outsourced this fact-finding function to Ms. Knox, without any familiarity with her findings.

### D.   Richards' Performance Fell Beneath These Standards

In the affidavit authored by Ms. Knox which is attached as Exhibit "A," she explains that Richards made no effort to learn any of the facts of Davila's case before the hearing; the two met only one time and for a brief period when there were multiple distractions going on in the room.   It appears that Mr. Richards was not up to form as he had suffered several strokes during the investigatory period.

### E.   Prejudice Is Shown By The Judge's Disposition of His Claims

The linchpin of the state court's decision to reject the proffered testimonies of the family-member witnesses was that these constituted "alleged second-hand statements which are unsworn, unverified, and unrecorded."   FFCL, p. 6. Furthermore, the state court reasoned, "[m]uch of the information Knox obtained during her interview was already known to the Applicant's trial team[.]"   *Id.* Simply put, the purpose of evidentiary hearings is to develop further facts, not simply to read the writ back to the presiding judge.   Had Richards done anything to

52

actually bring witnesses other than the mitigation specialist to testify, the district court could not have reached the same result.

**F.     Davila Alleges That State Habeas Counsel Was Deficient In The Following Ways:**

1.      State habeas counsel failed to conduct a thorough review of the record.   Had habeas counsel thoroughly reviewed the record he would have recognized that the State Appellate Attorney was ineffective for failing to raise the issue that the jury instructions given in guilt and innocence were unlawful.

2.      Habeas counsel was ineffective in his performance in raising and presenting the *Wiggins* claim to the state court.   Habeas counsel completely outsourced the mitigation investigation, without providing any guidance or oversight to his investigator.  He failed to properly review his investigator's report, learn the details of that report, or include any of the details in his state writ briefing.   He failed to properly review the facts of the case prior to the writ hearing.  He failed to prepare with his investigator prior to the hearing.  He also failed to contact or subpoena any of the potential witnesses identified by his investigator.

3.      Davila incorporates all claims from claim two, and asserts that state writ counsel was ineffective for failing to raise any and all of these claims. Further,

state habeas counsel was ineffective for failing to identify, develop, and present the arguments in claims twelve and thirteen, below.

4.   Davila was prejudiced as a result of the state writ counsel's deficient performance.

> **CLAIM FIVE: The Trial Court erred in overruling Davila's motion to suppress his three written statements admitting to the commission of the offense of capital murder pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978) in violation of the Fourth and Fourteenth Amendments to the United States Constitution.**

> **CLAIM SIX: The Trial Court erred in overruling Davila's motion to suppress his statement admitting to the commission of an extraneous murder offense pursuant to *Franks v Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978) in violation of the Fourth and Fourteenth Amendments to the United States Constitution.**

>> **EXHAUSTION: These Claims were raised as points of error three and five in Davila's direct appeal to the Court of Criminal Appeals. They were addressed on their merits by that Court. *See Davila v. State*, AP–76,105, 2011 WL 303265 (Tex. Crim. App. 2011).**

## Fourth Amendment and *Franks v. Delaware*

The Fourth Amendment to the United States Constitution, coupled with the Due Process Clause of the Fourteenth Amendment, is the bulwark protecting all American citizens from unreasonable searches and arrests or seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Tex. Code. Crim. Proc. Art. 15.05 delineates the prerequisites necessary to render an affidavit for an arrest warrant, or a complaint under Texas jurisprudence, sufficient. Art. 15.05 (2) reads as follows: "It must show that the accused has committed some offense against the laws of the State, either directly or that the affiant has good reason to believe, and does believe, that the accused has committed such offense."

Incumbent in the evaluation of the sufficiency of the complaint is that the information contained within and sworn to by the affiant is credible and truthful. This very issue was addressed by the United States Supreme Court in *Franks v Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978). Specifically, the *Franks* court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavits false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56.

Explicating the holding of this opinion, Justice Blackmun quoted Judge

Frankel, in *United States v Halsey*, 257 F.Supp. 1002, 1005 (SDNY 1966)

(unreported)**:**

> "[W]hen the Fourth Amendment demands a factual showing sufficient
> to comprise 'probable cause,' the obvious assumption is that there will
> be a *truthful* showing" (emphasis in original). This does not mean
> "truthful" in the sense that every fact recited in the warrant affidavit is
> necessarily correct, for probable cause may be founded upon hearsay
> and upon information received from informants, as well as upon
> information within the affiant's own knowledge that sometimes must
> be garnered hastily. But surely it is to be "truthful" in the sense that
> the information put forth is believed or appropriately accepted by the
> affiant as true.

> *Id.* at 164–65.

In Davila's case, Detective Johnson prepared and swore to the probable

cause affidavit utilized to obtain the warrant for Davila's arrest for this offense.

The essential facts delineated in the affidavit connecting Davila to this crime came

from eye-witness April Coffield. Those paragraphs in Detective Johnson's

affidavit pertaining to the information that she provided read as follows:

> April Coffield was near the party at 5758 Luther Ct., visiting a cousin.
> I interviewed Coffield. Coffield saw what she believed to be a green
> Ford Focus drop a black man off in the 5700 block of Luther Ct.
> Coffield saw the man run toward the four bedroom town home at the
> corner of Anderson. Coffield saw a red dot on the ground while the
> man was running.
> . . .
> Coffield stated that she heard shots fired as did Charlene
> Ogierumwense. *Coffield ran into a house then peeked out.* Coffield
> saw the man, who got out of the car on Luther Ct., standing in front of

56

the apartment where the children's birthday party was in progress. He was holding a rifle. Coffield then saw the man fire into the apartment. The man fled on foot. Ken Reid [sic] saw the car that dropped off the man speed away from the scene. A man came out of the apartment at 5701 Anderson. The man was "hollering". Coffield recognized that there was trouble. Coffield went into the apartment in an attempt to help. In the apartment Coffield saw people who appeared to have been shot....

. . .

Detective F. Serra III 2167 prepared photospreads containing Davila and five other black males of similar physical characteristics. Detective Boetcher and I showed the photospreads to witnesses. Ken Reid [sic] immediately picked Davila as the man he saw carrying the rifle from Luther Ct. Reid [sic] told me that he saw Davila's face under a street light. April Coffield looked at the photospread. She seemed nervous at first. She put her finger on Davila and said she saw him once. Detective Boetcher asked her about Davila. Coffield admitted to Detective Boetcher that she has seen Davila at least a dozen times. *Coffield then said that Davila was the man she saw running with a rifle and that Davila was the man she saw shoot into the apartment where Oueshawn and Annette Stevenson were killed.*

24 RR 2–4; State's Ex. #117 [emphasis added].

It was elicited from Detective Johnson during the hearing on Davila's motion to suppress that this information had been obtained from Ms. Coffield during a recorded interview conducted the day after this offense. A transcription had been made of her interrogation. However, Detective Johnson conceded that Ms. Coffield had emphasized that she had not seen the face of the shooter. 34 RR 6; State's Ex. #117. Moreover, at no time did she inform him that she had run into a house while the shooting was in progress and then "peeked out," as he detailed in his affidavit. Detective Johnson's testimony in pertinent part is as follows:

BY MR. FORD [Defense counsel]:

Q. Detective Johnson, so were you able to listen to that recording?
A. Yes.
. . .
Q. So at some point when you made it, you heard what April Coffield was saying to you while you were recording it?
A. Yes.

Q. And you're aware, sir, that she told you she did not see the face of the man doing the shooting? That's a "yes" or "no."
A. She said she didn't see faces, but we clarified it, I believe. I couldn't understand that part of the tape, part of the recording.
**...**
Q. (BY MR. FORD) I'm going to show you page 6 of 9 of what has been admitted into evidence. Your question is: Okay. How--how did you see - would you recognize him again?
Coffield: I didn't see no face or nothing. I just seen. [sic]. So she says there, "I didn't see no face"?
A. Yes.

Q. And sir, you're a detective. You have to see a face in order to recognize somebody, correct?
A. Correct.

Q. And your affidavit, if you turn to your arrest warrant affidavit, you put a line in your arrest warrant affidavit that Coffield said that Davila was the man she saw running with a rifle and that Davila was the man she saw shoot into the apartment.
That's - is that correct?
A. Yes. Can I see the affidavit? Yes, that's - yes, that's correct.

Q. And yet you have a transcript, and she didn't see the shooter's face?
A. But I clarified that. Later, that one small place she said that she hadn't seen no faces or nothing. Very general statement. But I clarified that. I asked her if—I went back and said, "But you told me it was Big Truman."

And let me see, where did it go? And I said, "Did you see Big Truman or not?" "It was not. It was somebody else shooting," da, da, da.
And then when she finally clarified it was not Big Truman...
In the—in the transcript we go through a complete description of it where she describes his face, his beard color, his skin color, his hair. She convinced me that she had seen him. I mean, that one small part taken out of context, sure, she said that. But she went back and she described the guy she saw shooting.
Q. She gave a general description in general terms, correct? Weight, height?
A. Skin Color.
Q. Skin color?
A. Beard color.
Q. And she said--
A. Hair style.
Q. And she said he had short braids?
A. Correct.
Q. She didn't say, I recognize his face?
A. She did not use those words, no.

16 RR 230–33.

It is without question that the information that Detective Johnson inserted into his probable cause affidavit regarding Ms. Coffield's alleged identification of Davila as the shooter was specious. She had stressed to him that she did not see the shooter's face. She also never mentioned "peeking out" of a house during the shooting. Therefore, Detective Johnson's inclusion that she had identified Davila as the culprit was untrue and, and at a minimum, proves that he had a reckless disregard for the truth when he drafted his affidavit. Again, nowhere in her interview did she specifically identify Davila as having committed this offense. If Ms. Coffield's spurious identification of Davila is excised from the affidavit, and

the remaining "four corners" are analyzed, there is nothing to connect Davila to this crime.

The detective did include information from Kent Reed in which he identified Davila as carrying a rifle, but nowhere in the affidavit did Kent identify Davila as the shooter. 34 RR 4; Defense Ex. #89. And, since no probable cause existed to support Davila's arrest for this offense, his subsequent three statements admitting to the commission of this offense, as well as his statement to the extraneous murder, should have been inadmissible in violation the United States Constitution. *See Wong Sun v. United States*, 371 U.S. 471 (1963). By permitting the State to offer the three statements in the guilt/innocence phase of Davila's trial and the fourth statement in the punishment phase, the trial court violated Davila's federal Constitutional rights.

> **CLAIM SEVEN: The Trial Court erred in overruling Davila's motion to suppress his three written statements admitting to the commission of the offense of capital murder pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**
>
> **CLAIM EIGHT: The trial court erred in overruling Davila's motion to suppress his statement admitting to the commission of an extraneous murder offense pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**
>
> > **EXHAUSTION: These claims were raised as points of error seven and nine in Davila's direct appeal to the Court of Criminal Appeals. They were addressed on their merits by that Court. *See Davila v. State*, AP–76,105, 2011 WL 303265 (Tex. Crim. App. 2011).**

## Summary of the Argument

The United States Supreme Court in its landmark decision of *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774 (1964) espoused the now renown proposition that the Government's use of coerced confessions obtained pursuant to custodial interrogation against those persons at their trial violates the fundamental constitutional guarantee of due process of law. The Court explained:

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760, and even though there is ample evidence aside from the confession to support the conviction. *Malinski v. New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; *Stroble v. California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872; *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975. Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession.

*Id.* at 376–77.

Texas' Courts have explained that the State's use of both oral and written statements obtained pursuant to custodial interrogation are not admissible against an accused unless the state can demonstrate by a preponderance of the evidence that certain procedural safeguards were taken to protect a defendant's constitutional right against self-incrimination. *See, e.g.*, *Thai Ngoc Nguyen v. State*,

292 S.W. 3d 671, 677 (Tex. Crim. App. 2009); *State v. Gobert*, 275 S.W.3d 888, 892–93 (Tex. Crim. App. 2008). "Custodial interrogation" is legally defined as questioning initiated by law enforcement officers after an accused has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda v Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966).

At Davila's trial it was established that he was present in custodial interrogation for seven hours. 14 RR 283–85. During this seven hour period, Davila did not ask to use the restroom and was not given anything to eat or drink. *Id.* According to Detective Johnson, Davila never asked for anything to eat or drink, however he testified he had offered Davila food or liquids. *Id.* He did not put anything about the offer in his notes. *Id.*

There is no dispute that all four written statements given by Davila were obtained as a result of custodial interrogation. Davila had been formally placed under arrest pursuant to an arrest warrant. An examination of the totality of the circumstances surrounding his arrest shows that he was subject to interrogation for approximately seven hours without receiving any food or water, and without going to the restroom. Though Detective Johnson testified that Davila made no specific requests for anything, Davila contends that it ridiculous to believe that anybody would be in the position to give four voluntary written statements without receiving some food or water and without needing to use the restroom. Thus, the

trial court erred by overruling Davila's motion to suppress his four statements because they were obtained in violation of his federal constitutional rights.

**CLAIM NINE: The Trial Court Erred In Overruling Davila's Motion to Preclude the Death Penalty As A Sentencing Option and Declare Tex. Crim. Proc. Code 37.071 Unconstitutional On the Grounds That Texas Law Allows For A Death Sentence Without Grand Jury Review of the Punishment Special Issues**

**EXHAUSTION: This Claim was raised as point of error twelve in Davila's direct appeal to the Court of Criminal Appeals.  It was addressed on its merits by that Court.  *See Davila v. State*, AP–76,105, 2011 WL 303265 at 12 (Tex. Crim. App. 2011).**

### Summary of the Argument

The grand jury in Davila's case was called upon to determine whether probable cause existed to believe that he murdered Queshawn and Annette Stevenson; however, the grand jury, pursuant to Texas law, was not required to weigh (and therefore did not weigh) the special punishment issues. 1 CR 2–3.

The Fifth Amendment to the United States Constitution demands that no person be held to answer "for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V; *Jones v United States*, 526 U.S. 227, 243 n.6 (1999). The Fifth Amendment thus requires that a defendant charged with a felony offense be given notice by indictment of the charges against him.

In *United States v Robinson*, the Fifth Circuit considered the issue of whether aggravating factors that render a defendant eligible for the death penalty must be alleged in the indictment. 367 F.3d 278, 294 (5th Cir. 2004). Relying on the Supreme Court's decision in *Ring v Arizona*, the court in *Robinson* held that the Fifth Amendment requires that aggravating factors that render a particular defendant eligible for the death penalty are, in fact, elements of the offense. *Id.* Therefore, government is required to charge, by indictment, those statutory aggravating factors that it intends to prove at trial and render a defendant eligible for the death penalty. *Id.* Thus, the government's failure to do so was constitutional error. *Id.*; *accord United States v. Allen*, 357 F.3d 745, 748 (8th Cir. 2004) (aggravating factors essential to qualify a particular defendant as death eligible must be alleged in the indictment). *See also United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003).

Article 37.071 of the Tex. Code Crim. Proc. sets out the two "factors" that the jury must consider in a case in which the State has chosen to seek the death penalty. However, these factors are not presented to or passed on by the grand jury that returns the indictment. In light of recent Supreme Court jurisprudence, no other logical inference can be drawn than that the aggravating and mitigating "factors" that a Texas jury must consider in the sentencing phase of a capital are, in

fact, elements of the offense that must be alleged in the indictment and proven beyond a reasonable doubt. *See, e.g.. Ring*, 536 U.S. at 602, 12 S.Ct. at 2439.

As it presently stands, the Texas statutory scheme permits the State to bypass the grand jury indictment process and to arbitrarily determine which defendants it deems are "death worthy." This provision runs afoul of the Due Process Clause of the Fifth Amendment and the due process rights guarantees set forth in the Fourteenth Amendment to the United States Constitution**.** It not only defies logic but also federal criminal jurisprudence to permit a state statutory provision to circumvent the Fifth Amendment and afford its citizens fewer protections than those provided to citizens charged with a federal offense. The protections afforded by the Fifth Amendment to citizens charged with a federal offense must likewise be extended to citizens charged with state offenses. Thus, in light of recent Supreme Court jurisprudence, the Texas statutory scheme, which permits the State to seek the death penalty in any given case—independent of and subsequent to the return by a grand jury of the underlying indictment—is constitutionally impermissible. *See e.g.*, *Jones*, 526 U.S. at 232, 119 S. Ct. at 1219.

### CLAIM TEN: The Trial Court Erred in Overruling Davila's Objection to the Constitutionality of Texas's So-Called "10-12 Rule"

**EXHAUSTION: This Claim was raised as point of error thirteen in Davila's direct   appeal   to   the   Court   of Criminal Appeals.   It was addressed on its merits by that**

court. *See Davila v. State*, AP–76,105, 2011 WL 303265 at 12
(Tex. Crim. App. 2011).

## Summary of the Argument

Davila argues that the Texas' capital sentencing scheme, by affirmatively misleading jurors about their individual ability to give effect to their personal belief regarding mitigation, violates the Sixth, Eighth, and Fourteenth Amendments. This claim is based on *Mills v. Maryland*, where the Court ruled that the petitioner's sentence could not stand where it was possible that some "jurors were prevented from considering factors which may call for a less severe penalty [than death]." 486 U.S. 367, 376 (1988). As the Fifth Circuit has repeatedly recognized, "[s]ubsequent to *Mills*, the Supreme Court has explained that 'Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *See, e.g.*, *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (citing *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990)); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994).

The constitutional defect with Texas' current jury instructions is that they, by statute and as applied in Davila's case, mislead jurors about their individual ability to give effect to mitigating circumstances. *See* CR at 1936–38. Although Texas' sentencing statute gives individual jurors the power to prevent the death

penalty if they believe mitigating circumstances call for a sentence of life, that same statute also misleads jurors into believing their individual belief is immaterial unless they are able to persuade nine of their fellow jurors that their view of the evidence is correct. *See* Tex. Code of Crim. Proc. Art. 37.071.

Davila does not argue that it is necessary to instruct jurors about the consequences of a single holdout juror, although that would give meaning to Art. 37.071 § 2(g) (if the jury is unable to answer either of the special issues the court shall sentence the defendant to life in prison). Rather, Davila argues that the Texas sentencing scheme misleads jurors about their individual ability to "give effect to mitigating evidence when deciding the ultimate question whether to vote for a death sentence." *McKoy*, 494 U.S. at 442–43. The misleading nature of Texas' capital sentencing scheme is repugnant to the statement in *Mills* that "[w]hile juries indeed may be capable of understanding the issues posed in capital sentencing proceedings, they must first be properly instructed." *Mills*, 486 U.S. at 377 n. 10.

Davila relies on three different constitutional provisions which, considered in tandem, illustrate the level of harm imposed on him in this case. First is Davila's right to a trial by jury under the Sixth Amendment to the United States Constitution. The Supreme Court and the lower federal courts have long recognized the importance of each juror in death penalty cases, as illustrated by cases finding error when even one juror is improperly struck due to the juror's race

or the juror's attitude toward the death penalty. The concept underlying these cases is that a jury is not just a collective body, but also a group of individuals.

Furthermore, the Eighth Amendment to the United States Constitution, in conjunction with the Due Process Clause of the Fourteenth Amendment, calls for a higher degree of reliability in death penalty cases, due to "the non-availability of corrective or modifying mechanisms with respect to an executed capital sentence." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). In particular, the denial of information about each juror's individual responsibility runs afoul of the principle underlying *Caldwell v. Mississippi*, 472 U.S. 320 (1985). In *Caldwell*, the Supreme Court held that the Eighth Amendment is violated when a prosecutor argues in a way that incorrectly leads a jury, in a death penalty case, to believe that it is not ultimately responsible for determining whether infliction of the death penalty is appropriate in the case. *Id.* at 329.

While *Caldwell* addressed an explicit argument aimed at the entire jury, the fundamental issue of denying jurors a correct understanding of their responsibility is just as problematic when brought about by an incomplete judicial instruction that undoubtedly confuses the jury members as to their individual authority. In fact, judicial instructions are apt to be more powerful than prosecutorial argument, making it doubly important that the instruction be a complete and correct statement

of the law. In Texas cases, answering the special issues is the sum and substance of each juror's role in the punishment stage.

In *Mills v. Maryland*, the defendant challenged his death sentence, arguing that the Maryland capital punishment statute, as applied to him, was unconstitutional. 486 U.S. at 371. He asserted that the statute, as explained to the jury by the court's instructions and as implemented by the verdict form, required imposition of the death sentence if the jury unanimously found an aggravating circumstance but did not agree unanimously as to the existence of any particular mitigating circumstance. *Id.* at 371. Thus, Mills argued, even if some or all of the jurors were to believe that *some* mitigating circumstance or circumstances were present, unless they could unanimously agree on the existence of the same mitigating factor, the sentence necessarily would be death. *Id.*

The court of appeals concluded that the defendant's death sentence was constitutionally sound. *Id.* at 371–371. That court did not dispute that the statute would be unconstitutional if read as the appellant suggested in his appeal. Instead, it simply held that the legislature had intended a different result with the statute in question. *Id.*

At the crux of this case, then, is the critical question: Could any member of the jury have interpreted the court's charge to mean that unless it either reached ten votes against the death penalty, or twelve votes in favor of, that it would be

deadlocked and force a mistrial? The answer is undoubtedly "yes." The jurors here were never informed, in plain and simple language, that if even one of them believed the death penalty should not be imposed, Appellant could not be sentenced to death and that juror's holdout *would not* result in a hung jury. A reasonable juror would have believed that she had no ability—short of causing a hung jury—to determine that Appellant deserved life in prison as a result of mitigating factors, unless nine other jurors agreed with her.

The possibility that a single life-leaning juror would change her vote to death based on the misleading instructions is especially relevant to Davila's case. In Davila's case, the jury retired to deliberate on punishment at 11:31 a.m. on February 26, 2009. 25 RR 79. They continued deliberating until 5:35 p.m.  *Id.* at 80.  It wasn't until 11:12 a.m. on February 27, 2009, that the jury was able to reach a verdict.  More importantly, in her affidavit, filed by the State of Texas during the state writ proceedings, Defense Attorney Joetta Keene recalls watching juror Sabrina Gundy crying, alone, in a park before the jury came back with a verdict. Writ CR at 277.  Mrs. Keene explains "I watch [sic] the older African-American woman sit alone. I watched her cry on that park bench. In that moment, I knew we were losing our last hold out."  It is entirely possible, that had Sabrina Gundy not been affirmatively mislead about her individual power to prevent a death sentence,

she would have exercised her individual power, a possibility that would mean the difference between life and death for Erick Davila.

Thus, in this case, like many others before it, the inadequate and misleading jury charged violated Appellant's Sixth, Eighth, and Fourteenth Amendment rights.

> ### CLAIM ELEVEN: The Trial Court Erred In Overruling Davila's Motion to Instruct the Jury That The Sentencing Burden of Proof on the Mitigation Issue Lies With the State
>
> > **EXHAUSTION: This Claim was raised as point of error fourteen in Davila's direct appeal to the Court of Criminal Appeals.  It was addressed on its merits by that Court.  *See Davila v. State*, AP–76,105, 2011 WL 303265  at 12 (Tex. Crim. App. 2011).**

### Summary of the Argument

The Fifth Amendment to the U.S. Constitution guarantees that no person may be deprived of liberty without due process of law, while the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amends. V, VI. The right to trial by jury in serious criminal cases is "fundamental to the American scheme of justice, and therefore applicable in state proceedings." *Sullivan v Louisiana*, 508 U.S. 275, 277–78 (1993) (quoting *Duncan v Louisiana*, 391 U.S. 145, 149 (1968)). A prosecution must prove all elements of the offense charged and must persuade the fact finder beyond a reasonable doubt of the facts

necessary to establish each of those elements. *Sullivan* at 277–78. The Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. *Id.*

The trial court effectively deprived Davila of his right to a jury trial and his right to have all of the elements of the offense proven beyond a reasonable doubt, as guaranteed under the Fifth and Sixth Amendments.  Although the Court of Criminal Appeals (and, by extension, the United States District Courts of Texas) has previously declined to rule in favor of allegations similar to Davila's, the conclusion to be drawn from the Supreme Court's decisions in *Apprendi v. New Jersey*, *Ring v. Arizona*, and *Cunningham v. California*, when considered in tandem with the Texas death penalty statutory scheme, is inescapable: Because the mitigation issue in Tex. Code of Crim. Proc. Art. 37.071 (here, Issue Two) increases the maximum penalty for the crime of capital murder, the Texas statutory scheme is unconstitutional for not requiring this issue to be submitted, proved, and found by the jury beyond a reasonable doubt.

### *Apprendi v New Jersey*

In *Apprendi*, the defendant was convicted of a firearms offense under New Jersey state law. 530 U.S. 466 (2000). Apprendi's offense was enhanced under an independent "hate crime" statute that authorized imposition of a longer sentence if the trial court found by a preponderance of the evidence that the crime was

motivated by racial bias. *Id.* at 469–71. The Court noted that Apprendi's case squarely presented the issue of whether he had the right to have a jury, rather than the trial court, decide whether his crime was motivated by bias. In *Apprendi* the Court held: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. The Fourteenth Amendment commands the same answer in this case involving a state statute." *Id.* at 475–76.

The Court reiterated that a criminal defendant's rights to due process, and its associated jury protections, extend not only to a defendant's trial on guilt or innocence, but also to determinations that affect the length of the defendant's sentence. *Id.* at 484, 120 S. Ct. at 2359 (citing *Almandarez-Torres v. United States*, 523 U.S. 224, 251 (1998) (Scalia, J., dissenting)).

### *Ring v. Arizona*

In *Ring*, *supra*, the Court relied on its decisions in *Apprendi* and *Jones v. United States*, *supra*, 526 U.S. 227 (1999), to review the constitutionality of a death sentence imposed under the Arizona state statutory sentencing scheme. The Court concluded that, because Arizona state law authorized the death penalty only if an aggravating factor was present, *Apprendi* required the existence of such a

factor to be proven beyond a reasonable doubt to a jury rather than to the trial court. *Ring v. Arizona*, 536 U.S. at 603, 122 S. Ct. at 2428. The Court also specifically overruled its earlier decision in *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047 (1990), which had upheld an Arizona death sentence against a similar challenge. Citing the irreconcilability of *Walton*'s result with its reasoning in Apprendi, the Court held that: **"**Capital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589.

When *Ring* was decided, Arizona's first degree murder statute proved that the offense was punishable by either death or life imprisonment. *Id.* at 592. The statute required the judge to hold a separate hearing and find all facts and circumstances to determine the appropriate sentence. *Id.* At the conclusion of the hearing, the judge was to determine the presence or absence of those aggravating or mitigating circumstances. As the court in *Ring* pointed out, "[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* The Court concluded that if the State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt. *Id.* at 602.

Thus, "[a] defendant may not be expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* Integral to the Court's holding was its review of Justice O'Connor's dissent in *Apprendi*, where she disagreed with the majority's interpretation of the Arizona death penalty statute, noting: "A defendant convicted of first degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." *Apprendi*, 530 U.S. at 538 (O'Connor, J., dissenting).

### *Cunningham v. California*

More recently, the Supreme Court has reaffirmed that the Constitution requires that all facts relative to guilt and punishment be found by a jury beyond a reasonable doubt. *Cunningham v. California*, 549 U.S. 270 (2007). In *Cunningham*, the Court considered and rejected a California statutory scheme that required the judge, rather than the jury, to find certain "circumstances in aggravation" relative to punishment in order to justify the imposition of the upper prison term. *Id.* at 275. The relevant California rule required only that circumstances in aggravation "shall be established by a preponderance of the evidence." *Id.* In determining that the rule in question was constitutionally infirm,

75

the Court explained: "Because circumstances in aggravation are found by the judge and not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt . . . the [rule] violates *Apprendi*'s bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and be proved beyond a reasonable doubt.'" *Cunningham*, 549 U.S. at 286 (quoting *Apprendi*, 530 U.S. at 490.)

### The Texas Death Penalty Statutory Scheme

Texas Penal Code § 19.03 defines the offense of capital murder, while § 12.31 sets out the punishment for capital felonies. Tex. Penal Code §§ 19.03, 12.31. Under § 12.31, an individual found guilty of a capital felony in a case in which the State seeks the death penalty shall be punished by life imprisonment without parole, or by death. The penal code does not distinguish which defendants found guilty of capital murder are eligible for death. For this, state law requires that the jury make additional findings pursuant to Tex. Code Crim. Proc. Art. 37.071. Thus, like Arizona's statutory scheme in *Ring,* the Texas death penalty statute requires cross-referencing and additional fact finding under another statutory provision before a defendant can be sentenced in a capital murder case. *Ring*, 536 U.S. at 586. A defendant convicted of capital murder in Texas may not

be sentenced to death until the jury makes additional findings of fact under Subsections (b) and (e) of Art. 37.071.

Under Art. 37.071, if a defendant is found guilty of a capital offense for which the State is seeking the death penalty, the court must conduct a separate sentencing proceeding, before the jury, to determine whether the defendant should be sentenced to death or life imprisonment without parole. Art. 37.071 § 2(a)(1). At this proceeding, either side may present evidence on any matter that the court deems relevant to sentencing, including evidence of the defendant's background or character, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. *Id.*   At the conclusion of the evidence, Art. 37.071 requires that the court submit special issues to the jury, including "the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at §. 2(b)(1). If the jury returns an unanimous, affirmative finding on that issue, it must then decide whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance, or circumstances, to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.  *Id.* at sec. 2 (e) (1).

If the jury returns a negative finding on any issue submitted under Subsection (b), or cannot reach a unanimous affirmative finding, the court must sentence the defendant to life imprisonment without parole. *Id.* at § 2(g). Likewise, if the jury reaches an affirmative finding on the issue under subsection (3), or is unable to reach a unanimous negative result, the defendant must receive a life sentence without parole. *Id.* In other words, Texas law authorizes the trial court to sentence the defendant to death only if: (1) the jury unanimously finds there is evidence to prove, beyond a reasonable doubt, that the defendant will probably commit future acts of violence that pose a continuing threat to society; and (2) the jury unanimously agrees that the evidence in mitigation of the offense is not sufficient to warrant a sentence of life imprisonment rather than death. Thus, Davila could not be punished with a greater sentence—in this case, the death penalty—until and unless the jury *unanimously* found that (1) there was a probability that Davila would commit criminal acts of violence that would constitute a continuing threat to society, and (2) any mitigating evidence did not rise to a level to warrant a sentence of life imprisonment rather than a death sentence.

As the Court in *Ring* stated: "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the

factfinding necessary to put him to death." *Ring*, 536 U.S. at 609.  Likewise, Davila's right to a jury trial will be undermined if this Court holds that his Sixth Amendment right encompasses the right to have the jury find beyond a reasonable doubt that he was responsible for the deaths of the decedents, but not to find all the facts beyond a reasonable doubt necessary before he is eligible for the death penalty to be imposed under Art. 37.071.

Despite the obvious constitutional issues raised in requiring a defendant to prove that he is not "death-worthy," the Court of Criminal Appeals has continued to hold that "the burden is implicitly placed upon [the defendant] to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case." *Lawton v. State*, 913 S.W. 2d 542, 557 (Tex. Crim. App. 1995). *See also Allen v. State*, 108 S.W. 3d 281, 285 (Tex Crim. App. 2003) (declining to consider sufficiency of the evidence to support the special issues). In *Lawton* the Court of Criminal Appeals stated that "[T]here is no constitutional requirement that the burden of proof regarding mitigating evidence be placed on either party, and to the extent that the burden is on appellant . . . it is not unconstitutional to so place the burden." *Id.* at 557.

Likewise, in *Cantu v. State*, 939 S.W. 2d 627 (Tex. Crim. App. 1997), the Court of Criminal Appeals held that failing to assign a burden of proof on the mitigation issue, or placing the burden on the defendant rather than the State, does

not render the Texas statutory scheme unconstitutional. *Id.* at 641. "In instances where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury can consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. . . . [T]he absence of an explicit assignment of the burden of proof does not render Article 37.071 sec. 2 (e) unconstitutional." *Id.* Both *Cantu* and *Lawton* were squarely based on the Supreme Court's opinion in *Walton v Arizona*. *Walton*, however, was expressly overruled by *Ring*. *Ring*, 536 U.S. at 609 ("[W]e hold that *Walton* and *Apprendi* are irreconcilable.").

The Fifth Circuit Court has likewise declined to shift the burden of proof from the defendant to the State on the issue of mitigation. In *Rowell v. Dretke*, that court addressed this issue in the context of whether the respondent had established that he was entitled to a certificate of appealability under 28 U.S.C. § 2253(c)(2). 398 F. 3d 370 (5th Cir. 2005). The court held that *Ring* did not apply to Rowell's case because the Supreme Court did not contemplate that the Sixth Amendment's "reasonable doubt" requirement would extend to a capital sentencing jury's findings regarding mitigating factors. Instead, *Ring* focused exclusively on certain judicial findings regarding aggravating factors. *Rowell*, 398 F. 3d at 877–78. The State argued, and the court agreed, that Rowell was foreclosed from relying on *Ring* and *Apprendi,* because unlike the statutory schemes challenged in those cases,

the Texas mitigation special issue does not operate as "the functional equivalent of an element of a greater offense." *Id.* at 377.

In *Rowell,* the court correctly noted that the jury is the "entity that determines death eligibility beyond a reasonable doubt." However, the court upheld the Texas death penalty scheme as constitutional by reasoning that "mitigating evidence" under the Texas statutory scheme is a "fact in mitigation" which no controlling authority required the State to prove beyond a reasonable doubt, rather than a "fact in aggravation of punishment." *Id.* at 376–78. The court in *Rowell* stated: "[N]o burden of proof exists for either the defendant or the State to prove or disprove mitigating evidence at the punishment phase. This is because the Supreme Court recognizes an important distinction between 'facts in aggravation of punishment and facts in mitigation.' Moreover, no Supreme Court or Fifth Circuit authority requires the State to prove the absence of mitigating circumstances beyond a reasonable doubt." *Id.* at 378 (*citing Apprendi*, 530 U.S. at 490 n. 16).

As illustrated by the *Rowell* case, in rejecting the applicability of *Apprendi* to the Texas death penalty statute, courts have relied heavily on language from *Apprendi* that states, "[T]he Court has often recognized [the distinction] between facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 U.S. at 490 n. 16. However, read in context, *Apprendi* and *Cunningham* make it clear that

if a fact must be found by the jury *before* the defendant may be put to death, then that fact is an "element of the offense" that must be proved to the jury beyond a reasonable doubt. *Id.* at 490; *Cunningham*, 127 S. Ct. at 858. As the Court in *Apprendi* stated, "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be proved beyond a reasonable doubt." *Id.*

Under *Apprendi, Ring*, and *Cunningham*, Special Issue Number Two is unconstitutional because it fails to place the burden on the State of proving a negative answer to the mitigation issue beyond a reasonable doubt. *See, e.g., United States v. Matthews*, 312 F. 3d 652, 663 (5th Cir. 2002). In *Matthews*, the Court held that, consistent with *Apprendi*, any fact that increases the statutory maximum penalty must be found by a jury beyond a reasonable doubt, regardless of whether the legislature intended the fact to be a "sentencing factor" or an "element" of a separate offense. *Id.* The Texas statute cannot be saved simply because the required fact finding is labeled "mitigation." The Supreme Court has clarified that *Apprendi* repeatedly instructs that the characterization of a fact or circumstance as an "element" or a "sentencing factor" is not determinative. *Ring*, 536 U.S. at 602; *see also Matthews*, 312 F. 3d at 662–63. The dispositive question, then, is not one of form but of effect. *Ring*, 536 U.S. at 602, 122 S. Ct. at 2439. If a

state makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt. *Id.* Art. 37.071 provides that a defendant convicted of capital murder is not eligible for the death penalty until and unless the jury finds that there is not mitigating evidence that would justify a life sentence rather than death. Thus, whether in this case the State of Texas calls Special Issue Number Two "facts in mitigation" rather than "facts in aggravation" or "sentencing factors," does not change the *effect* of the dispositive issue: the defendant in a capital murder case cannot be put to death (that is, his level of punishment cannot be raised beyond life imprisonment) unless the jury makes findings of fact under Special Issue No. 2. Under *Ring*, *Apprendi*, and *Cunningham*, then, the mitigation issue is an element of the offense that the State must prove beyond a reasonable doubt before a defendant can be sentenced to death.

A completely different outcome would result in this case if the Texas statutory scheme was drafted so that the defendant would be sentenced to death on conviction of capital murder (in cases where the State sought the death penalty) *unless* the jury found evidence in mitigation thereof. If the Texas statutory scheme provided that punishment for capital murder was automatically death, *unless facts in mitigation were shown*, then *Ring* would foreclose Davila's argument on this issue. But, "[a]ggravators operate as statutory 'elements' of capital murder under

[Texas] law because in their absence, [the death] sentence is unavailable." *Ring*, 536 U.S. at 599, 122 S. Ct. at 2438 (*citing Walton v. Arizona*, 497 U.S. at 709 n. 1 (Stevens, dissenting)). Here, Davila could not have been assessed the death penalty unless there was a negative finding on Special Issue Number Two. As a result, the statute has made the "absence" of mitigating circumstances an element that must be proven beyond a reasonable doubt.

Texas death penalty scheme is unconstitutional because it impermissibly shifts the burden of proof on mitigation to the defendant. The statute requires the jury to consider, along with mitigating evidence, the "moral culpability of the defendant," having just found the defendant guilty of the offense, beyond a reasonable doubt. The statute then demands that the defense produce "sufficient" mitigation (while considering this same "moral culpability") to warrant a sentence of life imprisonment. The mitigating evidence must be "sufficient" to reduce the defendant's moral culpability or blameworthiness as already established in the jurors' minds. In death penalty deliberations, "moral culpability" is not evidence, it is a finding that the jury has already made. The statute places an unfair, undue, and unconstitutional emphasis on that finding. The defendant, if he is to save his own life, must offer evidence that is somehow greater than the finding of moral culpability beyond a reasonable doubt.

Aside from shifting the burden of proof to the defendant, the statute provides no other guidance to the jury that is called upon to make this life and death decision. As a result, the death penalty is imposed in a wanton haphazard manner in violation of the defendant's rights to due process and protection from cruel and unusual punishment.

This impermissible shift of the burden to the defense is made more unconscionable by the language of Art. 37.071(2)(f), which provides that the jury shall not answer the mitigation issue "yes" (resulting in a life sentence) unless ten or more jurors agree. The defense, according to the instructions to the jury, must then offer "sufficient" mitigating evidence to not only overcome his "moral culpability" as already established in the eyes of the jury, but ten of those jurors must be convinced of the sufficiency of that evidence.

Moreover, the effect of the statutory scheme is to require the defendant not merely to assume a burden of proving mitigation, but to demonstrate mitigation sufficient to outweigh the jury's pre-existing affirmative finding, beyond a reasonable doubt, of the aggravating factor of future dangerousness. Davila is aware of the existence of adverse authority in this matter, but nonetheless contend that these issues merit the Court's reconsideration.

By not requiring the "beyond a reasonable doubt standard" to prove that element, the statutory scheme violates *Apprendi*, *Ring*, *Cunningham*, and the Sixth

and Fourteenth Amendments to the United States Constitution. Therefore, this Court should reverse Davila's death sentence, and remand his case for a new hearing on punishment.

### CLAIM 12:   Davila's trial was contaminated by Improper influence that affected the Deliberations Process

"[T[he Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence. Whether an influence is 'external' or 'internal' depends on the facts of each case, but at its core the distinction amounts to an examination of the 'nature of the allegation' of an improper influence on the jury." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008). Davila alleges that his trial was unlawfully influenced by external influence on the jury. The improper external influence "had a substantial and injurious effect or influence in determining the jury's verdict." *Pyles v. Johnson*, 136 F.3d 986, 992 (5th Cir. 1998). The full factual and legal basis of this claim will be included in the amended writ.

### CLAIM 13:  Davila's conviction and sentence were obtained in violation of *Brady*.

In *Brady v. Maryland*, the Supreme Court held that suppression by the State of "evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In later

cases, the Supreme Court extended *Brady* and held that the prosecutor's duty to disclose such evidence applies even if there has been no request by the defendant, *United States v. Agurs*, 427 U.S. 97 (1976), and that this duty includes both impeachment and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667 (1985).

The Supreme Court has also decided the State is deemed to possess evidence that is in the possession of any part of the prosecutorial team. *Kyles v. Whitley*, 514 U.S. at 437.   Evidence withheld by the state is material, and a new trial is required, if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different.  *See e.g. Giglio v. U.S.*, 405 U.S. 150, 154 ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.")  Thus, a due process violation occurs if: (1) the State fails to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to the accused; (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. See *Brady v. Maryland*, *supra*.

Davila's conviction and sentence were obtained in violation of *Brady* because the government failed to turn over the following evidence:

1. Evidence tending to show Davila only had the specific intent to shoot Jerry Stevenson, including: evidence that Stevenson was associated with the Crips street gang, evidence that co-defendant Garfield Thompson believed the only target of the shooting was Stevenson, and other evidence showing that Davila did not intend to shoot anyone but Stevenson.

2. Evidence tending to show that Davila's confession were obtained in violation of the Fourth and Fifth Amendments.

Davila was harmed by the government's failure to disclose this information.

### CONCLUSION

As this petition demonstrates, Petitioner Davila's rights under the U.S. Constitution were violated and unremedied by the Texas courts.

### RELIEF REQUESTED

Prayer for Relief:

WHEREFORE, Petitioner respectfully prays this Court:

1. Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Davila to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26–37, to the extent

necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.     Order that upon completion of discovery, Petitioner be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Davila be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 cases to include additional materials related to the petition;

3.     Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.     Issue a writ of habeas corpus to have Davila brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.     In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have

Davila brought before it to the end that he may be relieved of his unconstitutional

sentences;


6.   Grant such other relief as may be appropriate and to dispose of the matter as

law and justice require.


WHEREFORE, PREMISES CONSIDERED, the Applicant DAVILA asks

this Court to hold hearings, make its findings of fact and conclusions of law, and

find that he was denied rights.  He requests the Court to vacate his conviction and

issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering

release of Davila from custody, or alternatively, to reverse Davila's conviction and

order a new trial, or alternatively, to vacate his sentence of death and order a new

trial on sentencing.

Respectfully submitted,

*Seth Kretzer*

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com

/s/ Jonathan Landers
_____

Jonathan Landers
2817 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

COURT APPOINTED LAWYERS FOR
PETITIONER  DAVILA

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Petition for Writ of

Habeas Corpus was served on all counsel of record by filing on the ECF System on

this _____th day of April, 2014.

_____
Seth Kretzer

### VERIFICATION

As a representative for the petitioner, I verify that the foregoing is true and

correct to the best of my knowledge.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com

/s/ Jonathan Landers

_____
Jonathan Landers
2817 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com