IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ERICK DANIEL DAVILA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action # 4:13-cv-00506-O |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

---

**RESPONDENT'S ANSWER TO PETITIONER'S
AMENDED PETITION FOR WRIT OF HABEAS CORPUS
AND REPLY TO PETITIONER'S MOTIONS
FOR STAY AND ABEYANCE AND AN EVIDENTIARY HEARING**

---

Petitioner Erick Daniel Davila, a member of the "Truman Street Bloods," armed himself with a semi-automatic assault rifle equipped with infrared scope and opened fire on a crowd of women and children attending a birthday party, killing Annette Stevenson and her five-year-old granddaughter, Queshawn Stevenson. For his actions, the State of Texas convicted Davila of capital murder and sentenced him to death. Davila currently petitions for a writ of habeas corpus raising eleven claims. (ECF No. 17). Davila also moves for stay and abeyance (ECF No. 18) and an evidentiary hearing (ECF No. 20). Respondent Stephens ("the Director) urges the Court to deny all requested relief because Davila fails to establish that the state-court adjudication of any issue warrants

relief under 28 U.S.C. § 2254(d); that relief is not otherwise barred by *Stone v. Powell*, 428 U.S. 465 (1976), or by a procedural default, *Coleman v. Thompson*, 501 U.S. 722 (1991), or by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989); or that if any error did occur, that it had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## DAVILA'S ALLEGATIONS

The Director understands Davila's amended federal habeas petition to raise the following grounds for relief:

1. The evidence is insufficient to sustain Davila's conviction for capital murder under Texas Penal Code § 19.03(a)(7)(A) because the State failed to prove that he intended to kill more than one person.

2. Trial counsel rendered ineffective assistance for failing to properly investigate and present the mitigation case.

3. Davila was denied effective assistance on direct appeal in violation of the Sixth, Eighth, and Fourteenth Amendments by appellate counsel's failure to recognize, and raise the claim, that Davila was convicted by an improper statement of law in the jury instruction.

4. State habeas counsel rendered ineffective assistance.

5. Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), in violation of the Fourth and Fourteenth Amendments, the trial court erred in overruling Davila's motion to suppress his three written statements admitting to capital murder.

6.   Pursuant to *Franks v. Delaware, supra*, in violation of the Fourth and Fourteenth Amendments, the trial court erred in overruling Davila's motion to suppress his statement admitting to an extraneous murder.

7.   Pursuant to the Fifth, Sixth, and Fourteenth Amendments, the trial court erred in overruling Davila's motion to suppress his three written statements admitting to capital murder.

8.   Pursuant to the Fifth, Sixth, and Fourteenth Amendments, the trial court erred in overruling Davila's motion to suppress his statement admitting to an extraneous murder.

9.   The trial court erred in overruling Davila's motion to preclude the death penalty as a sentencing option and declare Article 37.071 of the Texas Code of Criminal Procedure unconstitutional on the grounds that Texas law, in violation of the Fifth and Fourteenth Amendments, allows for a death sentence without grand jury review of the punishment-phase special issues.

10.  The trial court erred in overruling Davila's objection to the constitutionality of Texas's "10-12" Rule.

11.  The trial court erred in overruling Davila's motion to instruct the jury that the sentencing burden of proof on the mitigation special issue lies with the State.

(*See* ECF No. 17 at 34-162) ("Am-Petition" herein).

## STATEMENT REGARDING THE RECORD

The Director has filed with the Court's ECF system a copy of the records from Davila's direct appeal and state writ proceedings. (ECF Nos. 10-14). Additionally, a complete copy of the records in CD format were submitted to the Court (ECF No. 15) and provided to Davila's federal habeas counsel.

## TABLE OF ABBREVIATIONS

The Director uses the following abbreviations to represent the state-court record and federal habeas exhibits:

| | |
|---|---|
| **CR** | Clerk's Record of pleadings, orders, and documents from trial |
| **RR** | Reporter's Record of transcribed hearings, voir dire, trial testimony, and exhibits |
| **DX-** or **SX-** | Defendant's Exhibit or State's Exhibit |
| **SHCR** | State Habeas Clerk's Record |
| **SHRR** | State Habeas Reporter's Record of transcribed proceedings and exhibits from the state habeas evidentiary hearing |
| **FF** or **CL** | Findings of Fact or Conclusions of Law from the state habeas proceedings |
| **PX-** | Petitioner's Exhibit on federal habeas |

Citations are preceded by volume number and followed by page reference, exhibit number, or other identifier.

## STATEMENT OF FACTS

### I.   Facts Established at Trial

### A.   Evidence at guilt-innocence

The Texas Court of Criminal Appeals ("TCCA") summarized the facts of the offense and the evidence at trial in its opinion on direct appeal:

On April 6, 2008, eleven-year-old Cashmonae Stevenson, along with numerous friends and relatives, celebrated her sister Nahtica's ninth birthday at a "Hannah Montana" birthday party at her grandmother's home in the Village Creek Townhouses in Fort Worth.[1] Except for Cashmonae's uncle, Jerry Stevenson, all of the guests were women and children.  About 8:00 p.m., just as the fifteen children were eating ice cream and cake on the front porch, Cashmonae saw a black Mazda slowly drive by.  Inside was a man holding a gun with "a red dot" on it.  Cashmonae "felt in her stomach" that something bad was going to happen because "no one ever rolled by with a gun pointed towards our house."  Her uncle Jerry [Stevenson] said, "The fool has a K in the car."[2] And then Cashmonae heard her grandmother, Annette Stevenson, say, "They['re] trying to find trouble."

A few minutes later Cashmonae saw a man run across the field, stand next to the house in front of theirs, and start shooting with "the red dot" pointed at their porch.[3] He kept shooting at them as the children and adults "stacked up on top of each other" as they tried to run through the front door.  They were all screaming and trying to get to safe places inside.  Cashmonae saw her uncle, Jerry Stevenson, lay his five-year-old daughter, Queshawn, down on the sofa.  She was bleeding and looked dizzy.  According to Jerry, "her guts was hanging out." After the gunshots ended, Cashmonae discovered that she had been shot in the elbow, the hand, and the shoulder.  Nahtica and another little girl, Brianna, as well as Sheila Moblin, one of the adults at the party, had also been shot.

---

[1]     This neighborhood was known for gang-related violence, frequently between the Bloods, who used red as their "color," and the Crips, who used blue.

[2]     Jerry later testified that he thought the rifle was an AK-47; in fact, it was an SKS. The two rifles are similar in appearance and function.

[3]     Jerry Stevenson testified that he saw the gunman, dressed all in black, shooting at them, so he grabbed his son's hand, pulled him into the house, and threw him into a corner to protect him as he saw his mother stagger through the door and walk toward her bedroom. When Jerry saw that his daughter, Queshawn, was not inside, he ran to the door, and saw her lying on the front porch.  He ran out, picked her up, and carried her back inside.

Cashmonae's grandmother, Annette, had been killed, as had five-year-old Queshawn.

Meanwhile, just a couple of blocks away, Kent Reed was attending a different birthday party at his mother-in-law's home on Luther Court.  While he was barbecuing, Kent saw a black car with customized vents pull up and stop.  A man with distinctive-looking ears[4] and slashes in his eyebrows got out on the driver's side.  It was [Davila].[5]  He was wearing a hoodie, black jeans, a baseball cap turned backwards, and red and black tennis shoes.  [Davila] was carrying a big gun with a red beam shining from it onto the ground. He knocked on the next-door neighbor's door, but no one answered, so he walked down a trail between the buildings toward the field. The passenger in the black car slid over into the driver's seat and sped off.

A few minutes later, Kent heard a series of distinctive shots, a pause, and then several more shots.  He gave a written statement to the police that evening in which he described the car and the man that he had seen. The next day, Kent picked [Davila] out of a photo line-up.

Fifteen-year-old Eghosa, along with several of his friends, was at the same party with Kent.  He noticed the man with a long rifle and a red-dot beam and, sensing something peculiar,[6] he and two friends followed the man as he walked between the buildings. Eghosa saw the man walk through the field, stand next to an air conditioning unit beside one building, and then take aim on the house across the street.  He saw the man train the red beam from

---

[4]   [Davila] had a very large diamond-looking earring as well as a large silver bolt in his earlobe.

[5]   Kent's wife, Arlette, also saw the black car and knew it was a Mazda.  She saw [Davila] and could identify him by the distinctive earrings in his ears.

[6]   The rest of the party-goers were also apprehensive at the sight of this silent man in black toting a big rifle with an infrared scope. They went inside the home on Luther Court.

the rifle on Jerry Stevenson[7] ("Big Boy Dooney"), but when "Dooney" went inside, the man moved the beam to the windows of the house. Eghosa saw "Granny"—Annette Stevenson—and the kids playing on the Stevenson's porch.  Once "Dooney" went inside, the man started firing the gun.  [The man] trained the red beam on "Granny" who tried to shoo the children inside.  Then Eghosa saw "Granny" get shot a couple of times; he could see the bullets hitting her as she fell in the doorway. The man shot about nine times while he was standing at the corner, then he ran to the middle of the street and shot several more times.  The same car that Eghosa had seen the shooter get out of on Luther Court came around the corner and stopped.  The shooter jumped into the driver's seat and then sped off.  Eghosa said that the man appeared frustrated when he failed to hit "Dooney," and he lowered the rifle, but then raised it again and started firing once more.[8]

By the time the first police officer arrived, it was a chaotic scene.  There was a dead woman—Annette Stevenson—in the back bedroom, a seriously injured child—Queshawn—on the couch in the living room, two more children with leg wounds in the dining room, blood splattered everywhere, and both adults and children screaming and trying to help or console the wounded and each other. Crime scene officers found four shell casings beside the air conditioning unit across the street and four more scattered in the street where the second series of shots had been fired.  They photographed the bullet holes found all along the porch walls and in the windows of the Stevenson home.

---

[7]     Jerry Stevenson testified that, about a week before the murders, he had intervened in what may have been a gang-related quarrel in front of his mother's home between some Bloods and his nephew, Gary, who was visiting.  Jerry agreed that the apartment complex was known as Blood territory, but that his mother's house might have been identified as "a Crip house," even though no one at her home actually was a Crip member.  One of [Davila's] fellow gang members testified that Jerry or "Dooney" was "never no threat" to the Bloods, so nobody had ever bothered him or his family members.

[8]     Numerous other witnesses from the neighborhood also heard and saw the shooting and described [Davila's] actions as did Eghosa.

Nichcole Blackwell testified that she and [Davila] were living together in April of 2008. She said that [Davila] had a "Truman Street Bloods" tattoo on his chest and he liked to wear the color red. He had a black rifle, but Nichcole told him to take it away because she didn't like guns. On Sunday, April 6th, [Davila] drove off in Nichcole's black Mazda 626 at about 3:00 p.m. He was wearing a black shirt and either red or black pants. He returned about 8:00 or 9:00 p.m., left again, returning around 11:00 p.m., and then left once more around midnight and finally returned around 4:00 a.m. and went to sleep. The next day Nichcole learned that her car might have been involved in the murders, so she called the police who asked her to come down and give them a statement.

Based upon the police investigation, Detective Brent Johnson obtained a warrant for [Davila's] arrest shortly after midnight on April 8th. That afternoon, [Davila] was arrested and, over the course of seven hours, gave four written statements to the police. In his third statement,[9] [Davila] said that he and his friend Garfield were driving around in Nichcole's black Mazda when he decided that

> we can have a shoot em up. I told [Garfield] I was gonna drive to the back and to let me out of the car and for him to leave. I had the AK with me, but I didn't have the clip, so I had to go to Ms. Sheilas to get the clip. We went around to the back of the apartments and the AK has a scope and a red beam on it. I went up to Ms. Sheilas door carrying the AK. A little boy answered the door and I went in and got the clip that was right under the sofa. I got the clip and put it in the AK. When I went back outside I went through the field where the shooting happened. Ms. Sheilas house is kind of like a trap. That is where everybody goes to keep their guns and their weed.

---

[9]     [Davila's] fourth statement dealt with an extraneous murder, evidence of which was admitted during the punishment phase of trial.

. . . When I told Garfield it was my hood and we were going to have a shoot em up, and I was going to scare them and let them know that I had a gun. . . . I had a scope on my gun, so I had range. I stood in the field across the street. The fat dude was in the middle of the street. The other 3 were on the porch. I wasn't going to give them a chance to get a gun. Garfield had stopped my car in the middle of Anderson and I thought they were going to start shoot up my car. I only let off ten rounds and I had 21 in the clip. I was trying to get the guys on the porch and I was trying to get the fat dude. I wasn't aiming at the kids or the woman and don't know where the woman came from. I don't know the fat dudes name, but I know what he looks like, so I recognized his face.[10]

[Davila] also explained that he had given his SKS semi-automatic rifle to "Terminal," a fellow Bloods gang member, the day after the murders. Terminal [Anthony Tamunoene] later led police to [Davila's] rifle, which had been covered in a dark shirt and left in a wooded area. The SKS had a folding stock, an infrared scope, and a bayonet affixed to it.

*Davila v. State,* No. AP-76,105, 2011 WL 303265, at *1-3 (Tex. Crim. App. Jan. 26, 2011) (unpublished) (footnotes in original).

## B.  Evidence at punishment

### 1.  The State's case-in-chief

The State's case focused on Davila's prior convictions, violent extraneous criminal acts, gang membership, attempted escape from jail during which several guards were injured, and inability to conform his behavior.

---

[10]    This excerpt is taken verbatim from [Davila's] written statement without change of syntax, spelling, or punctuation.

### a.   Davila's prior criminal convictions

The State presented evidence of Davila's May 11, 2006, conviction for burglary of a habitation for which he received a three year sentence of imprisonment. (21 RR 28; 22 RR 27-29; 31 RR at SX-281). Davila also had convictions for possession of marijuana and unlawfully carrying a weapon stemming from a February 12, 2006 arrest.  (22 RR 32-44, 49-52, 65, 71-75; 31 RR at SX-282 to SX-285). Officers testified Davila became belligerent and verbally aggressive while being taken to jail, and additional restraints were used for officer safety and to decrease the chance of escape after Davila maneuvered his handcuffs out from behind his back. (22 RR 47-48, 56-58, 79-83, 91-92).

### b.   Davila's April 3, 2008, murder of Darrell Ford

Further State's evidence showed that Davila committed an extraneous murder just three days before the capital offense.  Tanna Martinez, an admitted prostitute, testified that during the early morning hours of April 3, 2008, she stood on the corner of East Lancaster Street talking with her friend Darrell Ford when a black car with dark tinted windows drove by and turned into an apartment complex. (21 RR 70-72, 75-77).  Martinez said that a man (whom she later identified as Davila) came walking towards them from the apartment complex, with his head lowered. (*Id.* at 78). She testified that when Davila reached them, Ford asked him, "What's up?" but Davila pulled out a gun and

shot Ford, who was unarmed. (*Id.* at 79-80). Martinez said Davila then shot Ford four more times in the back before driving away in the black car. (*Id.* at 79, 81). A deputy medical examiner testified that Ford died as a result of "a perforating handgun wound" to the chest. (22 RR 13).

Davila's jury learned that he confessed to shooting Ford after he was arrested on the underlying capital crime. (21 RR 20-23; 30 RR at SX-237). Davila stated that he saw Ford around 4:00 a.m. on April 3rd "talking to the lady and another dude" in front of a convenience store; that Davila got a "strap" (a gun) from the back of the apartments and told his friend to drop him off on East Lancater because he was going to walk up there; that as Davila walked towards the man, the man said "What's up?" and then "What's up G Money?"; and that Davila "let him have it. I shot him as he walked towards me, and then I went and got back in the car with Tyler and I went home." (21 RR 21, 23).

### c.    Davila's April 4, 2008, aggravated robbery

The State also presented evidence establishing that Davila participated in an aggravated robbery on April 4, 2008, just two days before the capital offense. Gabriel Ramos testified that around 5:00 a.m. on  April 4th, he was driving his pickup truck to work at Prime Hardwoods and was transporting a wooden counter top when it started to rain. (20 RR 59-60, 63). Because the counter top was only partially covered, Ramos pulled into an abandoned car

wash and called his boss, Joe Jiminez, for help. (*Id.* at 59-61, 63). When Jiminez arrived, the men began tying down a plastic cover to protect the wood. As they were doing so, a black Mazda-type car pulled into the stall next to them and three men jumped out with guns demanding their money. (*Id.* at 61-62, 64-65, 97-98). One man kept a revolver on Ramos; a second man who appeared to be in charge kept a Glock semi-automatic aimed at Jiminez's head; and the third man, carrying an assault rifle, went though Ramos's truck and stole his stereo. (*Id.* at 65-66, 88-95). Although Ramos handed over his wallet, Jiminez did not carry any cash and this angered Davila, who kept poking his gun at Jiminez and cussing at him. (*Id.* at 89-91). Ramos believed that Davila was just about ready to shoot Jiminez when a service truck pulled in and the robbers left. (*Id.*). Ramos identified Davila in a photo lineup as the man who "had Joe" (20 RR 88, 99-100; 21 RR 39-40; 31 RR at SX-232) and Garfield Thompson as the robber wielding the assault rifle. (21 RR 40-41; 31 RR at SX-233). The weapon used during the aggravated robbery was similar to the type of weapon used by Davila during the underlying capital murder. (21 RR 45-47; 27 RR at SX-7).

### d.   Davila's gang membership

Various witnesses testifying for the State identified Davila as a member of the "Truman Street Bloods." (22 RR 38, 73; 23 RR 124). Davila even went by the name of "Truman" while in jail awaiting trial for capital murder. (24 RR

111). The State presented evidence of Davila's numerous gang-related tattoos. (15 RR 189-90; 16 RR 58-59, 75, 98, 101, 112-13, 137-39; 27 RR at SX-43 to SX-46). A picture of Davila flashing gang signs was also shown to the jury. (18 RR 48; 27 RR at SX-48).

### e.      Davila's August 20, 2008, attempted escape from jail

The State presented evidence of Davila's attempted escape from the Tarrant County jail on August 20, 2008, while awaiting trial for capital murder. Detention Officer Michael Thompson testified that he was escorting Davila and four other inmates to the gymnasium when he was suddenly attacked by Davila, Herschel Hurd, and James Edwards. (22 RR 154-56, 161-67, 191, 199, 215-17; see 23 RR 14-16, 115). The inmates took Thompson's wallet and keys while continuing to hit and kick the officer. (22 RR 166, 195-96; 23 RR 116).[11] Thompson testified that the inmates demanded he tell them how to escape from the jail, so he directed them toward a fire stairwell. (22 RR 166, 193-94; 23 RR 116-20).[12] The witness stated that Davila specifically threatened to kill him

---

[11]      An inmate testified the assailants "forcefully brought [Thompson]. . . into the rec room" and "slammed him on the floor, put his arms out in front of him, started kicking him, hitting him, stabbing him trying to rip his uniform off." (23 RR 116).

[12]      Unbeknownst to the inmates, Thompson knew the stairwell was secured and would not allow the inmates to exit the detention facility because an additional key (which Thompson did not have) was required to unlock a door that would allow further access to the ground floor exit door. (22 RR 166-67, 193-94).

during the attack and said he had "nothing to lose" by killing Thompson. (23 RR 116-17). Thompson received a large cut on his check, a cut above his left eye, and head trauma, and was transported to a local hospital. (22 RR 168-70, 173-74; 32 RR at SX-286 to SX-291). Thompson testified that he later learned the inmates had attacked another detention officer, Teresa Otterson, during the period before Thompson escaped to the jail's seventh floor to obtain help. (22 RR 167, 169).

Nathan Peters, a Tarrant County maintenance worker, testified that he was also attacked during the attempted escape. (22 RR 244-47, 253-56). Peters, co-worker Charles Tucker, and officer Teresa Otterson had taken an elevator up from security control to the eighth floor of the jail. (*Id.* at 242-43). Peters testified that when the elevator doors opened, Otterson exited and turned right to go towards the gym; however, she was hit in the head by one of the inmates and "fell flat on her face." (*Id.* at 243, 245). Peters sad that he went to help Otterson, but saw several inmates with blood on them and realized he had better get out of there. (*Id.* at 245-46). Peters stated that he and Tucker ran to the elevators but one of the inmates hit Peters in the face, breaking his nose. (*Id.* at 247-50, 258; 32 RR at SX-293, SX-308, SX-309). The inmate attacked Tucker and jumped out of the elevator before the doors closed. (22 RR 247). Peters and Tucker went to security control to get help (*Id.* at 250). Peters later received medical treatment to "straighten" out his nose. (*Id.* at 252; 32 RR at SX-293).

-14-

Linda Richards, a nurse at the Tarrant County Jail, found detention officer Teresa Otterson in a near unconscious state, lying face down on the floor outside the gymnasium with her arms out stretched in front of her. (22 RR 229-30). Otterson did not move or respond initially and had lost a significant amount of blood. (*Id.* at 230). When Otterson began to regain consciousness, she was "totally disoriented" and confused, and could not remember names or answer simple questions like where she was. (*Id.* at 231-32). Richards testified that Otterson was covered in blood and had one eye swollen shut, a deep gash at the hairline, a puncture wound on her cheek, and lips swollen and cut from inside out. (*Id.* at 230, 231; 32 RR at SX-292). Otterson was transported to a hospital for further medical care and was off duty from August 20, 2008, until February 2009 as a result of her injuries. (22 RR 235-36).

The State's evidence showed that Davila's right hand appeared swollen after his attempted escape. (23 RR 162; 32 RR at SX-310). DNA testing on blood stains found on Davila's jumpsuit (SX-260) were consistent with the DNA profile of Officer Thomson while blood stains on Davila's tennis shoes (SX-261) were consistent with Thompson, Peters, and Otterson. (21 RR 161-62, 165-67).

### f.   Davila's inability to conform his conduct

Finally, the State presented evidence that (1) on May 11, 2008, Davila threatened officers in response to their repeated requests for him to get off the

telephone while they were attempting to deliver dinner to inmates (22 RR 102-08); (2) on November 19, 2008, officers conducting a cell search had to pepper spray Davila when he refused to obey commands and maneuvered his handcuffs from behind him to the front, creating a safety risk to officers (*id.* at 133-36); and (3) on January 7, 2009, Davila was found in possession of a hair pin that could be used to pick a lock or as a weapon. (23 RR 183-87).

### 2.   The defense's case-in-chief

Six of Davila's family members testified on his behalf: his father (Mario Davila), mother (Sheila Olivas), two sisters (Emily Davila and Vivianna Estelle Olivas), and two maternal aunts (Angela Jones and Debra Jones). The defense presented records from the Child Study Center (35 RR at DX-112) and testimony from clinical psychologist Emily Fallis. (24 RR 182-261; 25 RR 4-41).

### a.   Testimony of Davila's father, Mario Davila

Mario Davila testified that he became sexually involved with Sheila "KK" Olivas when she was a young teenager and he was either twenty-three or twenty-four years old. (23 RR 224, 229-30, 241-42). He said they had a common law marriage, although he was already married to a woman in Mexico. (*Id.* at 228-30). Mario reported that Sheila gave birth to Erick when she was fourteen or fifteen years old. (*Id.* at 224, 230). About nine months later, Sheila gave birth to Emily. (*Id.* at 230). Mario testified that Sheila was totally responsible for

raising the children. (*Id.* at 231). He also referenced the difficulties the family faced as being one of blended ethnic and racial backgrounds. (*Id.* at 226, 233).

Mario stated that he had a drinking problem that caused trouble in their marriage and that Sheila moved out several times, taking the children to live with her father. (*Id.* at 232-33, 235-36, 242-43, 245-50). When Erick was very young, Mario was convicted of driving while intoxicated and spent a year in jail. Sheila only visited once and did not bring Erick with her. (*Id.* at 234-35). Mario testified that he lived at his mother's home with Sheila and the children after his release; however, Sheila soon ended the relationship and left with the children to live with her father. (*Id.* at 236-37). Mario reported that was the last time he saw Erick until seeing him in court during the capital murder trial. (*Id.* at 237, 238). When Erick was only three or fours years old, Mario was convicted of murder and sentenced to a twenty-year term of imprisonment, which he was serving at the time of his testimony. (*Id.* at 248).

### b.    Testimony of Davila's mother, Sheila Olivas

Sheila Olivas testified that Mario Davila gave money to her father in exchange for the right to take her as his wife. (24 RR 53-54). She stated that she became pregnant by him at age thirteen and gave birth to their son, Erick, at age fourteen. (*Id.* at 53, 56). She claimed that Erick and his sister Emily were both conceived as a result of her being sexually assaulted by Mario and that

when Erick learned this fact, he felt hurt. (*Id.* at 53-54, 65-66). Sheila testified that she had no prenatal care, did not understand about being pregnant, and did not know she was in labor when she was taken to the hospital. (*Id.* at 56-57). She reported that she got no help from Mario because he was drinking and that his family was filled with alcoholics and violence. (*Id.* at 57-58). When Mario was locked up in jail, a then fifteen-year-old Sheila took the children and went to live with her father. (*Id.* at 59). Sheila said she relied on public assistance and the help of her older sister, Angela. (*Id.* at 60-61). Sheila testified that in December 1989, she met Santos Olivas (who was fourteen years her senior) and began a relationship with him. (*Id.* at 61-62). Sheila gave birth to three daughters: Cynthia, Vivianna, and Esmeralda. (*Id.* at 62). She recalled that Erick considered Santos to be his father until he was about five or six years old when she revealed otherwise. (*Id.* at 64-65). However, Santos would get drunk and rowdy and police responded to calls of domestic violence.  She ordered Santos to move out and he did so, leaving her without child support. (*Id.* at 67-68).

Sheila further testified that when Erick was in elementary school, she took him to the Child Study Center where they learned that he needed eye glasses and medication for attention-deficit, hyperactivity disorder ("ADHD"). (*Id.* at 68-70). She reported that she stopped giving Erick the medication because it made him too sleepy to concentrate. (*Id.* at 70). Sheila said Erick made good grades

-18-

until high school, but left home when he was fourteen or fifteen years old and took a job roofing. (*Id.* at 71, 74-75). She was largely unaware of his involvement with organized gangs, but admitted that other relatives saw instantly the signs of his gang involvement. (*Id.* at 72, 82-83, 87, 96-97, 105-06; 35 RR at DX-120). Her testimony revealed that when Davila was released from prison for his burglary conviction, he returned to his involvement in the Bloods. (*Id.* at 87-88, 105-08). Finally, Sheila admitted that the first time she visited her son in jail on the capital murder charge was after he had been there for six months. (*Id.* at 90). She also admitted that she had been uncooperative with her son's trial attorneys, failed to respond to phone calls and text messages, and only met with counsel for thirty minutes "because she had a lot going on." (*Id.* at 91-93). Questioning from Davila's attorneys suggested that the only reason she bothered to show up to testify was because they threatened to have her arrested if she failed to appear. (*Id.* at 94).

### c.    Testimony of Davila's sister, Emily Davila

Emily Davila testified that she shares a close bond with her brother Erick, who is nine months older than she. (24 RR 11-12, 16-17, 30, 41-42). She stated that she never met her biological father, Mario, but that she has spent time with his family and they often used racially insensitive slurs around Emily and her brother. (*Id.* at 16). Emily said that Sheila provided little emotional or financial

support to her and her brother. (*Id.* at 19). She testified that Sheila kicked her out of the family house when she was sixteen years old and had kicked Erick out about a year earlier. (*Id.* at 17, 24-25, 39, 44-45). What little parental guidance they received came from their step-father, Santos. (*Id.* at 20-22). Nevertheless, Emily testified that Santos treated her and Erick differently from the other children in the household and that made them feel unwanted. (*Id.* at 22). She reported that Santos left the family when she was around fourteen years old and she had not seen him since. (*Id.* at 24, 26). When Emily and Erick were older, Sheila told them that they were the result of her having been raped by Mario. (*Id.* at 23). As teenagers, both Emily and Erick were required to work and give their earnings to their mother (who did not work) to pay bills. (*Id.* at 26-29). Emily described the "Stop Six" neighborhood of Fort Worth where they grew up as being infested with gangs like the Reds, the Crips, and the Bloods. (*Id.* at 37). She recalled seeing condom wrappers and needles when they went outside to play and said they sometimes heard gunshots in the distance. (*Id.* at 38).

### d.    Testimony of Davila's sister, Vivianna Estelle Olivas

Vivianna Estelle Olivas testified that she is Erick's fifteen-year-old sister. (24 RR 128-29). She explained that Erick was the only boy in the family and there were six girls who all lived at home except Emily. (*Id.* at 129). Vivianna recalled that Erick often come by the house to play with his sisters, that they

would run to him and start hugging him, and everyone was excited when he appeared. (*Id.* at 131). She said Erick is not a bad person and he tried to fill a parental role of being a protector when her father, Santos, left. (*Id* at 130-32). Vivianna begged the jury to spare her brother's life. (*Id.* at 134).

### e.   Testimony of Davila's maternal aunt, Angela Jones

Angela Jones testified that when Erick was a baby, his father Mario was not around. (24 RR 135, 138). Angela reported that when she was sixteen years old, she worked at Sonic and gave Sheila part of her earnings to help her buy diapers, milk, and other necessities. (*Id.* at 135-36, 137-38). After Sheila qualified for public assistance, Angela stopped providing financial support. (*Id.* at 139-40). Angela testified that when Erick became a teenager, she noticed that he was showing signs of being involved in a gang and she expressed those concerns to his mother, Sheila. (*Id.* at 144-45). Angela testified that her own oldest son had been in a gang, but through prayer and continued support, was able to get out. (*Id.* at 142-44).

### f.   Testimony of Davila's maternal aunt, Debra Jones

Debra Jones, the younger sister to Erick's mother Sheila, testified that Sheila got help from her sisters, Angela Jones and Ethel "Faye-Faye" Jones, and from Sheila's step-mother when Erick was a baby. (24 RR 109, 119-20). She affirmed that Angela worked at Sonic and at Church's Chicken, and that she

gave part of her earnings to Sheila. (*Id.*). Jones testified Erick lived with her briefly when he was around fourteen years old in the ninth grade, he wore lots of red clothing and she suspected he was involved with a gang, and she tried to deter his involvement by taking him to the Boys Club. (*Id.* at 122-23).

### g.   Defense-sponsored records and expert testimony

The defense team introduced records from the Child Study Center that documented Davila's poor educational background, borderline to low-average intelligence including a full-scale IQ score of 76 on the Wechsler Intelligence Scale for Children (WISC) III at age seven, and behavioral problems as a toddler and in elementary school including impulsiveness, excessive demands for attention, and inability to control anger. (24 RR 5-7; 35 RR at SX-112). The records evidenced that at age seven, Davila was diagnosed with ADHD with oppositional features and prescribed Ritalin. (*Id.*).

Finally, the defense called Dr. Emily Fallis, a clinical psychologist, to testify regarding the significance of much of Davila's mitigating evidence. (24 RR 182-261; 25 RR 4-41). Dr. Fallis utilized a Power Point presentation[13] to highlight aspects of Davila's background, including:

● Davila's mother Sheila received no prenatal care while she was pregnant with him. (24 RR 190, 227, 228; 25 RR 38).

---

[13]   A copy of Dr. Fallis's Power Point presentation is included in the state habeas record. (3 SHRR at SX-1).

- Sheila was fourteen years old when she gave birth to Davila. (24 RR 190). Teenage mothers are more likely to be ill-equipped to be adequate parents, are more likely to suffer from depression, and are less likely to show affection. (*Id.* at 238). Children born of teenage parents have a higher risk of developmental delays and school-related problems. (*Id.* at 239-40; 25 RR 29-30).

- Sheila did not tell the defense team the truth when she said Davila had no developmental problems when he was very young. (24 RR 191, 194-95). It was likely she tended to minimize any problems with her son's life that she might have caused through her neglect. (*See id.*).

- Child Study Center records (DX-112) indicated that Davila had behavioral problems as a toddler and in early elementary school. (24 RR 191-92; 25 RR 29-30).

- Davila was not involved in any extra-curricular activities at school, even though research shows that children who are involved in such pro-social activities are less likely to become vulnerable to bad influences in life. (24 RR 195).

- Sheila did not encourage Davila to succeed academically, nor did she encourage him to attend school. (24 RR 197, 230, 231; 25 RR 29-30). Davila had forty reported absences during his freshman year of high school. (24 RR 205). At one point, Sheila took Davila out of school and made no effort to continue his studies in the home environment. (*Id.* at 230).

- Sheila did not encourage Davila to wear glasses even though she knew he had poor eyesight. (24 RR 200).

- Sheila neglected early signs during Davila's preschool years that he had behavioral and learning difficulties. (24 RR 212-23, 231; 25 RR 29-30).

- Sheila failed to ensure that Davila took Ritalin for ADHD. Davila's disorder made it harder for him to focus on schoolwork and to develop positive peer relationships. (24 RR 212-16, 249; 25 RR 29-30).

- Sheila did not visit Davila when he was in prison on the burglary charge, thus demonstrating her continued neglect and lack of parental support. (24 RR 219).

- Sheila often told Davila that he would either end up dead or in prison like his father Mario. (24 RR 224).

- Davila's family had a history of physical, emotional, and verbal violence. (24 RR 225-26; 25 RR 29-30).

- Davila felt abandoned by Mario's family after Mario went to prison because the family members made no attempt to maintain a relationship with Davila. (24 RR 226).

- Sheila herself was apparently "sold" to Mario by her own uncaring father, which explained in part the paucity of Sheila's own parenting skills. (24 RR 212).

- Davila's family moved frequently when he was a child; by the time he was a young adult, he had lived in fifteen or sixteen places. (24 RR 250). This added to the sense of instability in his life. (*Id.* at 250-51).

- Many members of Davila's family had been involved with the criminal justice system. (24 RR 252). "[K]ids with this kind of history, with a lot of relatives who have been arrested, are highly likely themselves to have a criminal history, a delinquent history." (*Id.* at 253-54).

- Various factors during the developmental period of Davila's life put him at a much higher risk of having behavior problems, social problems, and academic problems including lower socioeconomic status, having a fourteen-year-old mother, maternal neglect, exposure to domestic violence, learning that he was the product of a sexual assault, low functioning or borderline IQ, and ADHD. (*Id.* at 5, 8-9).

- Research shows that children like Davila join gangs primarily because they need physical protection in a violent neighborhood and have a profound feeling of wanting to belong to something. (25 RR 10).

- Because of Davila's neglected childhood, he was more vulnerable to developing antisocial problems as an adult. (25 RR 28-29).

- Had there been intervention in Sheila's life to change the environment and family dynamics, it is possible that she could have ended up connecting with Davila. (25 RR 39). Even with all the risk factors identified in Davila's case, there is still a possibility for change if there is positive intervention along the way. (*Id.* at 40).

With the conclusion of Dr. Fallis's testimony, the defense rested its case and both sides closed. (25 RR 41). After closing arguments from the parties, the jury deliberated the special sentencing issues and answered affirmatively the issue on future dangerousness and answered negatively the issue on mitigating evidence. (9 CR 1936-38; 26 RR 5).

## II.    Procedural History

The State of Texas indicted Davila for capital murder for his intentionally or knowingly killing Queshawn Stevenson and Annette Stevenson during the same criminal transaction. (1 CR 2).[14] On February 19, 2009, a Tarrant County jury found Davila guilty as charged. (9 CR 1928-20; 20 RR 55). After a separate punishment hearing, the trial court sentenced Davila to death based on the jury's answers to the special sentencing issues. (9 CR 1947-49; 26 RR 7-8).[15]

---

[14]    Tex. Penal Code § 19.03(a)(7)(A).

[15]    Tex. Code Crim. Proc. art. 37.071, §§ (2)(b)(2) & (2)(e).

The TCCA affirmed Davila's conviction and sentence on direct appeal. *Davila v. State,* No. AP-76,105, 2011 WL 303265 (Jan. 26, 2011), and the Supreme Court denied certiorari, 132 S. Ct. 258 (Oct. 3, 2011).

Davila applied for a state writ of habeas corpus raising three grounds for relief including a claim of ineffective assistance for counsel's "failure to conduct a minimally sufficient mitigation investigation." (1 SHCR 3-174). The habeas court granted funding for Davila's requested "mitigation specialist" (2 SHCR 355-57, 366-38), conducted an evidentiary hearing on his claim of ineffective assistance (*id.* at 287; 1 SHCR 11), and subsequently issued "Findings of Fact and Conclusions of Law" recommending all claims be denied for lack of merit. (2 SHCR 329-52). The TCCA adopted the same, noted that two claims were also defaulted, and denied habeas corpus relief. *Ex parte Davila*, No. WR-75,356-01, 2013 WL 1655549 (April 17, 2013) (unpublished). The Supreme Court denied certiorari. *Davila v. Texas*, 134 S. Ct. 784 (December 9, 2013).

On April 14, 2014, Davila filed a federal habeas petition (ECF No. 16), which he subsequently amended to raise a total of eleven grounds for relief. (ECF No. 17). Davila also filed opposed motions for stay and abeyance, and for an evidentiary hearing. (ECF Nos. 18, 20). The Director's answer and reply to Davila's motions now follows.

## STANDARD OF REVIEW

AEDPA requires that state prisoners present claims in state court and exhaust available remedies before federal review becomes available. 28 U.S.C. § 2254(b)(1).[16] As a corollary to the exhaustion requirement, independent and adequate state procedural law may bar federal habeas review. If a prisoner fails to follow well-established state procedural rules for attacking his conviction and sentence and, as a result, the state court finds a claim defaulted, a procedural bar exists. *Coleman*, 501 U.S. at 729 (a claim is defaulted when a state court clearly and expressly bases its dismissal on a state procedural rule that provides an independent and adequate ground for dismissal).

For claims that were denied on the merits, § 2254(d) imposes a "highly deferential standard" that demands state-court decisions "be given the benefit of the doubt." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (citation omitted). Under § 2254(d), a federal court's authority to grant a writ of habeas corpus is limited to instances where a state-court adjudication

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[16]     A federal habeas court has discretionary authority to reach the merits of an unexhausted claim, but must deny relief unless the State waives the exhaustion requirement. *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998).

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has explained that this intentionally "difficult to meet" standard "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citation omitted). As a condition for obtaining a writ, a prisoner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

For purposes of § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). When a state court declines to apply a specific legal rule that has not been "squarely established" by the Supreme Court, the decision is not unreasonable. *Richter*, 131 S. Ct. at 786. And reasonableness does not depend on citation to, or even awareness of, any particular Supreme Court precedent so long as the result of the state-court decision did not contradict that precedent. *Early v. Packer,* 537

U.S. 3, 8 (2002).[17]

Under § 2254(d)(1), an "unreasonable application" of clearly established federal law exists if the state court "identifies the correct governing legal principle from [the Supreme Court's] decision but unreasonably applies that principle to the facts of the prisoner's case" or "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. However, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).[18] The federal reviewing court focuses on "the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

---

[17]     Even if a state court issues a summary ruling, a federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Richter*, 131 S. Ct. at 786. This is "the only question that matters under § 2254(d)(1)." *Id.*

[18]     This is particularly true for a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which, when analyzed in conjunction with § 2254(d), creates a difficult-to-surmount, "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 788 (quoting *Knowles v. Mirayance*, 556 U.S. 111, 123 (2009)). When § 2254(d) applies, the question is not whether counsel's actions were reasonable but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Section 2254(d)(2) likewise commands deference to the state court's determination of the facts in light of the record before that court. "[A] state-court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams*, 529 U.S. at 411). Furthermore, under § 2254(e)(1), a state court's factual findings are presumed correct unless rebutted by "clear and convincing evidence." This presumption applies to explicit findings of fact as well as "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

The Supreme Court instructs that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Thus, "evidence later introduced in federal court is irrelevant." *Id.* at 1400. The same rule "necessarily applies" to a federal court's review of purely factual determinations under § 2254(d)(2). *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011). Even if new evidence only supplements a claim, it cannot be considered if it was not submitted to the state courts. *See Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012) (explicitly rejecting the holding in *Dowthitt v. Johnson*, 230 F.3d 733, 745-46 (5th Cir. 2000), that where new affidavits supplement, rather than

fundamentally alter, a state court claim, they may be admissible for review of a habeas claim under § 2254(d)).

"Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *(Michael) Williams v. Taylor*, 529 U.S. 420, 437 (2000). If a petitioner fails to exercise diligence, § 2254(e)(2) prohibits an evidentiary hearing in the absence of a convincing claim of actual innocence established by newly discovered evidence. *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001). Even if the standard is met, a court has discretion to deny a hearing if the record is sufficient to make an informed decision on the merits. *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000).

Finally, AEDPA did not subsume prior precedent that forecloses relief if a claim is barred by the doctrine of non-retroactivity, *Teague*, 489 U.S. at 310,[19] or is based on trial error that did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637.

---

[19]    For *Teague* purposes, Davila's conviction became final on October 3, 2011, when the Supreme Court denied certiorari review of the TCCA's opinion on direct appeal. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994).

## SUMMARY OF ARGUMENT

With only two exceptions (Claims 3 & 4), Davila appears to have largely presented his claims on direct appeal or state habeas. Davila's Fourth Amendment claims regarding the validity of the arrest warrant (Claims 5 & 6) are barred under *Stone v. Powell*, *supra*. For the remaining claims that were presented in state court (Claims 1, 2, 7-11), Davila is not entitled to relief because he fails to demonstrate that the state-court decision on any issue warrants an exception to AEDPA deference under § 2254(d).

Davila's claim alleging ineffective assistance of counsel ("IAC") on direct appeal (Claim 3) is unexhausted and defaulted. Alternatively, Davila cannot show IAC for appellate counsel's failing to raise a point of error based on a statement that the TCCA has since rejected as "improvident" *dictum*.

Davila's claim alleging IAC on state habeas (Claim 4) provides no cognizable ground for habeas relief. Nor does the Supreme Court's holding in Martinez v. Ryan, 132 S. Ct. 1309 (2012), excuse the procedural default of Davila's IAC of appellate counsel claim (Claim 3). Davila's contention that state habeas counsel provided ineffective assistance in presenting a claim based on *Wiggins v. Smith*, 539 U.S. 510 (2003) serves no purpose because Davila's IAC-*Wiggins* claim (Claim 2) was denied on the merits.

Additionally Davila has moved for stay and abeyance in order to present Claim 3 and Claim 4 in state court. (ECF No. 18). The Court should deny relief because Davila fails to show "[1] there was good cause for the failure to exhaust the claim[s]; [2] the claim[s are] not plainly meritless; and [3] there is no indication that the failure was for purposes of delay." *Williams v. Thaler*, 602 F.3d 291, 309 (5th Cir. 2010) (citing *Rhines v. Weber,* 544 U.S. 269, 777-78 (2005)). The IAC on direct appeal (Claim 3) was previously available and could have been included in Davila's initial writ application, and that claim as well as Davila's IAC on state habeas (Claim 4) are both plainly meritless.

Finally, the Court should deny Davila's motion for an evidentiary hearing on whether "any potential procedural defaults" can be excused on the grounds of IAC on direct appeal or state habeas. (ECF No. 20). Davila did not exercise diligence in failing to present the IAC of appellate counsel claim (Claim 3), so a hearing is precluded under § 2254(e)(2). *Beazley*, 242 F.3d at 272-73. In any event, the Court can reject this issue on the existing record because Davila's point of error is based on *dictum*, not trial court error. No hearing is warranted on IAC on state habeas (Claim 4) because it is no ground for relief, the underlying IAC-*Wiggins* claim is not defaulted, and the Court cannot consider new evidence under the Supreme Court's directive in *Pinholster*.

# ARGUMENT

## I.   Evidence of Davila's Guilt is Sufficient. (Davila's Claim 1)

As his first federal habeas claim, Davila alleges the evidence is legally insufficient to support his conviction under a multiple-murder theory of capital murder. (Am-Petition at 36-45). He maintains that evidence raised at trial showed that he intended to kill only Jerry Stevenson and therefore his one criminal intent to kill Jerry cannot be transferred to the deaths of both Queshawn Stevenson and Annette Stevenson. (*See id.* at 37). The TCCA rejected Davila's claim on the merits after concluding that evidence was sufficient to support the jury's verdict that Davila intended to or knew that he was reasonably certain to cause two deaths when he opened fire with a semi-automatic rifle on the birthday party group. *Davila*, 2011 WL 303256, at *3-5. Davila fails to show this adjudication is not entitled to AEDPA deference.

When a federal habeas court reviews the sufficiency of the evidence, it views all the evidence in the light most favorable to the prosecution with all reasonable inferences and credibility choices made in support of the verdict. *Jackson v. Virginia*, 443 U.S. 307, 320 (1979). This standard applies regardless of whether the conviction is based on direct or circumstantial evidence. *United States v. Peterson*, 101 F.3d 375, 379 (5th Cir. 1996). A federal habeas court must give "great weight" to a state court's thoughtful determination of the

sufficiency of the evidence. *Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985) (citing *Jackson*, 443 U.S. at 310 n.15). A reviewing court cannot disturb a jury's verdict unless, based upon the record evidence at trial, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990) (citing *Jackson*).

A sufficiency issue is a mixed question of law and fact which the Court reviews under § 2254(d)(1), in determining whether the state court's decision unreasonably applied the *Jackson* standard. *Gomez v. Acevedo*, 106 F.3d 192, 198 (7th Cir.), *vacated on other grounds*, 522 U.S. 801 (1997). Also applicable to this latter type of review is the statutory presumption of correctness, which governs any underlying factual determinations made by the reviewing court pursuant to its sufficiency review. 28 U.S.C. § 2254(e)(1); *Gomez*, 106 F.3d at 199 n.7; *see Parker v. Dugger*, 498 U.S. 308, 321 (1991) (federal court must give deference to a state appellate court's resolution of factual issues). Given these standards, petitioners challenging the sufficiency of evidence face "a formidable task in establishing that the state appellate court's ruling as to this claim was an unreasonable application of clearly established federal law." *Hughes v. Johnson*, 191 F.3d 607, 621 (5th Cir. 1999). Davila cannot make this "formidable" showing.

The theory of capital murder under which Davila was indicted and convicted, Texas Penal Code § 19.03(a)(7)(A), includes within its ambit both intentional and knowing murders. Section 19.03(a)(7)(A) provides that a person commits capital murder if he "commits murder as defined under Section 19.02(b)(1) and . . . murders more than one person . . . during the same criminal transaction." Section 19.02(b)(1) states that a person commits murder if he "intentionally or knowingly causes the death of an individual." Davila was convicted of capital murder based on an indictment that alleged

> [O]n or about the 6th day of April 2008, [Davila] did then and there intentionally or knowingly cause the death of an individual, Queshawn Stevenson, by shooting her with a deadly weapon, to wit: a firearm, and did then and there intentionally or knowingly cause the death of an individual, Annette Stevenson, by shooting her to death with a deadly weapon, to wit: a firearm, and both murders were committed during the same criminal transaction.

(1 CR 2; 9 CR 1924). Under Texas law, it was unnecessary for the State to prove that Davila had specific intent to kill both Queshawn and Annette Stevenson because under the doctrine of transferred intent, "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . a different person or property was injured, harmed, or otherwise affected." Tex. Penal Code § 6.04(b)(2). Davila's jury was provided a supplemental instruction that tracks this provision. (*Compare id. with* 9 CR 1933).

-36-

On direct appeal, the TCCA summarized Texas law regarding transferred intent and, consistent with the Supreme Court's directive in *Jackson*, "thoughtfully reviewed" Davila's claim in light all of the favorable evidence supporting the jury's verdict. The TCCA reasoned in part:

> The evidence shows that [Davila] intended to kill possible members of the Crips gang, but he mistakenly killed a grandmother and small child instead. As [Davila] himself explained, he went to "a shoot em up" in which he intended to kill "the fat dude in the middle of the street" and the three "guys on the porch." That is, he intended to shoot four males, not two females. But, under Texas law, the intent to kill four males will transfer to the unintentional killing of two females.[] There is ample evidence in the record to support the jury's verdict that [Davila] intended to cause more than one death in his "shoot em up" attack. That evidence includes the following:
>
> (1)  [Davila] gave a written statement explaining that he intended to "get the fat dude" and who he mistakenly thought were three guys on the porch;[]
>
> (2)  Cashmonae testified (as did other witnesses) that [Davila] aimed the "red dot" at "different parts of the house" and at different persons;
>
> (3)  [Davila] used a high-powered SKS semi-automatic rifle with an infrared beam to fire between ten to fifteen bullets into the group of women and children on Ms. Stevenson's front porch;
>
> (4)  [Davila] fired a burst of bullets from one location across the street, then paused as he ran to the middle of the street and fired a second burst of bullets;
>
> (5)  Eghosa said that [Davila] looked "frustrated" after the first burst of fire when Jerry or "Dooney" had escaped into the house, so [Davila] moved and then fired a second burst at the remaining women and children;

(6) [Davila] used a rifle with an infra-red scope that would give him greater precision in shooting at what he intended to hit;

(7) His semi-automatic SKS required him to pull the trigger each time he intended to shoot; thus he intended to shoot his targets at least ten to fifteen different times; [and]

(8) Expert testimony that [Davila's] choice of bullets, high-powered hollow-point bullets, was consistent with a shooter who wants to cause maximum damage or death to his intended target.

Viewed in the light most favorable to the verdict under the appropriate *Jackson* standard,[] we conclude that the evidence is sufficient to support the jury's verdict that [Davila] intended to (or knew that he was reasonably certain to) cause two deaths when he repeatedly shot his SKS semi-automatic rifle at the birthday party group on Ms. Stevenson's front porch.

*Davila*, 2011 WL 303256, at *3-5. The jury's verdict must remain undisturbed since any rational trier of fact could have found the essential elements of Davila's multiple-murder capital crime beyond a reasonable doubt. *Schrader*, 904 F.2d at 284 (citing *Jackson*).

Davila argues that the state court's decision is unreasonable because while the evidence shows he intended to kill Jerry Stevenson, his single specific intent cannot support two intentional deaths. (Am-Petition at 37-38). He contends that the TCCA has "made clear that Texas' transferred intent doctrine cannot be used to increase murder to capital murder on the grounds that the defendant, while intending to kill a single person, actually kills two." (*Id.* at 38, citing *Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008)). In *Roberts*, the TCCA stated

that "[t]ransferred intent may be used as to a second death to support a charge of capital murder that alleges the deaths of more than one individual during the same criminal transaction only if there is proof of intent to kill the same number of persons who actually died." *Roberts*, 273 S.W.3d at 330. The TCCA cited this passage from *Roberts* in concluding that evidence was sufficient to show Davila intended to cause *more than one death* and thus his intent transferred to the deaths of Queshawn and Annette Stevenson. *Davila*, 2011 WL 303256, at *4 (citing *Roberts*, 273 S.W.3d at 330). No error or unreasonable decision exists here regarding the supplemental instruction.

In 2012, the TCCA clarified that its statement in *Roberts*—"that there must be proof of intent to kill the same number of people who actually died"—"was *dictum* and that such *dictum* was improvident[,]" reasoning that "[i]t is certainly possible to intend more than once to kill a particular person." *Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012). Accordingly, the evidence in this case is sufficient if it supports the rational conclusion that Davila intended to kill possible members of the Crips yet killed Queshawn and Annette Stevenson in separate shots as the TCCA concluded on direct appeal. However, the evidence is also sufficient under Davila's proposed single-intent-to-kill-Jerry theory because it supports the rational conclusion that he intended more than once to kill the same person. That is, intending to kill Jerry

Stevenson, Davila missed and killed Queshawn, and then again intending to kill Jerry, Davila continued shooting and killed Annette Stevenson, thus engaging in conduct with a two specific intents to kill during the same criminal episode.[20] Davila's claim should be rejected because his arguments do not establish that the TCCA's ruling—that evidence is sufficient to support Davila's conviction for capital murder—was an unreasonable application of the *Jackson* standard, or was an incorrect determination of facts based on the record evidence.

## II.   Davila's Claim of IAC at Trial Does Not Merit Relief. (Davila's Claim 2)

As his second federal habeas claim, Davila argues that counsel provided ineffective assistance under *Strickland* by failing to properly investigate and present the mitigation case at punishment. (Am-Petition at 41-79). The TCCA rejected the merits of the claim on state habeas review after the trial court held an evidentiary hearing. *Ex parte Davila*, *supra*. The Court should decline to consider Davila's new evidence and should deny relief under § 2254(d).[21]

---

[20]   Davila's Claim 3 alleges IAC on appeal for failing to challenge the "erroneous" instruction based on *Roberts* and his single-intent-to-kill-Jerry argument. (Am-Petition at 80-90). As argued in response to Claim 3 below, the instruction applies to the facts of this case under the TCCA's summary and under Davila's current argument. In any event, complaint regarding the jury instruction are not relevant to assessing the sufficiency of the evidence supporting the capital murder conviction.

[21]   The Director believes that Davila's IAC claim is exhausted to the extent it was presented in his state habeas application. (1 SHCR 11-17, 22-145). However, Davila now supports the claim with an April 1, 2014, affidavit of mitigation specialist Toni Knox. (Am-Petition at PX-B). That evidence was not considered by the TCCA in ruling on the merits. In accordance with *Pinholster*, the Court must decline to consider

###### A.   Standard for reviewing *Strickland* claims

Trial counsel's representation is evaluated under *Strickland*'s standard which requires an affirmative showing of deficient performance and prejudice. *Strickland,* 466 U.S. at 687. To make this showing, a petitioner must demonstrate that (1) in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms"; and (2) the resultant prejudice was "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Bell v. Cone*, 535 U.S. 685, 695 (2002). Where a state court rejects an IAC claim on the merits, the decision "must be shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). A federal habeas court's review is not on whether the petitioner made the showing required under *Strickland*, but rather "whether the state court's decision—that [petitioner] did *not* make the *Strickland*-showing—was contrary to, or an unreasonable application of" clearly established Supreme Court precedent. *Busby v. Dretke,* 359 F.3d 708, 717 (5th Cir. 2004) (quoting *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2003)).

---

the evidence in conducting its review of the state-court adjudication. In the alternative, if the Court does reach the new evidence, then it should still deny relief because counsel's alleged failure to investigate and present Davila's mitigating evidence does not prove IAC under *Strickland*.

Judicial scrutiny of counsel's performance must be highly deferential, with every effort made "to eliminate the distorting effects of hindsight" and to evaluate the conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 689-90. Counsel's decisions "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (citing *Strickland*, 466 U.S. at 690-91). There exists a "strong presumption" that the challenged conduct "falls within the wide range of reasonable professional assistance," and a petitioner must overcome the presumption that counsel's actions "might be considered sound trial strategy." *Strickland,* 466 U.S. at 689. A reviewing court may "not find ineffective assistance of counsel merely because it disagrees with counsel's trial strategy." *Cone*, 535 U.S. at 698. Indeed, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins*, 539 U.S. at 521.

Even if further investigation would have turned up additional evidence, that is insufficient to show prejudice. *Gray v. Lucas*, 677 F.2d 1086, 1092 (5th Cir. 1982)). The petitioner must instead show a reasonable probability that, but for counsel's assumed deficiencies, the result of proceedings would have been different. *Strickland,* 466 U.S. at 694-95. A reviewing court compares the mitigating evidence actually presented at punishment with all the available

mitigating evidence and determines whether the additional evidence is so compelling that there exists a reasonable probability that at least one juror could reasonably have concluded that death was not an appropriate sentence. *Neal,* 286 F.3d at 241. In this regard, the likelihood of prejudice must be "substantial." *Richter,* 131 S. Ct. at 792 (citing *Strickland,* 466 U.S. at 693). Finally, clearly established federal law holds that it is virtually impossible to show prejudice where the State's punishment-phase evidence is overwhelming. *Strickland,* 466 U.S. at 698 (no prejudice due to State's overwhelming evidence on aggravating factors supporting death penalty).

### B. Davila fails to establish that the state court's denial of his IAC claim was contrary to, or an unreasonable application of, *Strickland*'s principles.

During state habeas proceedings, Davila alleged IAC "because of the defense team's failure to conduct a minimally sufficient mitigation investigation." (1 SHCR 7). Specifically, he asserted that counsel abandoned their investigation after acquiring only rudimentary knowledge of his background and history from a narrow set of sources. (*Id.* at 13-14). Davila argued that counsel's case for mitigation was almost entirely reliant on the investigation conducted by Dr. Emily Fallis, that this investigation was incomplete and fell short of "minimum requirements," and that a myriad of mitigating evidence was available because post-conviction investigation

uncovered "overwhelming" evidence of "a highly abusive childhood and an extremely dysfunctional family." (*Id.* at 15-16). Davila supported his claim with an affidavit from Toni Knox of Mitigation Partners; her affidavit included investigative work (a psychosocial history, timeline, notes based on interviews with Davila and his immediate family, and "family genograms"); an affidavit of James Hughes (an investigator who assisted Knox); and affidavits from Ethel Fay Jones-Silverio (Davila's maternal aunt), Lynda Jones Mireles (a cousin), Elizabeth Olivas (sister of step-father Santos Olivas), and Lisa G. Wallace (Emily Davila's mother-in-law). (*Id.* at 23-174).

The State replied and provided an affidavit from Davila's defense trial counsel Joetta Keene. (2 SHCR 224-57, 273-77).[22] In her affidavit, Keene explained that the defense hired a total of four mental health professionals to assist in the punishment stage: (1) Dr. Emily Fallis "was hired to present our mitigation case to the jury" and "not hired as a mitigation investigator"; (2) Dr. Kelly Goodness conducted a psychological battery and IQ testing; (3) Dr. Sargi Sharma, a child psychologist, assisted with issues regarding gang membership; and (4) Dr. Dennis Zgaljardic ruled out cognitive dysfunction and brain damage after conducting a neuropsychological examination. (*Id.* at 273-74). Keene stated

---

[22]     The trial court appointed Robert Ford as lead counsel and Joetta Keene as co-counsel. (1 CR 4, 29, 30; 2 RR 2). However, Mr. Ford died unexpectedly on December 8, 2011, before completing a responsive affidavit. (2 SHCR 272).

that the defense team hired an investigator (Gary Cooper) to assist in obtaining records, serving subpoenas, and locating Davila's family members, teachers, employers, and friends; however, most of the interviews were conducted by the attorneys. (*Id.* at 274). According to Keene, defense counsel interviewed Davila's mother (Sheila Olivas), father (Mario Davila), sister (Emily Davila), sister Emily's mother-in-law (Lisa Wallace), Davila's girlfriend and mother of his baby (Nichcole Blackwell), Davila's maternal aunts (Debra Jones and Angela Jones), his little sisters (Cynthia and Vivianna Olivas), members of his father's family (Mario Davila's mother, brother, and a niece), an employer (Ron Reagan), former teachers in Fort Worth and Louisiana, an employee with the Boy's and Girl's Club (Melvin Carter), and a psychologist who wrote articles on gang membership (Dr. Christopher Thomas). (*Id.* at 274-76). Trial counsel Keene briefly explained the strategic reasons why certain witnesses were chosen to testify while others were not. (*See id*). Keene also stated that the defense team tried to locate Santos Olivas but were unsuccessful and that they attempted to talk to Davila's aunt Ethel Fay Jones but "were repeatedly turned down." (*Id.* at 276). Finally, Keene verified that the defense team did not talk to Linda Jones Mireles (Davila's cousin), Rosa Nash (Davila's mother's step-mother), Sandra Vargas (Nash's daughter), or Elizabeth Olivas (Santos Olivas's sister). (*Id.* at 276-77).

The trial court granted $12,000 for Davila to obtain a mitigation investigator, Toni Knox, and conducted an evidentiary hearing on the IAC claim. (*E.g.*, 2 SHCR 355-57, 366-38). Davila presented testimony from Toni Knox while the State presented defense trial counsel Joette Keene. (2 SHRR 11-90, 92-147). Afterwards, the state court issued extensive findings and conclusions recommending the IAC claim be denied on the merits because "[t]he scope and extent of [trial counsel's] mitigation investigation was constitutionally sufficient under the Sixth Amendment and as required by *Wiggins*." (2 SHCR 345 at CL #26; *see id.* at 329-35). The TCCA adopted the findings and conclusions in full and denied habeas relief. *Ex parte Davila, supra.*

Davila argues that the TCCA's adoption of the state court's proposed findings of fact and conclusions of law is a decision that is contrary to, or an unreasonable application of, *Strickland*'s principles, or else an unreasonable determination of the facts. (Am-Petition at 47). Specifically, he alleges that counsel failed to comply with the standards articulated by the American Bar Association Guidelines regarding the appointment and performance of counsel in death penalty cases and, as a result, failed to uncover powerful mitigation evidence. (*Id.* at 51-55). He further asserts that counsel were ineffective for failing to hire a mitigation specialist who could have uncovered evidence of his "traumatic childhood" and for failing to conduct their own thorough

investigation, and that his defense was prejudiced under *Strickland* as a result of counsel's omissions. (*Id.* at 62-68). These allegations are largely a re-hash of the IAC claim rejected on the merits by the TCCA. (*Compare id. with* 1 SHCR 11-17). While Davila is dissatisfied with the denial of relief, he fails to show that the state-court adjudication is not entitled to AEDPA deference under § 2254(d) which is the only question that matters for this Court's review.

As an initial matter, Davila maintains that counsel's decision to conduct the mitigation investigation themselves is contrary to ABA Guidelines. (Am-Petition at 51-55). However, *Strickland* stressed that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. *Strickland*, 466 U.S. at 688. Even then, the standards "must not be so detailed that they would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Bobby v. Van Hook*, 558 U.S. 4, 8 n.1 (2009). "[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* at 17 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (quoting *Strickland*, 466 U.S. at 690).

In this instance, the state court also found that counsel "made the conscious decision to retain ultimate responsibility for directing the mitigation investigation in this case." (2 SHCR 337 at FF #57, citing 2 SHRR 97, 98-100, 141). Such a decision was consistent with the prevailing practices of criminal defense attorneys in Tarrant County, Texas, to lead and conduct their own mitigation evidence investigations in death penalty cases rather than delegate the duty to someone else, especially a non-lawyer like Davila's state habeas investigator Toni Knox. (2 SHCR 339-40 at FF ##82-93). Because *Strickland*'s concern is whether the representation amounted to incompetence under prevailing professional norms, 466 U.S. at 690, and Davila failed to make that showing, it is little wonder the TCCA denied habeas relief.

The crux of Davila's IAC claim is that counsel acquired only rudimentary knowledge of his background from a few sources and failed to present compelling evidence obtained by his post-conviction mitigation specialist. (*Compare* Am-Petition at 55-68 *with* 1 SHCR 13-14). However, the state court found that the testimony of Dr. Fallis and the other witnesses at trial showed that Davila's defense team prepared an in-depth mitigation investigation. (2 SHCR 340 at FF #94). The record fully support that determination and Davila presents no evidence to rebut the presumption of correctness accorded the state court's factual findings.

When a reviewing court evaluates the performance of trial counsel against a claim of failure to investigate, the relevant inquiry focuses on what counsel did to prepare, what evidence counsel accumulated, what additional leads counsel had, and the results counsel might reasonably have expected from those leads. *Cf. Neal*, 286 F.3d at 237. As the state court found—and Davila fails to rebut—he was represented at trial by Robert "Bob" Ford and Joette Keene; both attorneys had been practicing before the court for many years; and the court had personally observed their skill and competency. (2 SHCR 331 at FF ##1, 3, 4, 6).[23] During state habeas proceedings, Joetta Keene provided an affidavit and testified live, and the state court found the entirety of her testimony truthful and credible. (2 SHCR 332 at FF ##9, 12).

Based on trial counsel's testimony, the state court found that Keene spent close to 100 hours investigating the mitigation case while Robert Ford spent 80 hours or more. (2 SHCR 332 at FF ##13, 14). The state court found that counsel "spoke with numerous members of [Davila's] family, including one of his cousins, his sister Emily Davila, his mother Sheila Olivas, his girlfriend Nichcole Blackwell, his aunt Angela Marie Jones, his aunt Debra Jones, and the mother of his biological father." (*Id.* at FF #15, citing 2 SHRR 103-06, 108-113, 119). The

---

[23]     The court found that Robert Ford died "mere weeks" before he was to submit an affidavit responding to Davila's allegations. (2 SHCR 331 at FF #2).

court also issued findings regarding counsel's strategic reasons for presenting testimony from Mario Davila (2 SHCR 333 at FF ##18-22) and from Linda Fontaine, records custodian for the Child Study Center (*id.* at FF #23). Counsel obtained and reviewed educational records from Texas and Louisiana, medical and mental health records, and records from Child Protective Services, various jails, and the Texas Department of Criminal Justice. (*Id.* at 336 at FF ##46-47, citing 2 SHRR 124-25). Additionally, the defense team hired Dr. Emily Fallis who, through her training and education, was able to gain specialized insight into Davila's family, upbringing, and background as a result of conducting forensic interviews. (*Id.* at 337 at FF ##59-61, citing 2 SHRR 98). The state court found that Dr. Fallis compiled information, testified at trial, and accompanied her testimony with a PowerPoint presentation that provided a visual illustration of Davila's life and themes the defense believed to be critical to the mitigation case. (2 SHCR 337 at FF ##58-64).[24]

However, counsel's investigation was not limited to the witnesses who testified. The state court found—and Davila fails to rebut—that counsel interviewed other witnesses but made strategic decisions not to present their testimony, including Davila's cousin Orlando (2 SHCR 335 at FF ##35-37), a former employer (*id.* at FF ##38-42), and a "great number" of  Davila's former

---

[24]     This testimony is summarized in Part I.B.2 of the Statement of Facts.

teachers (*id.* at FF ##43-44). The court also found that counsel searched for evidence to support a claim of mental retardation (intellectual disability) and found evidence of low-functioning IQ, but abandoned the claim after finding no evidence in support. (*Id.* at 336 at FF ##48-49, citing 2 SHRR 103). Counsel hired a neuropsychologist to conduct testing but he found no evidence of brain dysfunction and so counsel did not call him to testify. (2 SHCR 336 at FF ##50-51, citing 2 SHRR 106-07).

It is against this back drop that Davila needed to establish his IAC claim, and he failed to do so. The state court found that the testimony of Dr. Fallis and the other witnesses at trial showed that Davila's defense team prepared an in-depth mitigation investigation. (2 SHCR 340 at FF #94). Indeed, trial counsel "presented a holistic, comprehensive, and thorough mitigation case on [Davila's] behalf. It covered the totality of [Davila's] life and brought forth meaningful themes designed to persuade the jury to vote in [Davila's] favor on the mitigation special issue." (*Id.* at FF #90). While Davila continues to insist that the mitigation investigation was cursory and incomplete, his claim is belied by the record. (*E.g.*, Am-Petition at 68-70).

In this Court, Davila chiefly faults counsel for not discovering and presenting the "new" mitigation evidence "uncovered" by post-conviction mitigation investigator Toni Knox, including information from Rosa Nash Jones

(Davila's step-grandmother), Sandra Kay Vargas (Rosa Nash's daughter), Ethel Fay Jones (maternal aunt), Linda Jones Mireles (Davila's cousin), and Elizabeth Olivas (sister of Davila's step-father Santos Olivas). (Am-Petition at 58-62). In state court, Davila presented affidavits from four uncalled witnesses and relied on hearsay statements contained in an investigator's affidavit for two of the witnesses: Rosa Nash Jones and Sandra Kay Vargas. (1 SHCR 155-74). Even if all the witnesses were available to testify and would have testified (which is highly doubtful), Davila cannot establish a *Strickland* claim. As the state court found—and Davila fails to rebut the presumption of correctness—the "new" mitigation evidence would only augment evidence and themes brought forth at trial. (2 SHCR 340 at FF #91). Counsel cannot perform deficiently nor can a petitioner show prejudice where the complained-of omitted mitigating evidence is largely cumulative of the evidence already before the jury.

Notwithstanding any witness's post-conviction change of heart, the state court additionally credited counsel's strategic decision to not call witnesses who refused to cooperate or said they did not want to testify, such as Davila's aunt Ethel Fay Jones. (2 SHCR 333 at FF ##24, 25, citing 2 SHRR 113-14; 2 SHCR 276). Jones's post-conviction affidavit does not state that she was willing to talk with counsel or willing to testify on Davila's behalf at trial. (1 SHCR 155-60). Counsel does not perform deficiently for contacting the witness in question

where the witness fails to cooperate. Neither does Davila show prejudice by the omission of such testimony.

Although not contested by Davila in this Court, the state habeas court rejected his reliance on affidavit testimony from Lisa Wallace, the mother-in-law of Davila's sister Emily. (1 SHCR 171-74). The court found that counsel did speak with Wallace and that she provided information useful to the mitigation case; however, the court additionally found that Wallace told Davila's attorneys she did not to want to testify. (2 SHCR 334 at FF #26, citing 2 SHRR 115, 116-17; 2 SHCR 275). Counsel made a strategic decision not to call Wallace because the risks attendant with calling a reluctant witness outweigh any potential benefit her testimony might have provided. (*Id.* at FF #27, citing 2 SHRR 117). That decision is entitled to a "strong presumption" of reasonableness. *See Strickland*, 466 U.S. at 689.

Regarding the affidavits of Linda Jones Mireles (Davila's cousin) (1 SHRR 163-66) and Elizabeth Olivas (sister to Santos Olivas, Davila's step-father) (*id.* at 168-69), the state court found that much of the information contained therein was already known to the defense and presented through different witnesses. (2 SHCR 334 at FF # 33, citing 2 SHRR 77-78; *id.* at FF #34, citing 2 SHRR 82). Again, counsel's performance cannot be objectively unreasonable nor can Davila show prejudice for failing to present evidence that is largely cumulative.

Regarding the purported testimony that could be offered by uncalled witnesses Rosa Nash Jones (Davila's step-grandmother) and Sandra Vargas (Nash's daughter), both witnesses refused to provide signed affidavits. (2 SHCR 334 at FF ##29, 31, citing 2 SHRR 68-70, 72; *see* 1 SHCR 146, 150). At best, Davila's proposed evidence is inadmissible hearsay-within-hearsay contained in a defense investigator's affidavit. (1 SHCR 146-53). Accordingly, the state court refused to give credence to such evidence attributed to Rosa Nash Jones. (2 SHCR 334 at FF #30). And much of Sandra Vargas's purported testimony was already known by the trial team and presented to the jury through different witnesses. (*Id.* at FF #32, citing 2 SHRR 75). Davila cannot show that counsel's representation was objectively unreasonable and prejudicial under *Strickland*.

The state court additionally considered whether counsel should have called a mitigation specialist like Toni Knox to testify at punishment and concluded that the omission did not support a valid IAC claim. Toni Knox testified during the evidentiary hearing that she did not know what evidence, if any, would have caused jurors to vote differently during the punishment phase of Davila's trial. (2 SHCR 338 at FF #76, citing 2 SHRR 68, 89-90). Knox also "reluctantly admitted her own psychosocial history of Davila contained errors, omissions, and inaccuracies" (2 SHCR 338 at FF #77, citing 2 SHRR 47-56, 59, 78-79, 80, 86, 88-89), and that such evidence—even if accurate—should not be presented directly

to the jury since it contains information that is harmful to the case for mitigation. (2 SHCR 339 at FF #78, citing 2 SHRR 62-63).

Considered together, Davila's complaints regarding trial counsel's performance do not satisfy the first prong of *Strickland*. Even if counsel could have investigated further or perhaps discovered additional witnesses, arguments that "essentially come[ ] down to a matter of degrees" are "even less susceptible to judicial second-guessing" than most IAC arguments. *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999). And where the complained-of, omitted mitigating evidence is of a "double-edged nature"—like Davila's purported evidence of severe abuse or extensive drug abuse history—the Fifth Circuit has recognized the great deference afforded to counsel. *Id.* (citing *Boyle v. Johnson*, 93 F.3d 180, 188 (5th Cir. 1996) (noting the heavy deference owed trial counsel when deciding as a strategic matter to forego admitting evidence of a "double-edge nature" which might harm a defendant's case, such as evidence of a violent family background or drug and alcohol abuse).

Regardless, Davila cannot show a reasonable probability that a death-qualified capital murder jury would look at his new mitigation evidence and conclude it was sufficient to overcome the specific aggravating facts in this case. As summarized in Part II.B.2 of the Statement of Facts and incorporated herein, Davila's underlying capital crime involved his opening fire on a crowd of women

and children with a high-power assault rifle and killing two innocents, including a five-year-old child. Three days before the capital murder, Davila committed an extraneous murder of an unarmed man at close range. Two days before the capital crime, Davila participated as the ring leader for the aggravated robbery of two men during which it appeared Davila was more than ready to shoot one of the men because he was frustrated the man had no cash. And to top it off, while awaiting trial for capital murder, Davila was involved in a violent attempted escape from jail during which several guards were injured. Even if Davila could establish deficient performance (which he cannot), because he fails to show a reasonable probability of a different result had his additional mitigation evidence been presented at trial, his claim fails on prejudice. *Strickland*, 466 U.S. at 694. Accordingly, this Court should deny relief because Davila fails to show that the state-court adjudication of the *Strickland* claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Busby,* 359 F.3d at 717.

### III.   Davila's Claim of IAC on Appeal is Unexhausted, Defaulted, and Without Merit. (Davila's Claim 3)

Davila next alleges that he was denied effective assistance on direct appeal in violation of the Sixth, Eighth, and Fourteenth Amendments by counsel's failure to recognize, and raise a claim, related to the transferred-intent instruction. (Am-Petition at 80-90). He  argues that Texas law requires "the

specific intent to murder at least two people" to be guilty under a multiple-murder theory of capital murder, but he intended to kill only Jerry Stevenson. (*Id.* at 82-83, citing *Roberts v. State*, 273 S.W.3d at 330). Davila argues that had the jury charge issue been raised on appeal, it is reasonably probable that his conviction would have been reversed and that counsel's "failure to raise a single meritorious appellate issue" constitutes ineffective assistance. (*Id.* at 84-87). This claim is unexhausted and defaulted. If the Court reaches the merits as an alternative ruling, it should deny all requested relief because there is no IAC where there is no error for counsel to raise on appeal.

### A.   Davila's claim is unexhausted and defaulted, and no stay is warranted.

Davila did not present this IAC claim in state court so it is unexhausted. Procedural default occurs "when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Williams*, 602 F.3d at 305 (citing *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004)). If Davila tried to return to state court to exhaust this previously available, record-based claim in a subsequent habeas application, the TCCA would surely dismiss it. *See id.* at 305-06 (unexhausted claims are defaulted by TCCA's prospective application of the Section 5 bar).

Davila acknowledges his failure to exhaust, but argues the Court should grant his motion for stay and abeyance (ECF No. 18) so that he may now pursue state remedies. (Am-Petition at 87-89). A court may grant a stay "only in limited circumstances." *Rhines*, 544 U.S. at 277. Those circumstances do not exist here because Davila cannot show "[1] there was good cause for the failure to exhaust the claim[s]; [2] the claim[s are] not plainly meritless; and [3] there is no indication that the failure was for purposes of delay." *Williams*, 602 F.3d at 309 (citing *Rhines,* 544 U.S. at 777-78). He argues that "good cause" exists because "state appellate counsel was ineffective for failing to identify and raise *this issue* on appeal[.]." (Am-Petition at 89) (emphasis added). However, his instant claim *is IAC on appeal*, not the underlying issue of whether there was an erroneous jury instruction. Ineffective assistance of appellate counsel cannot serve as cause for Davila's failing to exhaust the very same IAC claim. In any event, Davila's claim is also plainly meritless as argued immediately below.

Davila additionally asserts that habeas counsel was ineffective for failing to raise Claim 3 regarding IAC on appeal. (Am-Petition at 89-90, citing *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013)). He also separately briefs this allegation as part of Claim 4 alleging IAC on state habeas. (*Id.* at 91-92, 97, 101). These cases are of no avail because the unambiguous holding of *Martinez* does not extend to IAC on appeal claim.

In *Martinez*, the Supreme Court held that a petitioner may establish cause to excuse a procedural default by showing (1) his state habeas counsel was constitutionally deficient under *Strickland* in failing to include the claim in his first state habeas application, and (2) the underlying ineffective-assistance-of-trial-counsel claim is "substantial." 132 S. Ct. at 1318 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). The Fifth Circuit has declined to extend *Martinez* in the manner suggested by Davila. *Reed v. Stephens*, 739 F.3d 753, 778 & n. 16 (5th Cir 2014) (citing, e.g., *In re Sepulvado*, 707 F.3d 550, 554 & n.8 (5th Cir.), *cert denied*, 134 S. Ct. 420 (2013), and *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel.")). Yet even if *Martinez* could apply to an appellate IAC claim, Davila cannot satisfy its substantiality requirement because, as argued immediately below, the claim is meritless. It therefore remains defaulted in accordance with *Coleman*, 501 U.S. at 750.

## B.   In the alternative, the Court should deny relief on the merits.

Davila alleges IAC for appellate counsel's failure to raise a claim alleging that the supplemental instruction on transferred intent was erroneous because it did not clarify that Davila must have the specific intent to kill at least two

people to be guilty of capital murder. (Am-Petition at 80-83, citing *Roberts*, 273 S.W.3d at 330).[25] He argues that defense counsel objected to the charge and was overruled (*id.* at 82, citing 20 RR 53), but even if error was not preserved, the claim shows egregious harm and thus appellate counsel provided IAC for failing to raise the issue on direct appeal (*id.* at 84-87). The Court should deny relief because Davila fails to establish a *Strickland* claim.

A criminal defendant is constitutionally entitled to effective assistance of counsel on direct appeal.  *Evitts v. Lucey*, 469 U.S. 387 (1985);  *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). This does not mean that counsel must raise every non-frivolous ground available. *Smith v. Robbins*, 528 U.S. 259, 288 (2000); *Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he constitution guarantees criminal defendants only a fair trial and a competent attorney.  It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."). Only "solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999). In the appellate context, Davila must prove counsel performed deficiently by

---

[25]     As explained in response to Davila's Claim 1 above, the trial judge instructed Davila's jury in accordance with Texas Penal Code § 6.04(b)(2), that "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that: a different person was injured, harmed, or otherwise affected." (9 CR 1933).

inadequately briefing or ignoring points of error that were clearly stronger in posture than those actually raised. To prove prejudice, he must show a reasonable probability that he would have prevailed on appeal had counsel raised the omitted claim. *Robbins*, 528 U.S. at 285-87.

Davila cannot prove ineffective assistance where the purported error is not preserved and where there is actually no underlying error. During deliberations, the jury sent out a note asking for a clarification on whether the jury charge is "asking us did he intentionally murder the specific victims, or are you asking did he intend to murder a person and in the process took the lives of 2 others." (9 CR 1931). The trial judge returned a written response that repeated the definitions of "intentionally" and "knowingly," the charge on capital murder and instruction on reasonable doubt, and included the above-described supplemental instruction on transferred intent. (*Id.* at 1932-33). Defense counsel objected to the court sending in everything at once and proposed that the court delay the special charge until after the jury deliberated further. (20 RR 53). The objection was overruled and both responses were submitted. (*Id.*). Trial counsel did not object to the jury instruction in the manner now asserted by Davila, so any alleged error was not preserved for appeal.

Appellate counsel does not provide objectively unreasonable assistance by failing to raise a claim where error is not preserved, nor can Davila show

prejudice by counsel's omission because there was no underlying error in the jury instruction. Davila's claim turns on *Roberts v. State*, where the TCCA reasoned—in *dictum*—that a transferred intent may be used if there is "proof of intent to kill the same number of persons who actually died." 273 S.W.3d at 331. As argued in response to Davila's Claim 1, the TCCA correctly concluded on direct appeal that evidence was sufficient to show Davila intended to kill four males and his intent transferred to the unintentional killing of two females. *Davila*, 2011 WL 303265, at *4. Accordingly, no error occurred by the submission of the supplemental instruction.

Yet even if Davila intended to kill only Jerry Stevenson, the evidence shows he intended more than once to do so because Davila fired repeatedly at the crowd gathered for the birthday celebration and, therefore, his specific intent to kill Jerry transferred to his killing Queshawn and Annette Stevenson. In 2012, the TCCA expressly rejected the statement in *Roberts* that forms the basis for Davila's current claim as being improvident *dictum*, and instead held that a multiple-murder capital murder conviction under Texas Penal Code § 19.03(a)(7) may be supported by proof that the defendant intended "more than once to kill a particular person." *Ex parte Norris*, 390 S.W.3d at 341. Davila does not mention *Norris* nor attempt to distinguish it from the facts in this case.

Because the underlying claim of an erroneous jury instruction is without merit, Davila cannot show that appellate counsel provided ineffective assistance for not raising the issue and cannot establish prejudice under *Strickland* based on counsel's omission. And because the ineffective-assistance-of-appellate-counsel claim may be rejected on the existing record, the Court should deny Davila's motion for stay and abeyance (ECF No. 18) and deny his request for an evidentiary hearing on the issue (ECF No. 20).

## IV.   IAC on State Habeas is No Ground for Relief. (Davila's Claim 4)

Relying on *Martinez* and *Trevino* as "core legal principles," Davila alleges that his state habeas counsel provided ineffective assistance. (Am-Petition at 91). Specifically, he contends that habeas counsel was constitutionally ineffective under *Strickland* for failing to subpoena additional witnesses to testify during the state habeas evidentiary hearing, to better prepare for the IAC-*Wiggins* claim which was the sole issue at the hearing, and to more effectively present Davila's mitigation evidence to the state habeas court. (*Id.* at 91-98).[26] He also argues that habeas counsel's ineffectiveness establishes "cause for a default related to claims found in his *Wiggins* claim [Claim 2] . . . and his *Brady*[27] claim

---

[26]     Davila also alleges that counsel was ineffective for failing to raise a claim of IAC on appeal for counsel's failure to raise a point of error based on the transferred intent instruction. (Am-Petition at 92,  97, 100-01). The Director addressed this issue in full in answering Claim 3 above, and incorporates those arguments by reference.

[27]     *Brady v. Maryland*, 373 U.S. 83 (1963).

[Claim 13]." (*Id.* at 100). Finally, Davila asserts that the Court should either stay the federal action so that he can exhaust claims (ECF No. 18) or else review his claims de novo. (Am-Petition at 102). The Court should deny all requested relief on this rather confusing and otherwise non-cognizable claim.

To the extent Davila alleges IAC of habeas counsel as cause to excuse the default of a *Brady* claim (Claim 13), the Court must reject the same. Davila raised a *Brady* claim in his original federal habeas petition (ECF No. 16 at 86-88), but later filed an amended petition stating "**Davila abandons this claim**." (Am-Petition at 163) (emphasis in original). Since a *Brady* claim is no longer before the Court, there is no reason to consider the issue of default and no legal basis to grant a stay or hold an evidentiary hearing on the matter.

Davila's current IAC on state habeas claim is not relevant to this Court's consideration of the underlying IAC-*Wiggins* claim (Claim 2). As argued in response to the Wiggins, the TCCA adjudicated it on the merits during state habeas proceedings. *Ex parte Davila*, *supra*. Because the claim is not defaulted, Davila cannot avail himself of the equitable rulings in *Martinez* and *Trevino*. *See Brown v. Thaler*, 684 F.3d 482, 489 n.4 (5th Cir. 2012) (holding that *Martinez* does not apply to claims adjudicated on the merits in the state court)*, cert. denied,* 133 S. Ct. 1244 (2013); *Laws v. Stephens*, No. 11-20796, 536 Fed. App'x 409, 415 n.10 (5th Cir. 2013) (unpublished opinion noting that *Trevino* did not

apply "because, unlike that case, the [IAC] claim was raised in state habeas proceeding and, therefore, not asserted to be procedurally defaulted in federal court"), *cert. denied*, 134 S. Ct. 2133 (2014). Indeed, *Martinez* does not permit the Court to consider the alleged ineffectiveness of habeas counsel as "cause" to excuse the default of new evidence where the IAC claim has been raised and rejected in the state court. *See Brown*, 684 F.3d at 489 n.4 (holding that *Martinez* does not apply even for claims that the state habeas process was inadequate to provide a full and fair hearing). In addition to rejecting Davila's instant claim, the Court should deny Davila's motion for stay (ECF No. 18) because there is no legal basis under *Rhines* for abating a federal habeas action to allow a petitioner to exhaust a claim that is already exhausted.

In the event the Court construes Davila's instant claim to be a request for habeas relief, then it must reject the same as a matter of law. "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under Section 2254." 28 U.S.C. § 2254(i).  This provision of the AEDPA is fully consistent with the Supreme Court and Fifth Circuit pronouncements that there is no right—from any constitutional source, including the Due Process Clause—to the effective assistance of counsel during state habeas corpus proceedings. *See Murray v. Giarratano,* 492 U.S. 1, 10 (1989) (holding that due

process does not require the appointment of state habeas counsel in capital cases); *Pennsylvania v. Finley,* 481 U.S. 551, 555-56 (1987) (holding that due process does not require appointment of state habeas counsel in non-capital cases); *Beazley,* 242 F.3d at 271 ("[A]s reflected in the bar raised by § 2254(i), *no constitutional right* to habeas counsel in state collateral proceedings exists, so Beazley *cannot* claim a constitutional violation.") (emphasis in original) (citing *Fairman v. Anderson,* 188 F.3d 635, 643 (5th Cir. 1999)).

This controlling precedent was not altered by the holding in *Martinez* because the Supreme Court did not establish a constitutional right to the effective assistance of post-conviction counsel, but rather an "equitable ruling" for cause to excuse a procedural default. *Martinez,* 132 S. Ct. at 1315, 1319; *see In re Sepulvado,* 707 F.3d at 554 (*Martinez* "did not alter our rule that 'the Sixth Amendment does not apply in habeas proceedings.") (citing *Shamburger v. Cockrell,* 34 Fed. App'x 962, 2002 WL 663706, at *3 (5th Cir. 2002) (unpublished) (citing *Pennsylvania v. Finley,* 481 U.S. at 555-560)). Thus, both the AEDPA and federal constitutional law preclude granting a writ of habeas corpus on Davila's IAC on state habeas claim.

Finally, the Court should deny Davila's motion for an evidentiary hearing on whether "any potential procedural defaults" can be excused on the grounds of IAC on direct appeal or state habeas. (ECF No. 20 at 1). As argued in response

to Claim 3 above, Davila's appellate IAC issue may be rejected on the merits on the existing record with no need for a hearing. Davila's IAC on state habeas claim presents no cognizable basis for relief, Davila has abandoned his *Brady* claim (Claim 13), his underlying IAC-*Wiggins* claim (Claim 2) is not defaulted and regardless the Court cannot consider new evidence because its review under § 2254(d)(1) "is limited to the record that was before the state court," *Pinholster*, 131 S. Ct. at 1398.

## V.   Davila's Fourth Amendment Claims Cannot Be Considered on Federal Habeas Review. (Davila's Claims 5 & 6)

In two related claims, Davila contends the trial court erred in denying his motion to suppress his four written statements[28] because they were "the fruit" of an arrest warrant that contains false information in violation of *Franks v. Delaware*, 438 U.S. 154 (1978),[29] and the Fourth and Fourteenth Amendments. (Am-Petition at 103-11). He alleges there is a conflict or inconsistency between

---

[28]   Davila's Claim 5 concerns his three statements admitting to the offense of capital murder. (SX-118, SX-119, and SX-120 at the suppression hearing, renumbered as SX-164, SX-165, and SX-166 for trial). His Claim 6 challenges a fourth statement admitting to an extraneous murder. (SX-126 at the suppression hearing, renumbered as SX-237 at punishment). Copies of the statements are located in volumes 29 and 30 of the reporter's record on direct appeal.

[29]   In *Franks*, the Supreme Court held that a defendant can challenge an affidavit supporting a search warrant on Fourth Amendment grounds if the defendant shows that misrepresentations contained therein are the product of "deliberate falsehood or deliberate disregard for the truth" and that such statements were necessary in supporting the probable cause determination. 438 U.S. at 171-72.

two statements purportedly made by April Coffield to Detective Johnson in the arrest warrant and in a recorded interview the detective conducted with Ms. Coffield the day after the murders, and that if the "false information" is deleted from the affidavit, then the remaining information is insufficient to establish probable cause for his arrest. (*See id.*). The TCCA rejected the claim on the merits after concluding that the trial court's rulings satisfy *Franks*. *Davila*, 2011 WL 303265, at **5-7.

Federal habeas review is foreclosed by *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court held that a state prisoner cannot raise a Fourth Amendment challenge in a collateral attack if the prisoner had a full and fair opportunity to litigate that issue in the state courts. *Id.* at 494-95. The Fifth Circuit has consistently adhered to the holding in *Stone*. *See*, e.g., *ShisInday v. Quarterman*, 511 F.3d 514, 524 (5th Cir. 2007) ("*Stone* bars habeas review of Fourth Amendment claims when the state has provided an opportunity for full and fair litigation of the claim."); *Busby*, 359 F.3d at 722 (holding that Fourth Amendment claims are not cognizable in a federal habeas corpus proceeding); *Jones v. Johnson*, 171 F.3d 270, 278 (5th Cir. 1999) (same). "The Fifth Circuit has  since interpreted an 'opportunity for full and fair litigation' to mean just that: 'an opportunity.'" *Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002) (quoting *Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978)). "If a state

provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes." *Id.*

In this case, Davila had a full and fair opportunity to litigate his Fourth Amendment claim and exercised the opportunity to do so. Davila moved to suppress his oral and written statements (1 CR 185-87) and moved to suppress the arrest warrant alleging that it contained false statements that were knowingly or intentionally made or made with reckless disregard for the truth (9 CR 1919-21). The trial court conducted a hearing on these matters on February 12, 2009, during which the State presented testimony from Detectives Brent Johnson and Thomas Boetcher. (16 RR 174-288, 288-98). Davila offered no witness testimony, informing the court, "We don't have any witnesses, Judge." (*Id.* at 298). The State also presented a copy of Detective Johnson's affidavit in support of the arrest warrant (*id.* at 175-77; 35 RR at SX-117), and the defense played an audio recording of Detective Johnson's interview with April Coffield (16 RR 195, 204-30). At the conclusion of the hearing, the trial court denied Davila's motions and made findings on the record. (*Id.* at 300-03). Six days later, after Davila re-urged his motion to suppress, the trial court offered an additional, alternative basis for its denial. (19 RR 34-38). Davila

challenged the rulings on direct appeal raising Fourth Amendment grounds. Appellant's Brief in *Davila v. State*, No. 76,105 at 35-48 (points of error 3 & 5).

Because a state process existed whereby Davila could—and ultimately did—litigate his Fourth Amendment claims, *Stone* precludes federal habeas review. And because Supreme Court precedent is clear that federal courts may not re-litigate Fourth Amendment claims, for this Court to hold otherwise would violate the non-retroactivity principles of *Teague v. Lane, supra.*

## VI.    Davila's Statements Were Not Coerced. (Davila's Claims 7 & 8)

In two related claims, Davila argues that the trial court erred in overruling his motion to suppress his three custodial statements regarding the capital offense (Claim 7) and one custodial statement regarding an extraneous murder (Claim 8)[30] in violation of his Fifth, Sixth, and Fourteenth Amendment rights . (Am-Petition at 111-15). He alleges the statements were obtained as a result of coercion because he was interrogated for approximately seven hours without receiving any food or water and without going to the restroom. (*Id.* at 114-15). These same claims were raised and rejected on the merits on direct appeal. *Davila*, 2011 WL 303265, at **7-8. In this Court, Davila argues the state court's decision is an unreasonable application of *Jackson v. Denno*, 378 U.S. 368 (1964). He is mistaken on all accounts, and his claims do not warrant relief.

---

[30]       *See* note 28 *supra*, regarding the location of the statements in the record.

In *Jackson v. Denno*, the Supreme Court recognized that "[a] defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." 378 U.S. at 380. The Supreme Court held that when there is a factual issue about the voluntariness of a confession, the trial court must make a determination of voluntariness, including the resolution of any disputed facts. *Id.* at 390-91. The Court held that it is "practical and desirable" for such a determination to be made prior to the admission of the confession and that the defendant was entitled to testify about the circumstances of the confession outside the presence of the jury. *Id.* at 395.

The Supreme Court subsequently held in *Miranda v. Arizona*, 384 U.S. 436 (1966), that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Id.* at 444. While inculpatory statements may be elicited, the tactics that are used "must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Miller v. Fenton*, 474 U.S. 104, 110 (1985); *see also Brown v. Mississippi*, 297 U.S. 278, 286 (1936) (holding that confessions procured by means "revolting to the sense of justice" could not be used to secure conviction). To that end, the

Supreme Court has utilized a "totality of the circumstances" test to evaluate the voluntariness of a given confession. *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991). Two factors determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination: first, the waiver of the right must be voluntary in that it was not the product of intimidation, coercion, or deception, and second, the relinquishment must be made with a full awareness of the nature of the right being waived. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Where a defendant alleges at trial that his confession was coerced, the State must prove by a preponderance of the evidence that it was voluntarily given in order for it to be admissible. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Jackson*, 378 U.S. at 376-77.

Also, the Supreme Court has held that the admission of an involuntary confession is trial error subject to a harmless error analysis. *Fulminante*, 499 U.S. at 310. In order to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637. Therefore, even if this Court were to find that Davila's Fifth Amendment rights were violated, it must also consider whether the admission of the confession was harmless in determining the jury's verdict.

Davila insists (as he did on direct appeal) that his custodial statements were involuntary obtained in violation of his Fifth and Fourteenth Amendment rights because he did not eat, drink, or go to the bathroom for almost seven hours during his interview with Detective Johnson and, therefore, any statement he made was unconstitutionally coerced. (Am-Petition at 113-15). To the contrary, the record in this case establishes that Davila's statements were not coerced and thus were admissible. Prior to trial, Davila moved to suppress his oral and written statements. (1 CR 185-86). The trial court held a "*Jackson v. Denno* Hearing" outside the presence of the jury during which the State presented testimony from Detective Johnson and Detective Boetcher. (16 RR 3, 174-288, 288-93). Davila declined to call any witnesses. (*Id.* at 298). At the conclusion of the hearing, the trial court made oral findings that all four of Davila's statements were voluntarily obtained and denied his motion to suppress. (*Id.* at 300-03).

In reviewing Davila's instant claim on direct appeal, the TCCA summarized the relevant testimony and trial court findings as follows:

> Detective Johnson testified that [Davila] was arrested and brought to the police station at about 1:40 p.m. on April 8th. Detectives Johnson and Boetcher met with him in an interview room where [Davila's] handcuffs were removed and he was placed in leg cuffs. He began the interview by asking [Davila] if he wanted "anything to eat or drink or anything like that. He said no. I do it that way every time. And then I advised him of his *Miranda* rights." [Davila] told Detective Johnson that he understood his rights and

that "he freely, intelligently and voluntarily waive[d] those rights" and agreed to talk with the officers. "He was very relaxed. Just sat there kind of casual." [Davila] gave his first statement beginning at 4:00 p.m. and ended it at 4:25. [29 RR at SX-118]. He gave the second statement beginning at 6:47 p.m. and completed it at 7:22. [29 RR at SX-119]. The officers began taking the third statement at 7:38 p.m. and concluded it at 8:12.[31] [29 RR at SX-120]. Detective Johnson said that he did not do anything to deny [Davila] his basic needs, did not prevent him from having liquids or food, and did not prevent him from going to the restroom. He took a picture of [Davila] lounging casually in his chair in the interview room. [Davila] does not appear to be under any stress or duress.

On cross-examination, Detective Johnson again said that [Davila] appeared very relaxed; "[t]he whole thing was extremely friendly." [Davila] "never asked to go to the bathroom"; he never asked for fluids or food. Detective Johnson reiterated that he had offered, but [Davila] turned him down.

Detective Boetcher also testified and said that [Davila] gave his fourth statement beginning at 8:45 p.m. and completed it at 9:06. He said that [Davila] had used the restroom, but he did not specify when.

The trial judge entered oral findings into the record and stated, *inter alia*,

> [Davila] was offered nothing in exchange for these three statements. There was no force, threats, or coercion made by the police. He was lucid. Did not appear intoxicated. Never asked for a—food or for anything to drink.

> The court finds that the statements are freely and voluntarily made and are admissible.

---

[31]     The third statement is the one in which [Davila] admitted his guilt and explained his actions. Detective Johnson was not present when Detective Boetcher took the fourth statement concerning the extraneous murder. [29 RR at SX-126].

*Davila*, 2011 WL 303265, at *7-8 (footnote in original).

The TCCA assessed Davila's claim of coercion under Supreme Court precedent and Texas statutory and caselaw, and denied it on the merits.

[Davila] argues, without citation to any authority, that it is simply "ridiculous" to think that a person could give four voluntary statements if he had not had food, water, or use of the restroom for seven hours, even though he had never asked for those amenities.

The warnings required by *Miranda* were established to safeguard an uncounseled person's constitutional privilege against self-incrimination during custodial interrogation.[] The warnings required by [Tex. Code Crim. Proc.] article 38.22 are virtually identical to the *Miranda* warnings and are required to be given only when there is custodial interrogation.[] The determination of whether a statement stemming from custodial interrogation is voluntary is based upon an examination of the totality of the circumstances surrounding its acquisition.[] Additionally, great deference is accorded to the trial judge's findings of facts concerning the voluntariness of a suspect's statement[] and to her decision to admit or exclude such evidence, which will be overturned on appeal only where "a flagrant abuse of discretion is shown."[]

Relevant factors to consider when determining whether a confession is coerced include, but are not limited to, whether the defendant received Miranda warnings; the defendant's age, intelligence level, education and mental state; the conditions under which the defendant was interrogated (i.e., duration, environment and access to restroom facilities and food); and whether the defendant was physically punished.[32] A custodial interview lasting seven or more hours is not, by itself, unconstitutionally coercive.[33]

---

[32]     *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 [ ] (1973).

[33]     *See*, e.g., *Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (confession not coerced when evidence showed that defendant was detained in a small interview room for about eight hours and did not ask for food or water or ask to use bathroom facilities); *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir.1993) ("The fact that the

Nor is the fact that the suspect was not given food, drink, or use of the bathroom, absent a request to do so. In the present case, Detective Johnson testified that he did offer [Davila] food and drink, but [Davila] declined the offer. Detective Boetcher testified that [Davila] did use the bathroom at some time during the interview. There is no evidence that [Davila] made any request for food, drink, or use of the bathroom that was denied. Detective Johnson further testified that the rapport between the officers and [Davila] was "extremely friendly" and that [Davila] was fully cooperative. [Davila] proffers no persuasive argument or authority that his confession was not voluntarily given, and our review of the record reveals no evidence showing that his statement was not voluntary. We conclude that the trial judge did not abuse her discretion in admitting [Davila's] custodial statements.[] We therefore overrule [Davila's] seventh through tenth points of error.

*Davila*, 2011 WL 303265, at *8 (footnotes in original, but state-law footnotes omitted herein).

As the Texas courts found (and as Davila fails to rebut), he provided the officers with four different statements that were voluntary obtained and consequently their admission into evidence does not implicate constitutional concerns. Davila makes no attempt to rebut the trial court's factual determinations by clear and convincing evidence. *See* § 2254(e)(1). He also fails

---

questioning extended for six or seven hours is not *per se* unconstitutionally coercive."); *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir.1988) ("The seven and one-half hour interrogation, Sumpter's IQ of 89, and the special agent's references to Sumpter's child and wife, even if considered in combination with one another, do not make the confession involuntary ."); *cf. Stein v. New York*, 346 U.S. 156, 185-86[] (1953) (twelve hours of intermittent questioning by different officers over a 32-hour period was not unconstitutionally coercive); *compare Greenwald v. Wisconsin*, 390 U.S. 519, 520-21[] (1968) (confession involuntary when the suspect, while on medication, was interrogated for over eighteen hours without food, medication, or sleep, and was denied requested counsel).

to establish under § 2254(d)(1) that the adjudication resulted in an unreasonable application of clearly established Supreme Court precedent. While confessions procured by coercion cannot be used to secure conviction, that certainly did not occur in this case.

Even if the Court decides that any of Davila's statements were obtained in violation of his Fifth Amendment rights, the Court must still deny relief because the admission did not have a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637. Davila's confessions at best were only a small part of the State's overwhelming case against him at guilt/innocence and punishment, as summarized in the Statement of Facts section, *supra*.

## VII.  The Constitution Does Not Require the Texas Special Sentencing Issues Be Presented in an Indictment for a Grand Jury to Review. (Davila's Claim 9)

Davila alleges that the trial court erred in overruling his motion to preclude the death penalty and declare Article 31.071 of the Texas Code of Criminal Procedure unconstitutional because Texas law permits a grand jury to indict a person for capital murder without first reviewing the evidence to support the punishment special issues. (Am-Petition at 116-29). The TCCA rejected the claim on the merits. *Davila*, 2011 WL 303265, at *10. Davila fails to show that the adjudication warrants an exception to AEDPA deference under § 2254(d).

To this Court, Davila argues that indictment in his case did not comply with the notice requirements of the Fifth and Fourteenth Amendments. (*See* Am-Petition at 117-18). Citing *United States v. Robinson*, 367 F.3d 278, 294 (5th Cir. 2004), he argues that the government is required to charge by indictment all aggravating factors that it intends to prove at trial that would render a defendant eligible for the death penalty. (*Id.*) Because the State failed to include the punishment phase special issues in its indictment in this case, Davila suggests that he was denied his constitutional right to proper notice of the charges against him. (*Id.*) This argument is similarly unavailing.

To start, *Robinson* is inapposite because it addressed only the requirements of a grand jury indictment in a *federal* death-penalty prosecution. *See Robinson*, 367 F.3d at 288. But the Fifth Amendment right to a grand jury indictment was never incorporated into the Fourteenth Amendment requirements imposed on the states. *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (noting that the Fifth Amendment right to indictment was not among the Bill of Rights provisions incorporated into the Fourteenth Amendment); *see also Kerr v. Thaler*, No. 09-70030, 384 Fed.App'x. 400, 402-3 (5th Cir. 2010) (unpublished) (same). Because the Fifth Amendment requirements of federal indictments set forth in *Robinson* are irrelevant to defendants such as Davila who were prosecuted in state courts, his complaints concerning those requirements are

futile. Indeed, this was the first basis on which the TCCA rejected the instant claim on direct appeal. *Davila*, 2011 WL 303265, at *10 ("The federal constitutional right to indictment in a felony case does not apply to the state.").

Furthermore, *Robinson* was based on *Ring v. Arizona,* 538 U.S. 584 (2000) which, when considered together with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), stand for the proposition that when an increase in punishment is contingent upon an additional finding of fact, that fact must be found by a jury beyond a reasonable doubt. *Ring,* 536 U.S. at 609; *Apprendi*, 530 U.S. at 490. Davila cannot avail himself of this line of cases because his claim is based on a pure fallacy—that the Texas special issues are aggravating factors that somehow increase the maximum penalty for capital murder and must therefore be presented in the indictment. (Am-Petition at 117-18). In Texas, the aggravating factors that could render a person death-eligible are found solely in Section 19.03(a) of the Texas Penal Code, and the eligibility determination is made at the guilt phase of trial according to the elements that were alleged in the indictment.[34] *See Lowenfield v. Phelps*, 484 U.S. 231, 245-46 (1988) (noting that, in Texas, capital-murder aggravating factors are determined at the guilt-

---

[34]     In Davila's case, each of the statutory elements for the multiple-murder theory of capital murder charged by the State under § 19.03(a)(7)(A) (murder of more than one person in the same criminal transaction) was indicted, submitted to the jury, and proven beyond a reasonable doubt as a prerequisite to reaching the punishment phase of trial. (1 CR 2).

innocence phase of trial). The special issues addressed at the punishment phase have nothing to do with the eligibility determination, but instead are designed to narrow the jury's discretion in making the ultimate decision whether to impose a death sentence. *See Jurek v. Texas*, 428 U.S. 262, 279 (1976) (reviewing and upholding the Texas death-penalty statutory scheme). As such, the special issues are not elements of the offense that must be alleged in an indictment and proven beyond a reasonable doubt. Thus, Texas's special sentencing issues do not implicate the Supreme Court's holdings in *Ring* and *Apprendi*.

Indeed, the Fifth Circuit has consistently concluded that the Texas capital sentencing scheme does not violate *Ring* or *Apprendi*. E.g., *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006); *Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005). The Fifth Circuit has also held that *Apprendi* is not implicated by Texas's special issues not being pleaded in the indictment. *Anderson v. Quarterman*, No. 06-70004, 204 Fed. App'x. 402, 409 (5th Cir. 2006) (unpublished). Davila fails to establish that the state-court adjudication resulted in an unreasonable application of Supreme Court precedent and, because there is no such controlling precedent, the relief he seeks is barred under *Teague*.

## VIII. Texas's "10-12" Rule is Constitutional. (Davila's Claim 10)

As his tenth claim for relief, Davila argues that the trial court erred in overruling his objection to the punishment-phase jury charge submitted in

accordance with the Texas 10-12 Rule. (Am-Petition at 130-48). He alleges the jury instruction affirmatively misleads jurors about their ability to give effect to their personal beliefs regarding mitigation, thus violating the Sixth, Eighth, and Fourteenth Amendments. (Am-Petition at 130-48). Davila challenged the trial court's ruling but the TCCA denied relief noting it has "repeatedly considered and rejected this claim." *Davila*, 2011 WL 303265, at *10 (citing, e.g., *Coble v. State*, (Tex. Crim. App. 2010), and *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005)). Davila fails to demonstrate that the adjudication resulted in an unreasonable application of clearly established Supreme Court precedent, so the Court should deny relief on this meritless, *Teague*-barred claim.

Under Texas's capital sentencing scheme, a jury is instructed (1) that at least 10 jurors must agree before they may answer "No" to the future dangerousness issue or "Yes" to the mitigation issue, and (2) that all 12 jurors must agree before answering "Yes" to the future dangerousness issue and "No" to the mitigation special issue. Tex. Code Crim. Proc. art. 37.071, § § 2(d)(2) & (f)(2). Davila's jury was instructed in this manner. (9 CR 1936). While Texas law prohibits informing jurors of the effect of a failure to agree on a special issue, art. 37.071, § 2(a), Davila's jury was charged that depending on its answers to the two special issues the trial court would impose punishment "for life without parole or by death." (*See* 9 CR 1936). The jury was also instructed that it need

not agree on what particular evidence supports an affirmative finding on mitigation. (*Id.*)

Davila argues the 10-12 Rule creates an impermissible risk of a death sentence being arbitrarily imposed in violation of the Eighth and Fourteenth Amendments. (Am-Petition at 131-40, citing *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985), and *Woodsen v. Carolina*, 428 U.S. 280, 305 (1976)). The Fifth Circuit has recognized *Caldwell* does not "clearly support" such an argument:

> In that case, the prosecution urged the jury not to view itself as finally determining whether petitioner would die, because a death sentence would be reviewed for correctness by the state supreme court. *Caldwell*, 472 U.S. at 323[]. The Court held that this violated the Eighth Amendment since it led jurors to believe that "the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." *Id.* at 32829[].

*Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011). In this case, just like *Druery*, Davila "does not explain how the jurors would believe that the responsibility to determine the propriety of a death sentence rested elsewhere. The [10-12] Rules implicitly urge jurors toward consensus, but nothing in them suggests the ultimate responsibility to choose reposes in another actor." *Id.* Davila's reliance on *Caldwell* also fails because the jury instructions in his case did not misstate the role of the jury under Texas law. *Dugger v. Adams*, 489 U.S. 401, 407 (1989) ("if the challenged instructions accurately described the role of the jury under state law, there is no basis for a *Caldwell* claim").

To the extent Davila asserts that jurors should have been informed that a lack of unanimity during the penalty phase would result in a life sentence, relief is foreclosed by Supreme Court and Fifth Circuit precedent. In *Jones v. United States*, 527 U.S. 373 (1999), the Supreme Court concluded that a jury need not be told what happens procedurally when a verdict cannot be reached. While the jury may not be "affirmatively misled regarding its role in the sentencing process," a court is not required to instruct the jury "as to the consequences of a breakdown in the deliberative process." *Id.* at 381-82. Arguments similar to Davila's repeatedly have been rejected in this circuit, most recently in *Reed v. Stephens*, 739 F.3d at 779 (no instruction required on lack of unanimity) (citing, e.g., *Druery*, 647 F.3d at 542-45). The Fifth Circuit similarly holds that an accused facing the death penalty is not entitled to an instruction as to the effect of a sentencing deadlock. *ShisInday*, 511 F.3d at 523 (citing *Jones*). In Davila's case, the jury instructions accurately recited the governing law, and no error occurred here. This analysis is not changed by the Eighth Amendment's requirement of "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson,* 428 U.S. at 305, so Davila's reliance here is misplaced.

Davila further contends that the 10-12 Rule denied him his Eighth Amendment right to individualized sentencing because it may have misled

jurors about their individual ability to give effect to their belief on mitigating circumstances. (Am-Petition at 140-44, citing *Mills* v. *Maryland*, 486 U.S. 367 (1988)). In *Mills*, the Supreme Court held that the Eighth Amendment was violated where jurors likely believed that they were required to agree unanimously on the existence of a specific mitigating circumstance. 486 U.S. at 384. Subsequently, the Supreme Court explained that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 442-43 (1990). However, the Fifth Circuit has repeatedly rejected arguments like Davila's that the 10-12 Rule is unconstitutional and held that extending the principles of *Mills* and *McKoy* would violate *Teague*. *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005) (rejecting argument that potential of "10-12 Rule" to confuse jurors violates *Mills* and rejecting such an extension based on the non-retroactivity doctrine of *Teague*); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (rejecting petitioner's reliance on *Mills* and holding that any extension is barred by *Teague*); *Miller v. Johnson,* 200 F.3d 274, 288 (5th Cir. 2000) (holding that *Mills* is inapplicable to the Texas capital sentencing scheme); *Jacobs v. Scott,* 31 F.3d 1319, 1328-29 (5th Cir. 1994) (same).

Finally, Davila alleges the 10-12 Rule violates his Sixth Amendment right to a fair and impartial jury. (Am-Petition at 144-47). He contends that the 10-12 instruction creates confusion for jurors regarding their individual ability to give effect to their personal beliefs and then fails to correct misconceptions by informing jurors that a single "hold-out" could prevent the imposition of the death penalty and effectuate a life sentence. (*See id.*). It is unclear how this is an argument distinct from his preceding claims, especially since Davila states that this point "was earlier discussed within the context of the additional Eighth Amendment safeguards required to reduce the risk of arbitrary and unreliable sentences." (*Id.* at 145). However, because Davila's Eight Amendment allegations are meritless, so too is this claim.  In sum, Davila cannot demonstrate that the state-court adjudication warrants relief. Therefore, the Court should reject the entirety of Davila's meritless and T*eague*-barred claims.

## IX.   There is No Constitutional Requirement for the State to Prove an Absence of Mitigating Evidence. (Davila's Claim 11)

As his final ground for habeas relief, Davila alleges that his constitutional rights were violated by the jurors' not being instructed that the State has the burden of proving a lack of mitigating evidence. (Am-Petition at 148-62). The Court should reject Davila's claim because habeas relief is foreclosed by *Teague* and by Fifth Circuit precedent.

In order to obtain a death sentence under Texas law, the State has the burden to prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § (2)(b)(1). If the jury unanimously agrees to answer "yes" on future dangerousness, it must then consider whether there are sufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence. *Id.*, § (2)(e)(1). While the jury may not answer the mitigation issue "no" unless they unanimously agree, *id.*, § (2)(f), the sentencing scheme does not assign a burden of proof on this issue. Prior to trial, Davila moved for a jury instruction that would allocate to the State the burden of proof concerning the lack of mitigating evidence (1 CR 74-76), and the trial court denied the motion (*id.* at 74). On direct appeal, the TCCA denied Davila's current claim challenging the trial court's ruling, noting it has "repeatedly rejected this argument." *Davila*, 2011 WL 303265, at *10 (citing, e.g., *Mays v. State*, 318 S.W.3d 368, 397 (Tex. Crim. App. 2010), and *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008)).

Davila argues that the state-court adjudication is contrary to *Apprendi*, *Ring*, and *Cunningham v. California*, 549 U.S. 270, 286 (2007). (Am-Petition at 149-53). He contends that all facts relative to guilt or impacting punishment must be found by a jury beyond a reasonable doubt, that Texas's special

sentencing issues increase the maximum penalty to death and, therefore, the State is required to prove beyond a reasonable doubt the absence of mitigating circumstances. (*See id.*). His argument ignores the distinction between facts in aggravation and facts in mitigation, and his reliance on these cases is misplaced as argued in response to Davila's Claim 9 above and incorporated herein.

Most importantly for federal habeas review, the absence of controlling Supreme Court precedent is fatal to Davila's claim under § 2254(d). The Fifth Circuit has held on several occasions that "[n]o Supreme Court or Fifth Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Blue,* 665 F.3d at 668 & n.109 (citing *Druery*, 647 F.3d at 546) (quoting *Rowell*, 398 F.3d at 378)). The Fifth Circuit has also "specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances." *Sprouse v. Stephens*, 748 F.3d 609, 623 (5th Cir. 2014) (quoting *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007)); *Ortiz v. Quarterman*, 504 F.3d 492, 504-05 (5th Cir. 2007) (same holding). And in *Granados,* the Fifth Circuit rejected *Apprendi/Ring* claims because the State must "prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death," whereas "a finding of mitigating circumstances reduces a sentence from death,

rather than increasing it to death." 445 F.3d at 536-37. Davila makes no attempt to distinguish these cases or suggest they do not control. Nor could he.

Finally, because Davila seeks to extend *Apprendi* and *Ring* beyond their current holdings, his argument amounts to advocacy of a "new rule" of federal constitutional criminal procedure that is foreclosed under *Teague*.

## CONCLUSION

The Court should deny Davila's amended habeas petition (ECF No. 17), his motions for stay and abeyance (ECF No. 18), and his motion for an evidentiary hearing (ECF No. 20).

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division


s/Katherine D. Hayes*
Assistant Attorney General
* Attorney-in-charge              Criminal Appeals Division
Texas Bar No. 00796729

Office of the Attorney General of Texas
P. O. Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
katherine.hayes@texasattorneygeneral.gov

ATTORNEYS FOR RESPONDENT

**CERTIFICATE OF SERVICE**

I certify that on September 4, 2014, I electronically filed this Answer and Reply to Petitioner's Motions using the ECF system of the Court. A "Notice of Electronic Filing" is automatically sent to the following attorneys of record for Petitioner who have consented to accept such notice as service of the document by electronic means:

Seth Kretzer                          Jonathan David Landers
Law Office of Seth Kretzer            2813 W T C Jester
The Lyric Center                      Houston, TX 77018
440 Louisiana, Suite 200             Tel.: (713) 685-5000
Houston, TX 77002                     jlanders.law@gmail.com
Tel.: (713) 775-3050
Fax: (713) 623-0029
seth@kretzerfirm.com


 s/Katherine D. Hayes
Assistant Attorney General
Attorney-in-Charge for Respondent