No. 4:13-cv-00506-O

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FT. WORTH DIVISION

_____

ERICK DANIEL DAVILA,

*Petitioner,*

v.

WILLIAM STEPHENS,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the
Criminal District Court Number 1 of Tarrant County

_____

## REPLY TO ANSWER OF RESPONDENT THALER
_____

**SETH KRETZER**
SBN: 24043764
440 Louisiana Street; Suite 200
Houston, TX 77002
(713) 775-3050 (office)
(713) 224-2815 (fax)
*email: seth@kretzerfirm.com*

**JONATHAN LANDERS**
SBN: 24070101
2817 W. T.C. Jester
Houston, Texas 77018
(713) 301-3153 (office)
(713) 685-5020 (fax)
*e-mail: jlanders.law@gmail.com*

COURT-APPOINTED ATTORNEYS FOR PETITIONER, ERICK DAVILA

1

_____

## DAVILA'S RESPONSE TO STEPHENS'S ANSWER TO HIS PETITION FOR WRIT OF HABEAS CORPUS

_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, Erick Davila, the Petitioner, and respectfully submits his Reply to Respondent Stephens's Answer (Doc. No. 29).

### INTRODUCTION

## I.    INSUFFICIENCY OF THE EVIDENCE

### A.    Sufficiency Can be Reviewed Under 28 U.S.C. § 2254 (d)(2).

In his Amended Writ, Davila explained how the Court of Criminal Appeals' decision on this issue was based on an unreasonable determination of the facts. *See* Doc. 17 at 41-45. In its reply, Respondent Stephens (hereinafter, "The State" or "The Director") cites Seventh Circuit case law for the legal proposition that "[a] sufficiency issue is a mixed question of law and fact which the Court reviews under § 2254(d)(1)." *See* Doc. 29 at 35 (*citing Gomez v. Acevedo*, 106 F.3d 192, 198 (7th Cir. 1997), *vacated on other grounds*, 522 U.S. 801 (1997)). Davila contends that the improper factual findings made by the state court are relevant to the argument that the state court's decision involved an unreasonable application of *Jackson*, but urges that it would be proper for this Court to review this issue under the 28 U.S.C § 2254(d)(2) unreasonable factual finding standard. Davila would note that the state

has not identified any controlling precedent establishing that sufficiency claims must be reviewed under § 2254(d)(1), and that multiple Federal District Courts in Texas, as well as the Tenth Circuit, have reviewed sufficiency claims under both standards. *See, e.g.*, *Webber v. Scott*, 390 F.3d 1169, 1178 (10th Cir. 2004); *Jackson v. Quarterman*, CV. A. H-08-246, 2009 WL 562853 (S.D. Tex. Mar. 4, 2009); *Magee v. Cockrell*, CA-3:01-CV-0531-H, 2001 WL 1516755 (N.D. Tex. Nov. 28, 2001).

## B.   The State's Reply Relies on the Unreasonable Factual Determinations Made by the Texas Court of Criminal Appeals.

In his Amended Writ, Davila explained how the Court of Criminal Appeals decision on this issue was based on an unreasonable determination of the facts. *See* Doc. 17 at 41-45. Indeed, it is because of these unreasonable factual determinations that this Court has the authority to grant Davila's writ under 28 U.S.C. § 2254(d)(2). In response, the state simply copied the Court of Criminal Appeals factual findings, and used them as the basis for the contention that "[t]he jury's verdict must remain undisturbed since any rational trier of fact could have found the essential elements of Davila's multiple-murder capital crime beyond a reasonable doubt." *See* Doc. 29 at 37-38. The state does not attempt to explain why Davila's contention that these factual findings were unreasonable is incorrect. *Id.* As opposed to adopting the findings of the Court of Criminal Appeals and applying the findings to the *Jackson*

standard, a proper analysis of this claim should focus on the facts presented to the jury, and then apply those facts to the *Jackson* standard.

### C.   The State Was Required to Prove Two Separate Intents to Kill before Davila Could be Convicted of Capital Murder.

The parties agree that Davila was indicted, tried, and convicted of capital murder under Texas Penal Code § 19.03(a)(7)(4), which requires proof that a person "commits murder as defined under Section 19.02(b)(1) and . . . murders more than one person . . . during the same criminal transaction." *See* Doc. 29 at 36; Doc. 17 at 36-37.   Further, the parties and the Court of Criminal Appeals agree that Texas' transferred intent law applies to capital murder. *See, e.g.*, *Id.*; *Davila v. State*, AP-76,105, 2011 WL 303265 at 4-5 (Tex. Crim. App. 2011).   However, the state contests whether Davila's claim that the Court of Criminal Appeals has "made clear that Texas' transferred intent doctrine cannot be used to increase murder to capital murder on the grounds that the defendant, while intending to kill a single person, actually kills two" is still good law. *See* Doc. 29 at 39 (*citing Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008)). The state recognizes that the Court of Criminal Appeals itself agreed with this statement in reviewing Davila's sufficiency claim (*Id.* at 39), but points out that the Court of Criminal Appeals has since referred to the statement as mere dictum. *Id.* (*citing Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012)).   A review of Texas case law, namely the *Norris* and

*Roberts* cases, makes one thing clear: a capital murder conviction under Texas Penal Code § 19.03(a)(7)(4) cannot stand absent *two separate intents to kill.* For this reason, Davila's sufficiency argument should prevail.

In *Norris v. State*, the CCA held that Texas' transfer intent law applied to capital murder prosecutions in Texas. 902 S.W.2d 428, 438 (Tex. Crim. App. 1995), *overruled by Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008). Quite strikingly, the CCA in *Norris* also found there was sufficient evidence to find that Norris had the actual intent to kill both of his victims. *Id.* at 436. The facts of that case are that Norris went to the house of his lover and shot her and her baby at close range multiple times. *Id.* at 430. Apparently, he first fired shots from outside of the woman's window, climbed in the window and shot at the woman again (as she held her baby), then left the room and returned once again, firing a couple of more shots towards the woman. *Id.* at 430-31. Based on these facts, the CCA agreed that the evidence was "sufficient to prove the appellant specifically intended to kill the baby [and the mother]." *Id.* at 436.

However, the jury instructions in Norris' case allowed the jurors to convict Norris if they believed that both the mother and child were killed, even if Norris only intended to kill the mother. *Id.* Norris argued that this was an impermissible legal theory. *Id.* Although not clearly reasoned, the CCA found that the transferred intent doctrine applies to capital murder and Texas, and implicitly upheld the contention

that the intent to kill one person was sufficient to prove capital murder so long as two deaths result. *Id.* at 438.

This issue was raised once again in *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008), relied upon by Davila in his Amended Writ and on appeal to the CCA. *Roberts* involved a Dallas home invasion which resulted in a woman, who was in the early stages of pregnancy, being shot. *Id.* at 324. As a result of the woman's death, the fetus also died. *Id.* at 324-26. It was undisputed that Roberts did not know that the woman was pregnant. *Id.* at 328. In spite of his lack of knowledge, Roberts was indicted and convicted of capital murder for "intentionally and knowingly caus[ing] the death of [the woman] by shooting her with a firearm, a deadly weapon, and during the same criminal transaction had intentionally and knowingly caus[ing] the death of "another individual, to-wit: an unborn child of [the woman] by shooting [the woman] while said unborn child was in gestation . . ." *Id.* at 325.

The *Roberts* court in its analysis noted that the "*Norris* Court acknowledged that capital murder pursuant [to] TEX. PENAL CODE § 19.03(a)(6)(A) requires two or more intentional or knowing murders" and then noted the short paragraph in *Norris* which analyzed the transferred intent doctrine. *Id.* at 330. The CCA explained that the conclusion in *Norris* "is at odds with the *Norris* Court's recognition that, for capital murder pursuant to Section 19.03(a)(6)(A), each death must be intentional or

knowing—there must be a discrete *'specific intent to kill' as to each death*."   *Id.* (*emphasis added*).  This legal parameter, i.e., *specific intent to kill as to each death*, has never been overruled.  The CCA made clear that one intent cannot support more than one death.  *Id.* at 330-31.  The Court concluded there was not sufficient evidence that Roberts intentionally or knowingly caused the death of the woman's unborn child, and reversed Robert's death sentence.  *Id.* at 331-32.

After the *Roberts* decision, and after the CCA had ruled on Davila's sufficiency argument (which cited *Roberts* approvingly), Norris filed a writ of habeas corpus alleging that he was entitled to relief in light of *Roberts*.  *Ex parte Norris*, 390 S.W.3d 338, 339 (Tex. Crim. App. 2012). The CCA began by pointing out that they had found on direct appeal that Norris had indeed harbored the specific intent to kill both the mother and the child she was holding.  *Id.* at 339.  However, the Court went on to clarify that although a single intent to kill cannot be sufficient to prove two murders (as necessary for capital murder in this case), an intent to kill a single person could be sufficient to prove two murders, so long as the defendant "intend[ed] more than once to kill a particular person."  *Id.* at 341.  The CCA gave an example of such a circumstance: "A defendant could shoot at John on Monday with the bullet hitting Mary and killing her instead. Then the defendant could shoot at John again on Tuesday and this time succeed in killing him."  *Id.*  The Court then went to explain why the evidence was sufficient to convict *Norris* on transferred

intent grounds: "First, he fatally shot the child in the head, either (1) intending to kill the child or (2) intending to kill the mother but killing the child instead. Even if the latter were the case, his intent transferred to the child. Then, realizing that he had killed the child, he continued to shoot at the mother, thus engaging in conduct with a separate intent to kill." *Id.* at 341. Once again, what is clear is that there must be a *specific intent to kill as to each death*. Further, it appears that for the intent to kill a single person to be sufficient to convict for killing two persons, the defendant must know the first intent led to the death of someone other than the intended victim. Stated another way, there is no indication from the CCA that a defendant who fired two shots at person A killing him, with the intent to kill only person A, and who missed with one shot killing person B, could be found guilty of capital murder absent some knowledge that he had missed with the first shot. Otherwise, the defendant would have harbored only a single intent to kill.

Based on this understanding, the state argues that "the evidence is also sufficient under Davila's proposed single-intent-to-kill-Jerry theory because it supports the rational conclusion that he intended more than once to kill the same person." *See* Doc. 29 at 39. However, the evidence presented at Davila's trial does not present a situation where Davila shot at Jerry hitting someone else, realized he had missed, and then shot at Jerry again, hitting someone else. Rather, as Davila explained in his Amended Writ, the evidence is that Jerry was the target of Davila's

shooting, and that Davila in his attempt to shoot Jerry, while wildly shooting at Jerry's house, ended up killing two other people. There is no indication that Davila knew he had hit other people, or any other reason to believe that Davila had two separate intents to kill Jerry. *See* Doc. 17 at 38-45.

## II.   INEFFECTIVE ASSISTANCE OF PUNISHMENT PHASE MITIGATION CASE

### A.   Standard of Review

Davila agrees with the state's assertion that a defense attorney's "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *See* Doc. 29 (*citing Wiggins*, 539 U.S. at 521). However, Davila has shown in his previous briefing that his trial counsel failed to conduct a thorough investigation into the mitigation case, and that counsel's failure resulted in valuable mitigation evidence going undiscovered and therefore not being presented to the jury. *See* Doc. 17 at 45-79. Further, Davila has specifically pointed out that the state court's ruling, by adopting the state's proposed findings of facts and conclusions of law almost in their entirety, was based on multiple unreasonable factual findings and repeatedly involved unreasonable application of clearly established federal law. *Id.* at 68-79. As Davila is able to successfully clear the 28 U.S.C. 2254(d)(1) and (d)(2) hurdles, this Court has the ability to grant relief on this claim.

Further, the state's contention that the question for this Court "is not on whether the petitioner made the showing required under *Strickland*, but rather 'whether the state court's decision—that [petitioner] did not make the *Strickland*-showing—was contrary to, or an unreasonable application of' clearly established Supreme Court precedent" only applies to a review performed under § 2254(d)(1). *See* Doc. 29 at 41 (*citing Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004)).  Of course, if this Court believes that the state court's factual findings were unreasonable under § 2254(d)(2), then this Court should apply the *Strickland* standards to the correct factual basis in deciding if relief should be granted.

Also, *Cullen v. Pinholster*, 131 S. Ct. 1388, (2011), in no way limits this Court's review of new evidence in reaching the merits of a claim so long as the petitioner has satisfied the § 2254(d) requirement.  *See*, *e.g.*, *Smith v. Cain*, 708 F.3d 628, 634-35 (5th Cir. 2013) (explaining that *Pinholster* is inapplicable where the district court concludes that the § 2254(d) standard has been satisfied based on the record before the state court).[1]

Finally, the following legal premise presented in the state's reply is incorrect: clearly established federal law holds that it is virtually impossible to show prejudice where the State's punishment-phase evidence is overwhelming. *See* Doc. 29 at 43.

---

[1]. It appears the state agrees with this statement, although it is not clearly explained in the state's response.  *See* Doc. 29 at 40 n. 21.

Instead, as the Supreme Court pointed out in *Williams v. Taylor*, where Williams had smashed his victims head in with a mattock for a couple of dollars, and where the Supreme Court found the state court's denial of habeas relief to be unreasonable:

> *Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.* The Virginia Supreme Court did not entertain that possibility. It thus failed to accord appropriate weight to the body of mitigation evidence available to trial counsel.

529 U.S. 362, 398 (2000) (emphasis added). The Supreme Court has made it clear that overwhelming punishment phase evidence does not preclude relief pursuant to a *Wiggins* claim where trial counsel unreasonably limited the mitigation investigation, leading to a wealth of information going undiscovered.

### B.   Davila has Established the Elements of a Successful Ineffectiveness Claim.

In an attempt to show that trial counsel's investigation was not lacking, the state points to factual findings, which Davila has not specifically contested as being unreasonable, showing that the defense performed *some* mitigation investigation. *See* Doc. 29 at 48-51. This section of the state's reply begins with the troubling legal finding that the decision not to hire a mitigation investigator "was reasonable and consistent with the prevailing professional norms among the criminal defense bar of Tarrant County, Texas, during the relevant time period." *Id.* at 48. Davila specifically addressed this finding in his amended writ, showing that the Supreme

Court has time and again looked to the ABA guidelines as the standards by which we should determine what is reasonable, and pointing out that "the fact that an entire county fails to follow the standards for capital defense as identified by the Supreme Court should not excuse trial counsel's failure to follow those established norms." *See* Doc. 17 at 78. The state then proceeds to list the people who the defense team did contact. See Doc. 29 at 50.[2] Further, the state explains that the defense team hired a team of experts to help in Davila's case. *Id.* The state believes that the fact the defense team performed an investigation belies Davila's ineffectiveness claim. *Id.* at 51.

However, in making this argument, the state fails to recognize that in cases such as *Wiggins v. Smith*, the Supreme Court has found ineffectiveness of counsel in spite of the fact that trial counsel conducted a mitigation investigation. 539 U.S. 510 (2003). Because Wiggins' complaint was that his counsel failed to conduct a thorough social history investigation, the Court's "principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgmen[t], is not whether counsel should have presented a mitigation case. Rather, [the Court] focus[ed] on whether the *investigation* supporting counsel's decision not to introduce mitigating

---

2. The state in their reply cites to the state habeas court's finding that "a 'great number' of Davila's former teachers" were interviewed. *See* Doc. no. 29, at 51 (*citing* FF ##43-44). Although not included in Davila's Amended Writ, this is also an unreasonable factual finding because trial counsel herself remembers speaking with only two of Davila's teachers. *See* State Writ CR at 276; State Writ RR vol. 2 at 122-23. Further, one of those teachers had strong mitigation evidence to present on Davila's behalf, but she did not want to come testify and was not subpoenaed for that reason. *Id.*

evidence of Wiggins' background was *itself reasonable.*"  In much the same way, Davila argues that his counsels' decision not contact more of his family members, their failure to retain a mitigation investigator, and failure to uncover strong mitigation evidence was itself unreasonable.  The argument is not that no mitigation evidence was presented, but that the investigation itself was lacking.

Further, the fact that the expert witnesses hired by Davila's counsel failed to identify evidence of mental retardation or brain dysfunction cannot be relied upon where those experts were denied evidence of abuse and trauma missed by the defense team.  *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (pointing out that trial counsel's failure to uncover certain mitigation evidence deprived not only the jury of that evidence, but also the defense experts).  In order for the experts to properly perform their job, they must first be given the relevant evidence.  Davila's claim is simply that his counsel failed him by failing to conduct a full mitigation investigation.

Finally, the state argues that the evidence Davila's counsel failed to uncover is not sufficient to show ineffectiveness because the additional evidence "essentially comes down to a matter of degrees" and is therefore "even less susceptible to judicial second guessing."  *See* Doc. 29 at 55 (*citing Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)). The State would urge this Court to out allow the lesser to subsume the greater: because counsel did some investigation, their ***inferior*** investigation is

somehow more protected against an ineffectiveness claim than if they had done ***no*** investigation whatsoever. Of course, this theory is orthogonal to the holdings of subsequent Supreme Court case law. *See Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). Further, Davila contends the state is incorrect in claiming that evidence of his horrendous childhood is of the "double-edged" variety. *See* Doc. 29 at 55. The state, in a remarkably casual fashion, mischaracterizes evidence of severe abuse as inherently "double-edged," citing to *Kitchens*, a case that detailed strategic reasons for counsel failing to present this evidence. *See* Doc. 29 at 55. The state's reply does not suggest any reasonable strategy, and there is none, for Davila's trial counsel's failure to investigate and discover evidence establishing that Erick Davila was not merely raised by a neglectful mother, but rather a mother who ruled by mental and physical abuse, who did not love her children, and who forced her son into the gang-infested streets at a young age. *See*, *e.g.*, Doc. 29 at 55-62.

Even assuming for these purposes that the specific facts of Davila's nightmarish childhood could be considered "double-edged," this Court owes no "great deference" to trial counsels' reasons for omitting the evidence, as the state claims—the defense team failed to properly investigate, and so the evidence was omitted because they did not know about it, not because they made a strategic decision to keep it out. Further, this concept, that "any unhelpful information renders

otherwise potentially mitigating evidence useless, is foreclosed by *Williams*." *Walbey v. Quarterman*, 309 Fed. Appx. 795, 804–05, 2009 WL 113778 (5th Cir. Jan. 19, 2009) (*citing Williams v. Taylor*, 529 U.S. at 396 (addressing double-edged evidence in the context of a performance inquiry, but subsequently finding the failure to introduce the mitigating evidence, which contained the doubled-edged evidence, prejudicial)).

Davila contends that had the jury been presented with a graphic description of the full story of his childhood, "filled with abuse and privation," that there is a reasonable probability that at least one of the jurors would have held out for life sentence in this case. *Williams*, 529 U.S. at 398. Further, Davila has provided this Court with multiple examples of erroneous factual findings and legal conclusions at the state habeas level, and for this reason Davila asks this Court to grant his writ on the ineffective assistance of counsel claim.

III.  **INEFFECTIVE ASSISTANCE OF STATE DIRECT APPELLATE COUNSEL REGARDING HER FAILURE TO RAISE AS A POINT OF ERROR THE IMPROPER TRANSFERRED INTENT JURY INSTRUCTION.**

A.  **State Habeas Counsel Failed to Raise a Meritorious Ineffective Assistance of Appellate Counsel Claim.**

The state appears to argue that Davila's IAC appellate counsel claim cannot prevail because the erroneous jury charge was not preserved for appeal, because

there was no error in the jury charge, and because, in the state's view, the evidence was sufficient to convict Davila.  Davila would first point out that this issue does not rise or fall on the sufficiency of the evidence. Rather, this issue is based on an erroneous jury charge which allowed the jury to convict Davila even if the jury believed he merely had a singular intent to kill, in spite of the fact that Texas law required two separate criminal intents before the jury could lawfully convict Davila for capital murder.  Davila contends that it was improper to mislead the jury about the law in Texas, and that he was harmed by the improper jury instruction.

At Davila's trial, after the parties had closed and the jury had been deliberating for four hours, the jury sent the following note to the judge:

> In a capital murder charge, are you asking us did he intentionally murder the specific victims, or are you asking us did he intend to murder a person and in the process took the lives of 2 others

*Id.* at 1931.  Clearly, the jury was struggling with the intent issue.  However, the State's urged legal premise that capital murder could result if Davila "intend[ed] to murder a person and in the process took the lives of 2 others" was contrary to the law in Texas.  At the time of Davila's trial and appeal, the law in Texas was that "[t]ransferred intent may be used as to a second death to support a charge of capital murder that alleges the deaths of more than one individual during the same criminal transaction only if there is proof of intent to kill the same number of persons who actually died."  *Davila v. State*, AP-76,105, 2011 WL 303265 (Tex. Crim. App. Jan.

26, 2011) (*citing Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008)). This legal parameter is the *holding* of Roberts, and no Texas Court has ever claimed this holding has been overruled.

However, as explained in the reply to point of error number one, *supra*, the Court of Criminal Appeals later called this legal concept "dicta." *Ex parte Norris*, 390 S.W.3d 338, 339 (Tex. Crim. App. 2012). Interestingly, even the *Norris* case made clear that at a minimum, before someone can be convicted of capital murder under the statute Davila was charged under, that person must have *two separate intents to kill. Id.* at 340-41. Two additional points should be considered related to the *Norris* statement that the holding in *Roberts* was dicta: (1) at the time of Davila's appeal, the law in Texas was that set forth in *Roberts*, and (2) the *Norris* statement that *Roberts*' holding was merely dicta, was itself dicta in that it had no effect on the outcome of the case.[3]

Even assuming that *Norris* somehow overruled *Roberts,* and assuming that *Roberts* was somehow not the controlling law in Texas during Davila's trial and

---

3. The CCA had already ruled that *Norris* intended to kill both the mother and child in his case, and for that reason had the intent to kill two people. *Ex parte Norris*, 390 S.W.3d 338, 339 (Tex. Crim. App. 2012). Interestingly, on direct appeal Norris' attorney raised the very issue which Davila believes his counsel should have raised in his case: "appellant claims he could have been convicted under an impermissible legal theory." *Norris v. State*, 902 S.W.2d 428, 436 (Tex. Crim. App. 1995), *overruled by Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008). The jury was given an almost identical instruction as the one given in Davila's case. *Id.* The Texas Court of Criminal Appeals ruled against Norris, essentially holding that a single intent was sufficient for capital murder. *Id.* This theory was specifically overruled in *Roberts*, which was the controlling theory during the time of Davila's trial and appeal. *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008).

direct appeal, at a minimum Davila must have had *two intents to be convicted of capital murder*.  So, the question becomes: was this what the jury was instructed?  The answer is no.  The jury, clearly understanding that Davila's defense was that he only intended to kill Jerry Stevenson, was given the following response: "A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that: a different person was injured, armed, or otherwise affected."  CR at 1933.  This instruction in no way instructed the jury about the unalloyed and venerable legal parameter that Davila must have had two separate intents to kill to be convicted.  The instruction was erroneous under any standard of review.

In Texas, a reviewing court first determines whether error exists in the charge, and then must determine whether any error caused harm sufficient to require reversal.  *Heins v. State*, 157 S.W.3d 457, 460 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (*citing Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (*citing Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).  Clearly the charge was erroneous, so the question then shifts to harm.

In its Reply, the State suggests that the error in the charge was not objected to, and therefore, the issue was not preserved for appeal.  This is incorrect for two

reasons: (1) the error was objected to[4], and (2) even if it was not objected to, the issue was still preserved for appeal.  In Texas, if the jury charge error was objected to, the burden to show harm is easily met: "Cases involving preserved charging error will be affirmed only if no harm has occurred. 'Some harm' under the *Almanza* analysis means any harm." *Murphy v. State*, 44 S.W.3d 656, 665–66 (Tex. App.— Austin 2001, no pet.).  This standard of harm would have been easily met.

However, even if the charge was not objected to, relief would nonetheless be granted.  In Texas, failure to properly preserve jury charge error does not preclude review, but changes the degree of harm necessary for reversal. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). If the charging error was not preserved at the trial court level, a greater degree of harm, egregious error, is required. *Id.* However, the egregious harm standard is met in cases like Davila's, where the jury charge error goes "to the basis of the case and vitally affecting appellant's defensive theory." *Heins v. State*, 157 S.W.3d 457, 461 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (*citing Almanza*, 686 S.W.2d at 172). In Davila's case, the sole defense was that he intended to harm only Stevenson. *See, e.g.*, 20 RR at 20-30 (defense

---

4. The state argues the charge was not objected to, but rather, that trial counsel "objected to the court sending in everything at once and proposed that the court delay the special charge until after the jury deliberated further." *See* Doc. 29 at 61 (*citing* 20 RR 53).  However, in reality, the defense objected to sending the incorrect charge to the jury at that time, and stated that it would only be proper to send the charge in question if the jury was deadlocked later "if it's called for."  20 RR 53. Then, a separate objection was made: "We'd object to the submission of the second charge." *Id.* Further, Davila would point out that The Court of Criminal Appeals recently reaffirmed, in a unanimous opinion, that error preservation "is not an inflexible concept." *Thomas v. State*, PD-1454-12, 2013 WL 5336800 at 4 (Tex. Crim. App. Sept. 25, 2013).  Indeed, "all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id.* (citation omitted).

closing).  The jury seized on this defense.  *Id.* at 1931 (jury note suggesting the jury thought Stevenson was the only target).  However, the jury was instructed incorrectly, allowing Davila's only defense to be lost as a matter of law (albeit an incorrect statement of law).

There is no doubt that any effective, to say nothing of an even minimally competent appellate attorney, especially in a capital case, especially where the appellate attorney cited the controlling case law (in the sufficiency section of the direct appeal), would have raised the improper supplement jury charge as a grounds for error.  Had state direct appellate counsel raised this issue, Davila would have been granted a new trial.

### B.   *Martinez* Applies to Ineffective assistance of Appellate Counsel Claims.

The State begrudgingly admits that in *Martinez*, the Supreme Court relaxed the *Coleman* cause-and-prejudice standard to excuse procedural default of "an ineffective-assistance claim" by post-conviction counsel in an initial-review state-court collateral proceeding.132 S.Ct. at 1318.  State's Br. at 59.  Seeking to turn the logic of this exception on its head, the State attempts to insulate IAC on the part of state direct appellate counsel by confining *Martinez*'s logic to defaults made only trial counsel.  As precedent for this urged contention, the state relies on two cases:

*Reed v. Stephens*, 739 F.3d 753, 778 & n 16 (5th Cir. 2014) (*cert. pending*) and

*Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (*cert. pending*).

The *Reed* case involved three ineffective of assistance of appellate counsel

claims, all of which were without merit. *Reed*, 739 F.3d at 778. The Fifth Circuit

denied those claims for that reason. *Id.* It does not appear that Reed challenged the

district court's ruling that the claims were also procedurally defaulted. *Id.* (Reed

does not appear to challenge the district court's procedural ruling other than through

his assertion of actual innocence under *Schlup*, which, as we have discussed, is

unavailing.) However, in a footnote, the Fifth Circuit went on to note that "[t]o the

extent Reed suggests that his ineffective-assistance-of-appellate-counsel claims also

should be considered under Martinez, we decline to do so." *Id.* at n. 18. The Fifth

Circuit relied on *In re Sepulvado*, 707 F.3d 550, 555 (5th Cir. 2013), *cert. denied*,

134 S. Ct. 420 (U.S. 2013), for this legal conception. However, *Sepulvado* did not

hold that *Martinez* does not apply to ineffective assistance of appellate counsel

claims, but rather, that *Martinez* did not apply to "circumstances in which the state

permitted a defendant to raise ineffectiveness-of-trial-counsel claims on direct

appeal." *Id.* (*citing Ibarra*, 687 F.3d at 227). This holding was of course specifically

disavowed by the Supreme Court in *Trevino v. Thaler*, —— U.S. ——, 133 S.Ct.

1911 (2013). *See, e.g.*, *Canales v. Stephens*, 765 F.3d 551, 567 (5th Cir. 2014). *Reed*

therefore does not control this Court's ability to review this ineffective assistance of

appellate counsel claim.   Indeed, the reasoning of *Ibarra* (and *Sepulvado*), that *Martinez* did not apply to states where it was possible to raise ineffective assistance of counsel claims on direct appeal, does not even apply to this fact pattern. It seems impossible that a direct appeal attorney would allege himself ineffective for failing to raise a claim.   The only time it would be possible to raise an ineffective assistance of appellate counsel claim would be in collateral proceedings, for this reason *Martinez* and *Trevino* apply to ineffective assistance of appellate counsel claims.

Davila would point out the principles underlying *Martinez* lead to the conclusion that ineffective assistance of state habeas counsel can establish cause for a failure to raise an ineffective assistance of counsel claim at the state court level. The Supreme Court has identified three factors which compel the conclusion that Ineffective State Habeas Counsel excuses procedural default for the failure to raise an ineffective trial counsel claim.   "First, the right to the effective assistance of counsel at trial is a bedrock principle in our justice system . . . Indeed, the right to counsel is the foundation for our adversary system." *Trevino v. Thaler*, 133 S. Ct. 1911 at 7 (U.S. 2013) (quotations omitted).   Second, taking into account that ineffective counsel on direct appeal is cause, it only makes sense that ineffective assistance of habeas counsel should be cause for claims that cannot be raised on direct appeal.   *Id.*   Third, where a state channels review of certain claims into

collateral proceedings, the lawyer's failure to raise those claims at the state habeas level could deprive a person of any review at all. *Id.* at 7-8.

All three factors apply straightforwardly to IAC appellate counsel claims. The Supreme Court held years ago that "[a] first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Surely the legal parameter, to say nothing of desideratum, is that we do not convict a man, or in this case, kill a man without due process of law is a bedrock principle in America. Second, seeing as ineffective assistance of appellate counsel is cause to excuse a procedural default, and seeing as it is literally impossible for someone other than state habeas counsel to raise this issue in the first instance,[5] it only makes sense that IAC of habeas counsel should excuse a defendant's failure to raise his IAC appellate counsel claim in state habeas proceedings. Indeed, if IAC of state habeas counsel is not cause, then quite literally, no court would ever be able to review even the most powerful IAC appellate counsel claim when state habeas counsel failed to raise the claim. The rationale behind *Martinez* and *Trevino* apply straightforwardly to finding cause and prejudice in the instant case.

The Ninth Circuit, analyzing the issue in the same way, agrees:

---

5. The state record shows that the briefing for the initial writ was filed on July 28, 2010, that the Court of Criminal Appeals denied the direct appeal on January 26, 2011, and that the state writ was not filed until August 29, 2011.

The fundamental principle of *Martinez* is that a criminal defendant deserves a chance to assert a Sixth Amendment claim of ineffective assistance of counsel. Because an ineffective assistance claim cannot as a practical matter be made on direct appeal, the Court formulated an equitable rule that allows excuse of procedural default by ineffective counsel at the initial-review collateral proceeding. The *Martinez* rule is limited to an underlying Sixth Amendment ineffective assistance claim, and to a procedural default by ineffective counsel in an initial-review collateral proceeding. But, as the     Court held in *Trevino*, it is not limited to cases in which a state statute categorically prohibits raising a Sixth Amendment IAC claim on direct     review. Similarly, as we hold here, it is not limited to Sixth Amendment claims of trial-counsel IAC. ***It also extends to Sixth Amendment claims of appellate-counsel IAC.***

*Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013) (emphasis added).

As *Martinez* and *Trevino* apply straightforwardly to IAC of appellate counsel claims, and because neither *Pinholster* nor 28 U.S.C. § 2254(e) abridge this Court's power to hold a hearing or consider new facts related to an unadjudicated claim, this Court should hold a hearing to determine whether or not state habeas counsel was indeed ineffective in failing to raise this claim.  *See* Doc. 20 (Motion for a Hearing). However, before reaching the merits of this claim, it would be proper for this Court to give Texas a chance to pass upon Davila's claim, for this reason Davila requests this Court to grant his motion to Stay and Abet so that he may present this meritorious claim to the Texas state courts.  *See* Doc. 18 (Motion to Stay and Abet).

## IV.   THE STATE MISAPPREHENDS THE IMPORT OF *MARTINEZ/TREVINO*

In his prior briefing, Davila has never claimed that *Martinez* or *Trevino* create a freestanding claim for relief.  Rather, the ineffectiveness of his state habeas counsel is relevant for two reasons: (1) To the extent the state habeas court did not give credit to Davila's powerful mitigation evidence found by mitigation specialist Toni Knox because habeas counsel failed to properly prepare and present evidence at the state level, it was because of state habeas counsel's ineffective representation; (2) It was because of state habeas counsel's ineffectiveness that the ineffective assistance of appellate counsel claim was not raised at the state level.[6]  Further, the fact that state writ counsel completely missed the deadline to file Davila's writ (Writ CR at 358–60), completely failed to prepare for the state evidentiary hearing (*See* Doc. 17 at 95-97), and completely failed to brief the IAC appellate counsel claim, *supra*, all make it more likely that he was ineffective in his representation of Davila.

Davila understands that habeas counsel's ineffectiveness is not needed to show cause and prejudice for his *Wiggins* claim, as that claim is properly exhausted, but there is no reason this Court should not take state habeas counsel's failures as a whole into account when deciding if cause and prejudice is present for the purposes of the IAC appellate counsel claim, *supra*.  Indeed, it is interesting that the State of

---

6. Davila does not believe that IAC of his habeas counsel has anything to do with a *Brady* claim. That single word was left in the amended writ, but was done inadvertently.  Davila has indeed abandoned the *Brady* claim to focus on the claims raised in the amended writ.

Texas does not even attempt to argue that state habeas counsel's performance was sufficient.  *See* Doc. 29 at 63-67.

Finally, as Davila has raised a meritorious IAC appellate counsel claim, and because the only reason that claim was not presented to the state courts was habeas counsel's deficient performance, it would be proper for this Court to hold an evidentiary hearing to decide if cause and prejudice has indeed been established.  *See* Doc. 20.  Further, once this Court has ruled that cause and prejudice is present, it would be proper for this Court to grant a stay and abeyance so that Davila can present this claim to Texas' courts.

## V. *STONE V. POWELL* DOES NOT BAR REVIEW OF DAVILA'S PROPERLY PRESERVED SUPPRESSION ISSUES (RESPONSIVE TO STATE'S POINT NUMBER V).

The State summarily resists Davila's Fourth Amendment challenges in Claim 5 and 6 as follows:

> Federal habeas review is foreclosed by *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court held that a state prisoner cannot raise a Fourth Amendment challenge in a collateral attack if the prisoner had a full and fair opportunity to litigate that issue in the state courts.

State's Br. at 68.

### A.     Supreme Court Doctrine: *Stone* is Not Jurisdictional

The Supreme Court has made clear that its rule announced in *Stone* is "not jurisdictional in nature." *Withrow v. Williams*, 507 U.S. 680, 686 (1982).  Rather, it

is based upon "reasons of prudence and comity" and on a "balancing" of the state's interest in the finality of convictions versus society's interests in deterring Fourth Amendment violations. *See Kimmelman v. Morrison*, 477 U.S. 365, 379 (1983) ("[T]he Court may be free, under its analysis in *Stone*, to refuse for reasons of prudence and comity to burden the State with the costs of the exclusionary rule in contexts where the Court believes the price of the rule to exceed its utility[.]); *Stone*, 428 U.S. at 486-94.

### B.    *Stone* Does Not Apply to Death Penalty Cases

As one commentator has noted, it is most likely that *Stone* "does not apply to capital cases." Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice & Procedure*, § 27.1 at 1538 (6th ed. 2011).

> *Stone* itself was a noncapital case, and the Court this far has applied its rule exclusively in noncapital contexts.
>
> In capital cases, the Constitution may be thought to "constrain [the court's] ability to allocate as [they] see fit the costs" of their reliance on the fruits of unlawful police practices to condemn a human being to die. For, however expendable may be the "merely" "supervisory" interest in "preventing contamination of the judicial process" in noncapital cases, that imperative is of constitutional dimension in capital cases.

*Id*. at 1538-1539.

**ISSUE RESTATED: Given the fact that the Supreme Court has never applied *Stone* in a capital case and that it has often commented on the fact that "death is different," it is submitted that this Court should conclude that *Stone* does not apply in the capital context and therefore does not bar review of Davila's suppression issues.**

### 3.    AEDPA Abrogated The Rule in *Stone*

The United States District Court for the Southern District of West Virginia has held that, by failing to exclude Fourth Amendment claims from its standard of review, the revised 28 U.S.C. § 2254(d) has effectively abolished the distinction drawn by *Stone* between Fourth Amendment claims and other claims and requires federal court to employ a uniform standard for assessing *all* claims raised under 28 U.S.C. § 2254.  *Carlson v. Ferguson*, 9 F. Supp. 2d 654 (S.D. W.Va. 1997).  Law professors have concluded that the effect of the AEDPA on *Stone* is an open question. Alan K. Chen, *Shadow Law: Reasonable Unreasonableness, Habeas Theory, and the Nature of Legal Rules*, 2 BUFF. CRIM. L. R. 535, 587 (1999), *citing*, Peter W. Low & John C. Jeffries, Jr., *Federal Courts and the Law of Federal-State Relations* at 742 (4th ed. 1998).

Davila submits that the reasoning of *Carlson* is unassailable. As noted above, *Stone* is neither jurisdictional nor statutorily based. Congress, in enacting the analytical framework of § 2254(d), requires federal courts to review "the state court adjudication process to ensure that (1) the state trial judge reasonably applied clearly established federal law as interpreted by the Supreme Court of the United States; and (2) the decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Carlson*, 9 F. Supp. 2d at 656. There is absolutely no indication that Congress intended to exclude Fourth

Amendment claims from this review process. Indeed, as the *Carlson* court noted, 28 U.S.C. § 2254(d) provides that "[a]n application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court . . . ." Applying "the well-established plain language rule of statutory interpretation, . . . the phrase, 'any claim that was adjudicated on the merits' as drafted in section 2254(d) includes claims premised under the Fourth Amendment's exclusionary rule." *Carlson*, at 657.

The state's reply indicates some confusion as to the proper standards of review regarding the impact of a Constitutional error. On page 72, the state cites *Brecht v. Abrahamson* for the proposition that a trial error "must have a substantial and injurious effect or influence in determining the jury's verdict." *See* Doc 29 at 72, *quoting Brecht*, 507 U.S. 619, 634-38 (1993). However, on page 76, the State appears to argue that sections 2254(e) and (d) impose a heightened burden on Davila. *See* Doc. 29 at 76. This is incorrect; Davila must only clear *Brecht*'s harmless error hurdle on his claims concerning the statements he gave.

The Fifth Circuit addressed the interplay between *Brecht* and AEDPA directly in *Garcia v. Quarterman*, 454 F.3d 441 (5th Cir. 2006):

> In this circuit—at least when the state court did not perform its own harmless-error review—we simply apply the Brecht harmless-error analysis. *Robertson*, 324 F.3d at 306 ("We hold that AEDPA's restrictions on federal review of state habeas decisions do not alter *Brecht*'s mandate for harmless error analysis by federal courts when state courts have failed to address the question of harmless error.").

*Id*. at 447; *see also* Joseph J. Langkamer, *Harmless Error and AEDPA,* Brecht's *Applicability After* Fry, 80 TEMP. L. REV. 529, 549 (Summer 2007) (explaining *Garcia's* place in the array of Circuit-level opinions on this issue).

In a recent opinion granting habeas relief, the Fifth Circuit explained as follows about *Brecht*'s requirements:

> [W]e assess the prejudicial impact of this constitutional error, applying the standard set forth in *Brecht*. We make this assessment "in light of the record as a whole." [*Brecht* at 638] As the Supreme Court has explained, the *Brecht* standard does not require the petitioner to establish that it is more likely than not that the constitutional violation resulted in actual prejudice: "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win."

*Gongora v. Thaler*, 710 F.3d 267, 278 (5th Cir. 2013), *reh'g en banc denied* 726 F.3d 701 (5th Cir. 2013), (*quoting O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Regarding the first dimension of harmlessness, Davila's situation is the same as was seen in *Garcia*; the CCA did not address harmless error with regard to the Fourth Amendment claims or any others. Indeed, the word "harmless" does not appear a single time in the CCA's *Davila* opinion.

Regarding the second dimension of harmlessness, prejudicial impact, by all accounts the evidence of Davila's death-eligible intent to kill more than one person was thin. *See* Claim 1. Nor could the jury have returned a guilty verdict on this theory had it been properly instructed as to transferred intent. *See* Claim 3. Davila submits that the statements obtained in violation of the Fourth Amendment enabled

the state to bridge the gap between weak evidence/flawed jury instructions and conviction.

## VI.  TEXAS' FAILURE TO SUBMIT ITS SPECIAL ISSUES TO THE GRAND JURY IS UNCONSTITUTIONAL

Davila's Amended Writ preemptively and specifically addressed the state's concerns subsequently raised in its reply brief. *See* Doc. 17 at 118-29.  However, Davila would point out that the state, by relying on *Albright* as support for the contention that the right to grand jury "was never incorporated into the Fourteenth Amendment requirements imposed on the states," trips into the same legal fallacy as the Court of Criminal Appeals. *See Id.* at 118-20; 125-29.  The state does not try to rebut these arguments.

However, the main difference between Davila's argument and the state's can be whittled down to this contention repeatedly relied upon by the State of Texas: "The special issues addressed at the punishment phase have nothing to do with the eligibility determination, but instead are designed to narrow the jury's discretion in making the ultimate decision whether to impose a death sentence." *See* Doc. 29 at 80.  This legal premise has been a contested point among Texas' courts and the capital defense bar for years.  Davila believes that the state's position is rather outrageous because a sentence of death can only be imposed after the jury has answered two questions unanimously:

> 1. Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;
>
> 2. Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. ART. 37.071 (b)(1), (e)(1). As the jury must find special issue number one beyond a reasonable doubt before a man can be sentenced to death, and also make a negative finding on special issue number two before a man can be sentenced to death, it seems outrageous to characterize these special issues as anything less than prerequisites to a death penalty.

Davila persists in his claim that the Texas special issues are aggravating factors which should have been presented to the grand jury.

## VII.   TEXAS' INFAMOUS 10/12 RULE AFFIRMATIVELY MISLEADS JURORS.

In replying to Davila's argument on this issue, the state begins by explaining that "[w]hile Texas law prohibits informing jurors of the effect of a failure to agree on a special issue, art. 37.071, § 2(a), Davila's jury was charged that depending on its answers to the two special issues the trial court would impose punishment 'for life without parole or by death.' (*See* 9 CR 1936). The jury was also instructed that it need not agree on what particular evidence supports an affirmative finding on mitigation. *Id*." *See* Doc. 29 at 81-82. While these are true statements, they have nothing to do with the fact that the jurors in Davila's case, like jurors in all Texas

32

capital cases, were affirmatively misled about their individual power to bring about a sentence of life.  CR at 1936-37.  Nor does the state explain how the instruction quoted above fixes this constitutional infirmity.

Further, the state claims that Davila "does not explain how the jurors would believe that the responsibility to determine the propriety of a death sentence rested elsewhere. The [10-12] Rules implicitly urge jurors toward consensus, but nothing in them suggests the ultimate responsibility to choose reposes in another actor." *See* Doc. 29 at 82 (*citing Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011)).  This argument is rather strange because Davila discussed this very issue at length in his Amended Writ.  *See* Doc. 17 at 136-37.[7]

The state also improperly relies upon *Jones v. United States*, 527 U.S. 373 (1999), for the contention that "the Supreme Court concluded that a jury need not be told what happens procedurally when a verdict cannot be reached."  However, *Jones* is not applicable to Texas' misleading sentencing scheme.  In *Jones*, the defendant requested the following instruction: "In the event, after due deliberation and reflection, the jury is unable to agree on a unanimous decision as to the sentence to

---

7. Not only are the instructions inaccurate, but they were intended to be inaccurate and confusing in order to serve an illegitimate state interest. Just as jurors who are informed that their decision will be reviewed for appropriateness by an appellate court are impermissibly led to deflect their profound responsibility onto the appellate courts, Texas jurors are impermissibly led to relieve themselves of a sense of responsibility by placing it either upon the other jurors who are unwilling to join the vote in favor of life, or upon the statutory scheme that purports to require ten votes, rather than merely one, in order to give a life sentence. The principle behind *Caldwell* is that courts must ensure that jurors are not invited to place their individual responsibility onto anyone else. *Caldwell*, 472 U.S. at 329.
Just as it is impermissible to lead jurors to place that responsibility upon the appellate courts, it is impermissible to lead them to place it upon their fellow jurors, or upon a restrictive sentencing statute.

be imposed, you should so advise me and I will impose a sentence of life imprisonment without possibility of release. . . " *Jones*, 527 U.S. at 379. This instruction correctly explained to the jury what would happen in the event they failed to reach a unanimous decision. *Id.* at 381. The *Jones* Court decided that "the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree." *Id.* In so ruling, the Court pointed out that "[i]n no way, however, was the jury affirmatively misled by the District Court's refusal to give petitioner's proposed instruction." *Id.* at 382. According to the Court, the "truth of the matter is that the proposed instruction has no bearing on the jury's role in the sentencing process"; rather, it "speaks to what happens in the event that the jury is unable to fulfill its role." *Id.*

Davila's case is different. In Texas, individual jurors are specifically given the power to prevent a death sentence. *See* TEX. CRIM. PROC. CODE ANN. art. 37.071 (g). However, the sentencing statute also requires a court to affirmatively mislead the jurors concerning this power. *Id.* at (d), (f). In Davila's case, the jury instructions explained that the jurors could not cast a vote in favor of life, on either Special Issue, "unless ten (10) or more jurors agree to such answer." CR at 1936.

The situation in Davila's case is much more aligned with the situation in *Kubat v. Thieret*, 867 F.2d 351, 372 (7th Cir. 1989). *Kubat* involved the Illinois death penalty statute, which precludes the death penalty "if any one juror believes

34

that there are mitigating factors sufficient to preclude the death penalty." *Id.* at 369. However, in Kubat's case, the jury was erroneously instructed that they must "unanimously conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence" for a life sentence to result. *Id.* The jurors were thus affirmatively misled about their individual power to prevent a death penalty.

The Seventh Circuit agreed that Mills v. Maryland requires individual jurors be permitted to consider mitigation, and that individual jurors must not be precluded from granting mercy because of the mistaken belief that their individual vote for life is meaningless:

> The same analysis applies in Kubat's case. Kubat's jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. On the contrary, the instructions emphasized unanimity. There is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Kubat v. Thieret*, 867 F.2d 351, 372 (7th Cir. 1989) (*citing Mills v. Maryland*, 486 U.S. 367 (1988)).

The State is also incorrect in its contention that Davila "does not explain how the jurors would believe that the responsibility to determine the propriety of a death sentence rested elsewhere," *see* Doc. 29 at 82, because it ignores Davila's arguments

about the holdout juror, Sabrina Gundy, as detailed in the Keene affidavit. *See* Doc.

17 at 147-148.

> It is entirely possible that had Sabrina Gundy not been affirmatively misled about her individual power to prevent a death sentence, she would have exercised her individual power, a possibility that would mean the difference between life and death for Erick Davila.

*Id*. at 148.

Finally, as applied to the post-1991 sentencing statute, this claim is not *Teague*

barred. Under *Teague*, new rules of constitutional criminal procedure will not be

announced on federal habeas review unless an exception applies. *Webb v. Collins*, 2

F.3d 93, 95 (5th Cir. 1993) (*citing Teague v. Lane*, 489 U.S. 288, 316 (1989)).

However, Davila asserts that applying *Mills* as interpreted by *McKoy v. North

Carolina*, 494 U.S. 433 (1990), to Texas' post-1991 sentencing scheme does not

create a new rule. "[A] case announces a new rule when it breaks new ground or

imposes a new obligation on the States or the Federal Government. . . . To put it

differently, a case announces a new rule if the result was not dictated by precedent

existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at

301.

The principle that jury instructions that mislead individual jurors about their

ability to give effect to mitigating evidence violate the Eighth and Fourteenth

Amendments does not break new ground. The Supreme Court has long held that

"*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy*, 494 U.S. at 442–43 (1990)). This well-recognized Supreme Court rule dictates that the current Texas sentencing scheme is unconstitutional because it requires jury instructions that mislead individual jurors into believing that their individual vote for life is meaningless unless at least nine more of their fellow jurors agree.

Concerning the pre-1991 sentencing scheme, the Fifth Circuit ruled that "*Mills* may inform the analysis of his claim, but [it does] not dictate the constitutional rule urged by [the petitioner]." *Webb v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993). The basis of this ruling was that "*Mills* involve[d] statutory schemes different from the Texas sentencing statute and different legal standards." *Id.* At the time that this line of argument was adopted by the Fifth Circuit, Texas did not use the mitigation special issue. By adopting a mitigation special issue, Texas law was brought much closer in line with the sentencing scheme found in *Mills*. Further, the Supreme Court has found that differences in underlying sentencing schemes do not necessarily provide a basis for denying relief under *Teague*. *Stringer v. Black*, 503 U.S. 222, 229 (1992) ("We acknowledge there are differences in the use of aggravating factors under the Mississippi capital sentencing system and their use in the Georgia system in *Godfrey*. In our view, however, those differences could not have been considered

a basis for denying relief in light of precedent existing at the time petitioner's sentence became final.").

In conclusion, because the Fifth Circuit has not clearly addressed whether the 1991 change to Texas' sentencing scheme alters the analysis of this issue, this Court should not be bound by prior precedent and should address this issue on the merits. The instruction given in Davila's case was both an incorrect statement of Texas law and a violation of the United States Constitution; this Court has the ability to remedy this situation.

## VIII. TEXAS' FAILURE TO REQUIRE THE STATE TO DISPROVE THE MITIGATION SPECIAL ISSUE VIOLATES THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

In its reply, the state first argues, once again, that Davila's argument "ignores the distinction between facts in aggravation and facts in mitigation." *See* Doc. 29 at 87. In the state's eyes, in spite of the fact that Davila could not be sentenced to death unless the jury found against him on the mitigation special issue, the fact that the mitigation special issue is labeled "mitigation" insulates it from a finding which increases Davila's sentence from life to death. However, as Davila has already explained, absent a unanimous "no" answer to the mitigation special issue, the maximum sentence he could have received was life in prison. *See* Doc. 17 at 153. The state's argument completely ignores *Ring*'s holding that if the state makes an increase in a defendant's authorized punishment contingent on the finding of a fact,

38

that fact—no matter how the state labels it—must be found by a jury beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 603 (2002).

The argument that this issue is *Teague* barred is also incorrect. Davila understands that "[n]ew rules of procedure . . . generally do not apply retroactively." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). However, Davila's instant claim has its roots in *Apprendi v. New Jersey,* decided in 2000, and *Ring v. Arizona*, decided in 2002. 530 U.S. 466 (2000); 536 U.S. 584 (2002). Davila was not tried until 2009, meaning that both procedural rules mandated by the Supreme Court were already in effect at the time of Davila's trial. Finally, as Davila has explained in his prior briefing, both *Apprendi* and *Ring* apply directly to Texas' capital sentencing scheme. *See* Doc. 17 at 148-62. For these reasons, this issue is also not *Teague* barred.

Respectfully submitted,

*Seth Kretzer*

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street; Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (fax)

seth@kretzerfirm.com

/s/ Jonathan Landers
_____

Jonathan Landers
2817 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

COURT-APPOINTED LAWYERS FOR
PETITIONER, ERICK DAVILA

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing reply was served on all

counsel of record by filing on the ECF System on this 27th day of October, 2014.

_____

Seth Kretzer