**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ERICK DANIEL DAVILA,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **Civil Action No. 4:13-CV-506-O** |
| | § | **(death-penalty case)** |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal Jus-** | § | |
| **tice, Correctional Institutions** | § | |
| **Division,** | § | |
| | § | |
| **Respondent.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Erick Daniel Davila ("Davila") petitions the Court for a writ of habeas corpus, contending that his conviction and death sentence are unconstitutional because (1) the evidence adduced at trial was insufficient to support his conviction; (2) he was denied effective assistance of counsel at trial, on direct appeal, and at state habeas proceedings; (3) the trial court erred by admitting his three written statements admitting to the commission of the offense of capital murder; (4) the trial court erred by admitting his written statement admitting to the commission of an extraneous murder offense; (5) the trial court erred by denying Davila's Motion to Preclude the Death Penalty as a Sentencing Option and Declare Tex. Crim. Proc. Code 37.071 Unconstitutional; (6) the trial court erred by overruling Davila's objection to Texas's "10-12 Rule"; and (7) the trial court erred by incorrectly instructing the jury regarding the burden of proof on the mitigation issue.  Having reviewed the record, the briefs, and the exhibits tendered by the parties, the Court concludes that Davila is not entitled to relief under

the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

**DENIES** the petition, and **DISMISSES this action with prejudice**.

## I.      BACKGROUND

In February 2009, Davila was convicted and sentenced to death for the 2008 murder of an

elderly woman, Annette Stevenson, and her grandchild, Queshawn Stevenson, in Tarrant County,

Texas.  *State v. Davila*, No. 1108359D (Crim. Dist. Ct. No. 1, Tarrant Co., Tex. Feb. 27, 2009).  The

Texas Court of Criminal Appeals ("CCA") affirmed the conviction in an unpublished opinion on direct

appeal.  *Davila v. State*, No. AP-76,105, 2011 WL 303265 (Tex. Crim. App. 2011).  The Court takes

the following recitation of facts from that opinion:

> On April 6, 2008, eleven-year-old Cashmonae Stevenson, along with numerous friends
> and relatives, celebrated her sister Nahtica's ninth birthday at a "Hannah Montana"
> birthday party at her grandmother's home in the Village Creek Townhouses in Fort
> Worth. Except for Cashmonae's uncle, Jerry Stevenson, all of the guests were women
> and children. About 8:00 p.m., just as the fifteen children were eating ice cream and
> cake on the front porch, Cashmonae saw a black Mazda slowly drive by. Inside was
> a man holding a gun with "a red dot" on it. Cashmonae "felt in her stomach" that
> something bad was going to happen because "no one ever rolled by with a gun pointed
> towards our house." Her uncle Jerry said, "The fool has a K in the car." And then
> Cashmonae heard her grandmother, Annette Stevenson, say, "They trying to find
> trouble."
>
> A few minutes later Cashmonae saw a man run across the field, stand next to the house
> in front of theirs, and start shooting with "the red dot" pointed at their porch. He kept
> shooting at them as the children and adults "stacked up on top of each other" as they
> tried to run through the front door. They were all screaming and trying to get to safe
> places inside. Cashmonae saw her uncle, Jerry Stevenson, lay his five-year-old daughter,
> Queshawn, down on the sofa. She was bleeding and looked dizzy. According to Jerry,
> "her guts was hanging out." After the gunshots ended, Cashmonae discovered that
> she had been shot in the elbow, the hand, and the shoulder. Nahtica and another little
> girl, Brianna, as well as Sheila Moblin, one of the adults at the party, had also been
> shot. Cashmonae's grandmother, Annette, had been killed, as had five-year-old
> Queshawn.
>
> . . .

2

> By the time the first police officer arrived, it was a chaotic scene. There was a dead woman—Annette Stevenson—in the back bedroom, a seriously injured child—Queshawn—on the couch in the living room, two more children with leg wounds in the dining room, blood splattered everywhere, and both adults and children screaming and trying to help or console the wounded and each other. Crime scene officers found four shell casings beside the air conditioning unit across the street and four more scattered in the street where the second series of shots had been fired. They photographed the bullet holes found all along the porch walls and in the windows of the Stevenson home.

*Id*. at *1-3.  Following his appeal, Davila petitioned the United States Supreme Court for writ of certiorari, which was denied.  *See Davila v. Texas*, 132 S. Ct. 258 (2011).  While the appeal was pending, Davila's habeas counsel petitioned the convicting court for a writ of habeas corpus.  The convicting court recommended that all claims be denied.  Based on the convicting court's findings and conclusions and its own review of the record, the CCA denied relief in 2013.  *Ex parte Davila*, No. WR-75356-01, 2013 WL 1655549 (Tex. Crim. App. Apr. 17, 2013).

The Court appointed federal counsel, and Davila filed a petition for writ of habeas corpus and supporting brief on April 14, 2014 (ECF No. 16), which he amended on May 19, 2014 (ECF No. 17). Respondent filed its answer on September 4, 2014 (ECF No. 29), and Davila filed a reply on October 27, 2014 (ECF No. 33).

On May 19, 2014, Davila filed an Opposed Motion to Stay and Abet the proceedings, seeking to return to state court to exhaust his ineffective assistance of trial and appellate counsel claims. Mot. Stay, ECF No. 18.  In its November 10, 2014 Order, this Court denied relief on the basis that Davila failed to establish good cause for his failure to exhaust the claims and because he failed to establish that the "unexhausted" claims were potentially meritorious. Order, Nov. 10, 2014, ECF No. 34. Davila additionally filed an Opposed Motion for Hearing on May 21, 2014, seeking an evidentiary hearing

regarding the issue of whether any procedural default could be excused on the grounds of ineffective assistance of counsel rendered either on direct appeal or in state habeas proceedings. Mot. Hr'g, ECF No. 20. On November 10, 2014, this Court denied the motion without prejudice on the basis that Davila failed to identify facts that, if true, would entitle him to relief on his ineffective assistance of appellate counsel claim and on the basis that the Court had yet to address whether the state court adjudication was unreasonable. The habeas petition is now ripe for determination.

## II.    LEGAL STANDARD

This petition is subject to the AEDPA. *See* 28 U.S.C. § 2254. The Court will address the AEDPA standards of review where applicable to the issues raised. When a federal habeas petitioner challenges a prior state court adjudication on the merits, the AEDPA bars relitigation of the claim in federal court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. *See* 28 U.S.C. § 2254(d); *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). This determination is limited to the record that was before the state court that adjudicated the claim on the merits. 28 U.S.C. § 2254(d)(2); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). These conditions are meant to be difficult to meet and stop short of imposing a complete bar on the relitigation of claims already rejected in state proceedings. *Richter*, 131 S. Ct. at 786.

A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an different result. *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)). A state court's

application of law is "unreasonable" when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of a particular case. *Id*. at 901-02. The petitioner must show that the state court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87; *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786; *Woodall*, 134. S. Ct. at 1702 (stating a "merely wrong" holding or "clear error" will not suffice).

Factual determinations in a state court's decision are presumed correct, and a petitioner bears the burden of rebutting them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." 28 U.S.C. § 2254(d)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 134 S. Ct. at 15 (citing *Wood v. Allen*, 558 U.S. 290, 301 (2010)). The presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005) (quoting *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)). With this framework in mind, the Court turns to Davila's claims.

## III.    SUFFICIENCY OF THE EVIDENCE (CLAIM 1)

Davila first asserts that the evidence is legally insufficient to support his conviction for capital murder. Am. Pet. 36-45, ECF No. 17. Specifically, he contends that capital murder in Texas requires

the specific intent to kill two people; thus, the evidence adduced at trial showing Davila only intended to shoot one individual is insufficient to support his conviction. *Id*. at 37. In response, Respondent argues that the evidence establishes that Davila intended to kill multiple gang members and the doctrine of transferred intent applies, which established sufficient intent to kill the two victims. Resp. 39, ECF No. 29. This claim was raised and rejected by the CCA on direct appeal.

## A.     Applicable Law

The standard set forth in *Jackson v. Virginia* applies where an appellant challenges the legal sufficiency of the evidence presented at the trial court supporting his conviction. 443 U.S. 307, 308 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("[T]he *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."). On federal habeas review, "the limited question before [the federal] court is whether the CCA's decision to reject [the petitioner's] sufficiency of the evidence claim . . . was an objectively unreasonable application of the clearly established federal law set out in *Jackson*." *Martinez v. Johnson*, 255 F.3d 229, 244 (5th Cir. 2001). The evidence is sufficient to support the jury's verdict if, viewing the evidence in the light most favorable to the verdict, any rational juror could find the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Martinez*, 255 F.3d at 244 n.21. The *Jackson* standard is used to determine if the amount of evidence satisfies the Due Process Clause, while state law determines the substantive elements that must be proven. *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam).

Texas Penal Code Section 19.03(a)(7)(A) provides that "[a] person commits [capital murder] if the person commits murder as defined under Section 19.02(b)(1) and . . . the person murders more

6

than one person . . . during the same criminal transaction." Tex. Penal Code Ann. § 19.03(a)(7)(A)

(West 2013).  A person commits murder under Section 19.02(b)(1) where he "intentionally or knowingly

causes the death of an individual."  *Id*. at § 19.02(b)(1).  In addition, under Texas law, the doctrine

of transferred intent provides that a person may be held "criminally responsible for causing a result

if the only difference between what actually occurred and what he desired, contemplated, or risked

is that . . . a different person or property was injured, harmed, or otherwise affected."  *Id*. at § 6.04.

### B.    Evidence Presented

The CCA determined that there was "ample evidence in the record to support the jury's verdict

that [Davila] intended to cause more than one death in his 'shoot em up' attack."  *Davila*, 2011 WL

303265, at *4-5.  Specifically, the CCA concluded that the evidence at trial established the following:

> The evidence shows that [Davila] intended to kill possible members of the Crips gang, but he mistakenly killed a grandmother and small child instead. As [Davila] himself explained, he went to "a shoot em up" in which he intended to kill "the fat dude in the middle of the street" and the three "guys on the porch." That is, he intended to shoot four males, not two females. But, under Texas law, the intent to kill four males will transfer to the unintentional killing of two females.
>
> . . .
>
> (1) [Davila] gave a written statement explaining that he intended to "get the fat dude" and who he mistakenly thought were three guys on the porch;
> (2) Cashmonae testified (as did other witnesses) that [Davila] aimed the "red dot" at "different parts of the house" and at different persons;
> (3) [Davila] used a high-powered SKS semi-automatic rifle with an infrared beam to fire between ten to fifteen bullets into the group of women and children on Ms. Stevenson's front porch;
> (4) [Davila] fired a burst of bullets from one location across the street, then paused as he ran to the middle of the street and fired a second burst of bullets;
> (5) [A witness] said that [Davila] looked "frustrated" after the first burst of fire when [Jerry Stevenson] had escaped into the house, so [Davila] moved and then fired a second burst at the remaining women and children;
> (6) [Davila] used a rifle with an infra-red scope that would give him greater precision in shooting at what he intended to hit;

7

(7) His semi-automatic SKS required him to pull the trigger each time he intended to shoot; thus he intended to shoot his targets at least ten to fifteen different times; (8) Expert testimony that [Davila's] choice of bullets, high-powered hollow-point bullets, was consistent with a shooter who wants to cause maximum damage or death to his intended target.

*Id*.

## C.    Analysis

Davila argues that the CCA's factual determinations were unreasonable.  Am. Pet. 41, ECF No. 17.   Specifically, Davila argues that the determination that "the jury's verdict showed Davila 'intended to cause more than one death in his 'shoot him up' attack'" is incorrect.  *Id*.  In support, he points to a note the jury sent during their deliberations.  *Id*. The note stated: "In a capital murder charge, are you asking us did he intentionally murder the specific victims or are you asking us did he intend to murder a person and in the process took the lives of 2 others."  Clerk's R. vol. 44 (Jury Note 2) 1931, ECF No. 10-44.  Davila argues that this note "clearly established the jury believed Davila intended to murder 'a person.'" Am. Pet. 41, ECF No. 17.  He further argues that the CCA improperly utilized his written statement "explaining that he intended to 'get the fat dude' and who he mistakenly thought were three guys on the porch" to establish that he intended to kill at least two individuals. *Id*. Davila argues that this was erroneous because Jerry Stevenson, whom Davila intended to kill, was the only adult male at the birthday party.  *Id*. at 42.  Davila further contends that the CCA incorrectly concluded that witness Cashmonae testified that Davila "aimed the 'red dot' at 'different parts of the house' and at different persons."  *Id*.  Finally, Davila argues that the CCA incorrectly summarized witness Eghosa Ogierumwense's testimony.  *Id*. at 43-45.  Although the CCA stated that Eghosa "said that [Davila] looked 'frustrated' after the first burst of fire when [Jerry Stevenson] had escaped into the house, so [Davila] moved and then fired a second burst at the remaining women and children,"

Eghosa actually explained that the beam from Davila's weapon was first pointed on Stevenson and then was pointed on the windows of the home after Stevenson walked inside the home.  *Id*. at 43.

The Court finds support in the record establishing that Davila had the intent to kill multiple individuals.  Specifically, Davila's own written statement established that he intended to shoot four members of a rival gang.  In addition, the testimony also established that Davila intended, at two separate times, to kill Jerry Stevenson.  *See, e.g.*, *Ex Parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012) (noting defendant's intent to kill one individual on two separate instances was sufficient to establish capital murder under transferred intent theory).  As a result, the CCA's decision to reject Davila's sufficiency of the evidence claim was not an objectively unreasonable application of the clearly established federal law set out in *Jackson*. *See Jackson*, 443 U.S. at 308.  This claim is denied. *See* 28 U.S.C. § 2254(d)(1).

## IV.    ASSISTANCE OF TRIAL COUNSEL (CLAIMS 2 & 4)

Through state habeas counsel David Richards ("Richards"), Davila presented his ineffective assistance of trial counsel claim against Robert Ford and Joetta Keene ("trial counsel").  The habeas court granted Davila funding for a mitigation specialist, conducted an evidentiary hearing, and issued Findings of Fact and Conclusions of Law, recommending that the claim be denied for a lack of merit. The CCA adopted the findings of fact and conclusions of law.  *Ex parte Davila*, 2013 WL 1655549.

Davila now reasserts that his trial counsel rendered ineffective assistance by failing to properly investigate and present the mitigation case.  Am. Pet. 46-79, ECF No. 17.  Davila  further maintains that Richards was ineffective during the state writ proceedings because Richards attempted to "wing it" at the state-writ hearing and inadequately presented the ineffective assistance of trial counsel claim. *Id*. at 91-102.  In response, Respondent contends that the CCA reasonably rejected the ineffective

assistance of trial counsel claim on the merits, and Davila has failed to meet his burden under § 2254. Resp. 40, ECF No. 29.  The Court addresses each issue in turn.

### A.    Applicable Law

The clearly established federal law governing claims of ineffective assistance of trial counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor*, 529 U.S. 362, 398-99 (2000). Under *Strickland*, Davila must first demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  The objective standard of reasonable representation is defined by prevailing professional norms and is necessarily a general standard.  *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009).

Restatements of professional standards, such as the American Bar Association guidelines, are "only guides" to what is reasonable and are properly considered only to the extent they describe the prevailing professional norms and standard practice, and the restatements are not so detailed that they "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id*. at 8-9 n.1.  The Constitution imposes "one general requirement: that counsel make objectively reasonable choices." *Id*. at 9.  Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690)).  This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did.  *Id.* at 1407.

Trial counsel's failure to reasonably investigate and present mitigating evidence to a sentencing jury, when such evidence would have been discovered by a reasonably competent defense attorney, amounts to ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Regarding

counsel's duty to investigate, strategic decisions made by counsel following a thorough investigation are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 691.

Generally speaking, complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and allegations of what a witness would have stated are largely speculative. *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). To prevail on this type of claim, the petitioner must name the witness, demonstrate that he was available to testify and would have done so, set out the content of the proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id*. This showing is required for claims regarding uncalled lay and expert witnesses alike. *See, e.g.*, *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).

Next, Davila must demonstrate that there is a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from counsel's deficiency. *See Strickland*, 466 U.S. at 694. A "reasonable probability" of prejudice requires a substantial, not just a conceivable, likelihood of a different outcome. *Pinholster*, 131 S. Ct. at 1403. For claims that challenge counsel's sentencing investigation, the reviewing court reconsiders the evidence in aggravation against the totality of available mitigating evidence and determines whether there is a probability, sufficient to undermine confidence in the outcome, that the jury would have assessed a life sentence. *See Wiggins*, 539 U.S. at 534. After reviewing all of the evidence, the court must ultimately "decide whether the additional mitigating evidence was so compelling that there was a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death was not an

appropriate sentence." *Id*. (internal quotation marks omitted).

**B.   Relevant Facts**

1.   Trial Counsel's Investigation

At the state writ hearing, trial counsel Joetta Keene testified that she spent an estimated time of 100 hours and co-counsel Robert Ford spent an estimated time of 80 hours on the mitigation investigation alone.[1]  State Habeas Rep. R. (vol. 2) 27, 37.  Keene testified that she and Ford met with multiple doctors.  *Id*. at 37. Keene noted that although she and Ford worked with psychologist Dr. Emily Fallis ("Dr. Fallis") in preparing a PowerPoint presentation for trial, Keene and Ford remained in charge of the mitigation investigation.  *Id*. at 27-28, 37.  Because Davila had made an attempted escape from jail, Keene stated she felt the mitigation case was the "real issue" for purposes of punishment.  She believed the mitigation investigation should not be delegated because she had to build relationships with her witnesses first.  *Id*. at 28.  So, with the help of their fact investigator, Keene and Ford would find and talk to witnesses.  They would then refer certain persons to Dr. Fallis, who would interview them from the psychologist's standpoint.  *Id*.  Davila was also submitted for a psychological evaluation with Dr. Kelly Goodness and neurological testing with Dr. Dennis Zgaljardic. *Id*. at 8, 30.  Keene noted that she and Ford spoke with many of Davila's former teachers, his employer, and many of his family members.[2]  *Id*. at 30, 33-34.

---

[1] Robert Ford was unavailable to testify as a witness during the state habeas proceeding as he passed away weeks before the state habeas proceeding.  State Habeas Rep. R. (vol. 2) 27.

[2] In her affidavit, Keene noted that she and Ford spoke with the following members of Davila's family: (1) his mother, Sheila Olivas; (2) his father, Mario Davila; (3) his sisters, Emily Davila, Cynthia Olivas, and Vivianna Olivas; (4) Emily Davila's mother-in-law, Lisa Wallace; (5) his girlfriend, Nicole Blackwell; (6) his aunts, Debra Jones and Angie Jones; and (7) Mario Davila's mother, brother, and niece.  State Habeas Clerk's R. (vol. 2) 274-76.

2.    Aggravating Evidence

The State introduced evidence that Davila attempted to escape from jail while awaiting trial, committed an aggravated robbery and an additional murder only two days before this capital offense, and was convicted of burglary of a habitation two years earlier.  The State also introduced evidence of a traffic stop where a gun and marijuana were found in Davila's car and testimony about his presence as a security threat in the jail.

The State first called Gabriel Ramos who testified about an incident wherein Davila and two other individuals held Ramos and Ramos's boss at gunpoint while demanding money.  Trial Tr. vol. 20 at 65:17-24, ECF No. 11-22.  Ramos related that the robbery occurred at 5:00 in the morning on April 4, 2008.  *Id.* at 104:7-19.  He noted that Davila held a gun to Ramos's boss's head while demanding that he give Davila all of his money.  *Id.* at 89:1-5.  At one point, one of Davila's cohorts feared that the cops were near and advised that they should leave.  *Id.* at 91:5-25.  Davila then released Ramos's boss and started to retreat to his vehicle.  *Id.*  However, as he was doing so, he stopped and returned to Ramos's boss and again placed his gun on his head.  *Id.*  It was only at Davila's cohorts' insistence that Davila returned to his own vehicle and left the scene.  *Id.* at 91:19-25, 92:1-2. Ramos noted that it appeared that Davila was in charge of the robbery.  *Id.* at 106:17-20.

The jury next heard from Detective Thomas Wayne Boetcher.  Detective Boetcher took Davila's written confession regarding the extraneous murder of Darrell Ford and read the written confession to the jury:

> On the first part of the month, it was 4 Trey Day, April the 3rd. That's how I remember the day. I went to the convenience store on East Lancaster by the French Quarters. A friend of mine named Taylor *[sic]* was with me. We call him T. He hangs around East Lancaster. He wears red. He is not put down with any particular set.

13

I was driving Nichcole's car, and Taylor was with me on the passenger side. We both went into the store, and when I came out and started up the car, I let my window down on the driver's side, and then this old school man walked up to me. He was a black male about 37 years old. He walked up to me on the driver's side of the car while I was sitting in it. He didn't say nothing to me, he just pulled a pistol out on me and pointed it to my head.

I thought I was going to die in the car. I wait -- I waited for Taylor, and he didn't come out. I -- I told -- I told him what happened, and he was surprised.  We hung around the back of the apartments and smoking. We stayed out there all day, and finally went to leave around 4:00 a.m.

. . .

When we went to leave, we seen the dude talking to the lady and another dude. We were in the front of the store. The store was closed, and I got the strap from the back of the apartments earlier to get him. I told Tyler to let me off on East Lancaster, and I was going to walk up there.

I went up to the store, and I was walking -- as I was walking to him, the guy said to me, what's up? And then he said, What's up G Money? I said, What, and I let him have it. I shot him as he walked towards me, and then I went and got back in the car with Tyler and went home. I shot him because he had drawn down on me earlier in the day and pointed a gun at my head.

Trial Tr. vol. 21 at 21:8-25, 22:1-5, 23:3-16, ECF No. 11-23.

Tanna Martinez, who was with Darrell Ford when he was shot, next testified.  Martinez noted that she was a prostitute and Ford dealt illegal drugs and "watched out" for Martinez while she "was jumping in and out of cars, making sure nothing happened to [her]." *Id*. at 72:3-12, 73:18-25.  She testified that on the evening of April 3, 2008, she and Ford were standing on the corner after just having smoked crack, when a black vehicle drove past them. *Id*. at 76:1-6. Martinez noted that the she and Ford noticed the vehicle because they thought the driver was looking to pick up a prostitute.  *Id*. at 77:16-25, 78:1-2.  They noticed that when the vehicle first drove past them, it had two occupants, but when it drove past them again, it only had one. *Id*.  She then related that she then saw a man, who

she later identified as Davila, walking towards her and Ford. *Id*. at 78:20-24. Davila held his head down and did not say anything to them. *Id*. Ford then asked Davila, "What's up," and Davila did not respond. *Id*. Davila then pulled out a gun and Ford told Martinez to turn and run. *Id*. at 79:3-9. Martinez turned to run, but then fell. *Id*. She then heard "pow, pow" and turned back around and saw that Ford had begun to run, but then hit the ground. *Id*. She noted that Davila then walked over to Ford and shot him four more times in the back. *Id*. at 79:11-12.

The jury later heard that Davila had previously been convicted and sentenced to prison on May 11, 2006, for the offense of burglary of a habitation. Trial Tr. vol. 22 at 30:1-5, ECF No. 11-24. Davila was sentenced to three years confinement. *Id*.

The jury also heard from Arlington Police Officer Michael Moses. Officer Moses testified that he conducted a traffic stop on February 12, 2006, involving Davila. *Id*. at 32:13-15. During the stop, the officer found a small amount of marijuana on Davila's person, a loaded 9-millimeter pistol under the front seat of Davila's vehicle, and a brick of marijuana in the back seat of the vehicle. *Id*. at 44:5-6, 44:16-24, 46:1-2. Officer Moses noted that while Davila was cooperative at the beginning of the traffic stop, his demeanor changed when he was placed in the back of the officer's car. *Id*. at 47:1-15. Davila became verbally abusive with the officers. *Id*. During the course of Davila's transportation to the jail, he was able to maneuver his handcuffs from behind his back to the front of his body, which posed a security threat. *Id*. at 57:6-15. The officer finally testified that although he would normally escort a detainee alone into the prison, the officer felt that Davila was a significant security risk, and the officer required four or five jailers to assist him in extracting Davila from the cop car and escorting Davila to the jail. *Id*. at 58:4-6.

15

Charles Norton, a detention officer at the Tarrant County Sheriff's Department, additionally testified. He discussed one incident wherein he told Davila, who was using the payphone, to hang up the call and return to his cell so that the inmates could be administered their meals. *Id*. at 105:19-24. In response, Davila became argumentative with the officer and refused to end the phone call. *Id*. at 105:23-25. Davila then began "cussing out" the officer and eventually hung up the phone. *Id*. at 106:14-17. He then stated, "You don't know who you're messing with, you need to check my resume." *Id*. at 106:20-24. Ultimately, Davila complied with the officer's commands. *Id*. at 108:1-14.

Several other officers testified regarding the security threat that Davila posed while he was incarcerated and awaiting trial. One officer testified that he noticed Davila's nails were long and filed to a point. *Id*. at 126:14-16. This posed a potential safety issue for the jail staff members because officers had been scratched by inmates in the past. *Id*. at 126:18-20. Another officer testified that during a routine inspection of Davila's cell, the officer found contraband in Davila's cell. *Id*. at 135:6-8. When the inspection ended, Davila was instructed to come to the door so that the officers could remove his handcuffs. *Id*. at 134:1-3. Davila moved the handcuffs from behind his back to his front, refused to allow the officers to remove the handcuffs, and became argumentative. *Id*. at 135:1-5. The officer eventually had to spray Davila with "OC Spray"[3] to get him to comply with his orders. *Id*. at 135:9-10. The officer noted that Davila's behavior after he was sprayed was unusual because while most inmates become "more humble and . . . embarrassed," Davila "was singing, making jokes and taunting other inmates still in their cell and other officers." *Id*. at 136:5-8. Another officer testified that when Davila was being transferred for a trial court proceeding, a hairpin was found in Davila's breast pocket of his jumpsuit. *Id*. at 182:21-24, 186:2-3. The officer noted that the hairpin was considered contraband

---

[3] The officer testified that "OC Spray" is a form of pepper spray. *Id*. at 134:13-17.

because there was a "[p]ossibility that the hairpin could be used in a set of handcuffs, to get out of locking devices." *Id*. at 183:23-25.

Finally, detention officers testified about Davila's attempted escape from the jail where he was held prior to trial. The first officer to testify, Michael Thompson, noted that he was in charge of escorting Davila and four other inmates to the gym for their state-mandated recreation period. *Id*. at 160:12-13. Once the inmates were secured within the west gym, the officer went to complete paperwork. *Id*. at 161:15-19. However, as he was completing the paperwork, the inmates got the officer's attention and asked to move to the east gym because the floor of the west gym was damp. *Id*. at 162:14-20. As the officer moved the inmates to the east gym, three of them (including Davila) attacked the officer by punching and kicking him multiple times. *Id*. at 164:23-25, 165:1-4. The inmates took the officer's wallet and removed his keys from his holster. *Id*. at 166:9-14. The inmates then demanded an escape route. *Id*. at 166:17-24. The officer sent the inmates down the fire escape, knowing that it would lead them to a dead end. *Id*. Once the inmates left, the officer attempted to summon help. *Id*. at 168:1-12. He additionally noticed that his partner, Teresa Otterson, was also laying face down in the hallway in a pool of her own blood. *Id*. at 169:12-15. A fellow inmate who witnessed the attack noted that the inmates were hitting, kicking, and stabbing Officer Thompson. *Id*. at 115:1-3. He noted that as they were attacking the officer, they were saying, "I'll kill you, and you know, you don't know me, you don't know what I'm in here for. I have nothing to lose. How do you get out of this building?" *Id*. at 116:24-25, 117:1-2.

A nurse who responded to the scene first found Officer Otterson. The nurse noted that Officer Otterson was lying face down with her arms stretched in front of her in a large pool of blood. *Id*. at 230:9-14. Although the nurse attempted to call her name, she did not respond. *Id*. At this point, the

nurse feared that she was dead. *Id*. at 230:22-24. Once Officer Otterson regained consciousness, she was very disoriented and "had no idea that she really was even hurt." *Id*. at 231:10-14. Although she "kept rubbing at her hand and saying . . . what is this, I'm just a mess, I've just got stuff all over me," she did not realize it was her own blood. *Id*. In addition, a maintenance worker employed through Tarrant County Facilities testified. He testified that he was working to replace some light bulbs within the jail facility and was riding on an elevator with Officer Otterson to retrieve the light bulbs. *Id*. at 243:2-4. As the elevator door opened, the maintenance worker noted that Officer Otterson first walked out and was struck by an inmate wearing a cast. *Id.* at 243:15-19. The maintenance worker attempted to help Otterson. *Id.* As he was attempting to help her, he noticed that several inmates in various stages of undress and partially covered in blood spatter were approaching him. *Id*. at 245:1-23. He then turned and ran back onto the elevator. *Id*. at 247:1-8. An inmate then struck him in the face and broke his nose. *Id*. at 247:22-24. A crime scene investigator dispatched to the scene later found a shank[4] inside the gym. Trial Tr. vol. 23 at 70:13-6, ECF No. 11-25.

### 3. Mitigating Evidence at Trial

Trial counsel first presented Allen Dennis, the chief deputy over housing for the Tarrant County Corrections center. Dennis noted that he reviewed the reports authored by several officers regarding Davila's attempted escape and assault of corrections officers. *Id*. at 199:2-6. Based on his review, he determined that the pat down search of the inmates was inadequate, that Officer Thompson's radio had not been properly checked out, and that the east and west gyms had not been properly inspected. *Id*. at 200:5-24, 202:6-14. Dennis additionally noted that the job assignment process for detention

---

[4] An officer defined a shank as "a piece of metal or something sharp, hard . . . wrapped with cloth at the bottom to protect from unintentional injuries by the user," which is typically used as a weapon. *Id*. at 70:24-25, 71:1-4.

officers changed after the incident such that officers were required to rotate their assignments on a regular basis. *Id*. at 203:11-19. Ultimately, Dennis determined that the incident occurred, at least in part, as a result of "complacent lack of safety practices by both the officers involved." *Id*. at 209:2-7. Notably, however, Dennis attributed the biggest factor driving the assault to the "fact that you had three very aggressive individuals that wanted to get out of jail, and they were willing to do just about anything to do that." *Id*. at 210:25, 211:1-3.

The jury next heard from Mario Davila, Davila's father ("Mario"). Mario noted that he was currently incarcerated and serving a 20-year sentence for murder. *Id*. at 220:10-17. Mario fathered five children, three of whom also spent time in prison. *Id*. at 223-24. He testified that he met Davila's mother when he was working in her father's mechanics garage. *Id*. at 225:11-13. At that time, he was around the age of twenty-four and she was thirteen. *Id.* at 242:1-5, 230:12-14. Mario testified that he had a somewhat tumultuous relationship with Davila's mother, Sheila Olivas, which was caused by Mario's drinking problem. *Id*. at 242:12-23. Mario was sentenced to prison when Davila was very young, and as a result, the burden to raise and care for Davila was largely placed on his mother. *Id*.

Next, Emily Davila ("Emily"), Davila's sister testified. She noted that she and Davila were fathered by Mario Davila. Trial Tr. vol. 24 at 13:20-25, ECF No. 11-26. Although she had written to her father, she had never met him. *Id*. She further testified about her and Davila's poor relationship with their mother, Sheila Olivas. When Emily was thirteen, her mother advised her and Davila that they were the product of a rape. *Id.* at 23:18-20. When she was sixteen, Emily stated that her mother kicked her out of her home, forcing Emily to move in with her boyfriend and his family. *Id*. at 17:16-23. Davila was kicked out of the home when he was fifteen; he moved in with a girlfriend and her family.

*Id*. at 25:7-10.  Before they left the home, Emily and Davila worked at a grocery store to help their mother pay the household bills.  *Id*. at 27:1-2.  Emily further related that she and her mother had previously been in physical fights requiring police intervention and resulting in Emily being put in jail. *Id*. at 30:17-25.  In describing the environment in which she and Davila grew up, Emily testified that she would frequently hear gunshots and "would see all kinds of stuff on the ground. Condom wrappers here and there, needles here and there." *Id*. at 38:14-16.

The jury next heard from Sheila Olivas ("Olivas"), Davila's mother.  She testified that she was taken out of school when she was ten-years-old.  *Id*. at 51:23-25.  She explained that, when she was thirteen, her father "placed" her with Mario Davila in exchange for Mario giving Olivas's father money.  *Id*. at 53:16-23.  She later conceived both Davila and Emily as a result of Mario sexually assaulting her.  *Id*. at 54:11-15.  Olivas received no prenatal care during her pregnancy with Davila. *Id.* at 57:2-6.  Although she would often attempt to leave Mario as a result of his violent, alcoholic tendencies, Olivas's family would always "push" her back with him.  *Id*. at 54:24-25, 55:1-8. Olivas additionally testified that as they were growing up, her children often witnessed bouts of domestic violence between Olivas and her romantic partners, some of which required police intervention.  *Id.* at 66:16-18.  Regarding Davila, Olivas testified that he was diagnosed with ADHD[5] when he was a child and had very poor vision.  *Id*. at 69:22-24.  He additionally had a difficult time controlling his temper.  *Id*. at 99:22-25.  Although he was prescribed Ritalin for his ADHD, Olivas quit administering the medication to him because "[w]hen he took it, . . . he was like a zombie." *Id*. at 70:12-17.  As a student, Davila "had good grades until high school." *Id*. at 71:1-2.  When he was twelve or thirteen, Davila began wearing colored clothing suggesting that he was involved in gang

---

[5] The term ADHD was later defined as "attention deficit hyperactivity disorder." *Id*. at 213:1-4.

activity.  *Id*. at 71:14-25.  Olivas often picked Davila up from school and he was "beat up."  *Id*. at
82:14-15.  His teachers additionally reported that Davila "was exhibiting behaviors that are unacceptable
in the classroom, and at times [was] endangering the lives of other students in [the] classroom."  *Id*.
at 100:4-8.

Davila's aunt, Debra Jones, also testified.  Jones stated that she was Olivas's younger sister.
*Id*. at 113:12. Jones and her two other sisters assisted Olivas in raising and caring for Davila and Emily.
*Id*. at 120:17-19.  At the age of fourteen, Davila moved in with Jones.  *Id*. at 122:9-10.  Jones noted
that there were "issues" because Davila was "wearing red."[6]  *Id*. at 122:17-22.  Olivas sent him to
live with Jones because she thought that Jones would be able to help Davila.  *Id.*  Jones noted that
she attempted to help Davila by requiring him to attend church every week, having him go the Boys
& Girls Club, and discussing gang-related issues with him.  *Id*. at 123:7-14.  Angela Jones, another
of Davila's aunts, further testified that one of her six children (Davila's cousin) also was a gang
member—only he was a member of the Crip gang.  *Id*. at 142:6-9.

Dr. Fallis, the psychologist who was hired by defense counsel to prepare a social history on
Davila, also testified.  In conducting her investigation, Dr. Fallis spoke with Davila, Olivas, Mario,
Emily, and his aunt, Debra Jones.  *Id*. at 184:17-25, 185:1-5.  She also spoke with  "a former teacher
who remembered him from middle school, Lisa Walker [and] . . . someone who runs . . .  a program
through the Boys and Girls Club of Fort Worth and some program to keep kids outs of gangs. His
name is Melvin Carter. And two of his associates."  *Id.*  She additionally reviewed Davila's school,
medical, and penitentiary records.  *Id*. at 184:5-10, 186:8-12.  Dr. Fallis first noted that although Olivas

---

[6] Jones testified that because Davila constantly wore red clothing, she was concerned he was involved
in gang-related activity.  *Id*. at 122:23-25, 123:1-2.

received no prenatal care, Davila's birth was "normal." *Id*. at 190:7-10. Developmentally, Davila reached the early milestones, such as potty training, walking, and talking, at normal points in time. *Id*. at 191:11-20. When Davila first began his schooling, however, he began exhibiting behavioral problems, which included "[h]itting other kids, hitting his teacher, throwing furniture, running away from the teacher, interrupting the teacher, being very fidgety, just could not sit still. Being silly in the classroom. Having difficulty following directions." *Id*. at 192:7-11. His behavior issues were so significant that the school threatened to expel him from the first grade. *Id*. at 192:12-13. Davila was later diagnosed with ADHD and was prescribed Ritalin. *Id*. at 193:20-24. Although Davila's teachers reported that there was a "significant improvement in terms of not just his behavior, but also his academic performance" as a result of the Ritalin, Olivas decided to discontinue the treatment. *Id*. at 194:1-3, 213:9-12. Davila's records indicated that he had other behavioral issues in the fifth grade and was sent to an alternative school in the tenth grade. *Id*. at 195:1-5.

Davila was relatively uninvolved in any type of extracurricular activities—"no sports, no clubs, or other groups, apart from one brief period of playing soccer"—during his younger years. *Id.* at 195:15-19. Because he was not involved in pro-social activities, Dr. Fallis noted that Davila was more vulnerable to developing problems later on in his life. *Id*. at 195:20-23.

At the age of seven, Davila was administered an IQ test in which he performed significantly below average. *Id*. at 198:24. He also had very poor vision and was not encouraged or made to wear his glasses, which impaired his schooling. *Id*. at 200:4-8. Despite the fact that Olivas reported that he made excellent grades through elementary, middle, and high school, Dr. Fallis noted that Davila's records proved otherwise. *Id.* at 199:10-13. Instead, Davila's school records from fifth grade and on established that he received low grades, and sometimes failed his core classes. *Id*. at 201-03.

Additionally, he received several failing grades on his state-mandated tests. *Id.* at 204:18-22. Dr. Fallis found that Olivas, who had only received a third-grade education, did not place an emphasis on education in Davila's life. *Id.* at 197:5-8. In support, she noted that Davila was frequently absent from school.[7] *Id.* at 201:15-16, 205:16-21.

With respect to the quality of his relationships, Dr. Fallis noted that she could not find information suggesting that Davila had many friendships. *Id.* at 218:1-3. As a teenager, Davila dated and lived with much older women. *Id.* at 217:19-25 (noting that at age 15, Davila dated a 28-year-old woman and a 32-year-old woman). He also joined the Blood gang as a young teenager. *Id.* at 218:11-14. Davila had very limited contact with his father as a child, and had no physical contact with his father after the age of two, when his father went to prison. *Id.* at 223:13-18. Dr. Fallis further detailed the pattern of crime within Davila's family: "Mario has brothers, these would be [Davila's] uncles, who are also incarcerated. Mario has fathered other children. These would be [Davila's] half brothers. They are also incarcerated. There's a lot of conflict amongst the family members who are not incarcerated. A lot of arguing and fighting. And there's also a significant history of substance abuse amongst the paternal relatives." *Id.* 225:23-25, 226:1-5. Davila further has a history of "mental health problems, substance abuse problems and learning problems." *Id.* at 252:13-25.

Ultimately, Dr. Fallis stated that Davila was vulnerable to several risk factors he experienced during his development:

> I believe that the risk factors that are pertinent in -- in his case are the -- the genetic factors that have to do with developing ADHD, the limited intellectual abilities. Being raised by a teenage mother. Having a limited attachment to her because he was the product of a rape. Having been exposed to neglect from his mother. Exposed to domestic

---

[7] For example, Davila missed 20 days of school during his fifth grade year and 40 days of school during his ninth grade year. *Id.* at 201:15-16, 205:16-21.

violence in the home. Not having a father in the home. Finding out that the father he identified as his -- as his dad was actually not his father. Finding out that his biological father was someone who is in prison for a violent crime.

Not having the medication that assisted him in his schoolwork and his behavioral problems, the Ritalin continued. Not having a parent or a caretaker that pursued the academic assistance that he needed through school.

Another risk factor would be not involving him in prosocial activities in his early childhood, his later childhood, his adolescence. Getting exposed to gangs in the school system and the neighborhood. And when the -- the red flags arose that suggested he was getting gang -- interested in gangs that there was not some intervention then.

I think the -- the generational problems, the ways that his own mother was treated and then how that affected her parenting of him was a risk factor. The growing up in a family that was in the lower socioeconomic strata was a risk factor. Being in a neighborhood that tends to be a high crime area was a risk factor. And being involved in a gang was a risk factor.

Trial Tr. vol. 25 at 20:10-25, 30:1-15, ECF No. 11-27.

During closing arguments, the State argued that Davila's violent history—including the armed robbery, murder, and capital murder all committed within one week and his later attempted escape from jail—supported a finding that he would be a future danger to society. *Id*. at 54:9-23.  In response, defense counsel argued to the jury that their focus should be not on what Davila had done in the past, but instead on his capacity to change in the future. *Id*. at 58:22-25, 59:1-18.  Trial counsel drew on testimony elicited during cross-examination of the State's gang expert that many experiences Davila had in his life such as ADHD, his poor family structure, his relationship with his mother, and socioeconomic status were risk factors for gang activity. *Id*. at 63:19-25.  In addition, trial counsel referenced the State's expert's testimony that most gang members change and "mature" out of their behavior. *Id*. at 64:12-17.

With respect to the mitigation issue, trial counsel, although admitting that Davila made horrible choices in committing the crimes, focused on the choices Davila did not make: his teenage mother, his conception as a result of sexual assault, having a father who spent the majority of his life in prison, having no familial support from his grandparents, being raised in an environment that did not value education, growing up poor, and his lack of involvement in extracurricular activities. *Id*. at 67-70. Ultimately, trial counsel argued that Davila was "worth life" and deserved the opportunity to have time to change while in prison. *Id*. at 72-73.

4.      Mitigating Evidence Presented to State Habeas Court

During the state writ proceedings, Davila hired mitigation expert Toni Knox to conduct a mitigation investigation to determine whether trial counsel found and presented adequate mitigation evidence through trial counsel's investigation. Am. Pet. 46, ECF No. 17. Knox testified about her findings at the state writ hearing and provided an affidavit. *Id*. at 47.

Knox noted that trial counsel failed to attempt to contact Davila's maternal step-grandmother, Rosa Jones Nash and Davila's aunt, Sandra Kay Vargas. State Habeas Clerk's R. (vol. 1) 35, 38. Each of these individuals, however, refused to sign an affidavit. *Id*. at 146. In fact, when one of Knox's associates, James Hughes, went to meet with Nash and Vargas, he was met by males who "informed [him], in what [he] perceived to be a threatening way, that [he] needed to leave as the family did not want to get involved in [Davila's] case as they were fearful of some type of gang retaliation and just did not want to be involved." *Id*.

Ethel Fay Jones-Silverio, Davila's aunt, provided an affidavit. *Id*. at 155. She noted that Mario Davila was a "gangbanger" who would steal from his family and did illicit drugs. *Id*. Olivas met Mario when he worked in her father's garage and pursued him. *Id*. Olivas would often sneak out

of her home to meet Mario and stay with him overnight.  *Id*. at 156.  Prior to her relationship with

Mario, and at the age of twelve, Olivas had been sexually active with a man who was thirty-years-

old.  *Id*.  According to Jones-Silverio, Olivas's testimony that she was "sold" by her father to Mario

Davila was untrue.  *Id*.  Olivas did not treat Davila and his sister Emily in the same manner in which

she treated her other children–she treated them like "outcasts."  *Id*.  As punishment, Olivas would

often make Davila and his sister Emily stand in a corner for hours at a time.  *Id*. at 157.  Jones-Silverio

saw permanent stains on the walls where Davila had cried on the wall and marks where his forehead

had been pressed against the wall.  *Id*.  Olivas would also force Davila and Emily to work in the home

and care for their younger siblings, and she would also force them to work outside the home so that

she could take their paychecks.  *Id*. at 158-59.  These same facts were further established in an affidavit

obtained from Lynda Jones Mireles, Davila's cousin.  *Id*. at 163 (noting she saw tear streaks on the

wall where Davila and Emily were forced to stand as punishment for not cleaning the home).

Olivas's sister-in-law, Elizabeth Olivas, also provided an affidavit. She reiterated that Olivas

treated Davila poorly and would often hit him as punishment.  *Id*. at 168.  She noted that she was "sorry

that [she] was unable to speak with [Davila's] defense attorneys at the time of his trial because [she]

would have explained the effects that [Olivas] had on him growing up."  *Id*. at 169.  Additionally,

she stated that she blamed Olivas for what happened to Davila.  *Id*.

Finally, Emily Davila's boyfriend's mother, Lisa G. Wallace provided an affidavit.  She noted

that Olivas was very manipulative and would force Emily and Davila to give her their paychecks.

*Id*. at 173.  Davila lived in Wallace's home for a very short period of time after he got out of prison.

*Id*.  She noted that when Davila lived with her, he "abided by [her] rules and seemed to be doing well."

*Id*.

**C.      Analysis (Claim 2)**

The state trial court entered findings of fact and conclusions of law, which were adopted, in whole, by the CCA.  *See* State Habeas Clerk's R. (vol. 2) 331-345; *Ex Parte Davila*, 2013 WL 1655549, at *1.  The Court reviews the findings of fact and conclusions of law under the standards set forth in 28 U.S.C. § 2254(d).

1.      *Strickland* Analysis - Prong 1

Davila fails to establish his claim under the first *Strickland* prong. There are countless ways in which to effectively represent a capital defendant.  *See Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689). Here, the mitigation team consisted of two seasoned defense attorneys, an investigator, and a psychologist.  Trial counsel also consulted with multiple doctors who advised them about gang membership and gang activity.  State Habeas Rep. R. (vol. 2) 37.   Trial counsel made the decision to utilize Dr. Fallis as the mitigation specialist before the jury.   The ABA Guidelines—which are not binding upon this Court—allow for the use of psychologists as mitigation specialists.  *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.4, cmt. 1003 (2003) (noting that counsel is free to allocate duties imposed by the guidelines to appropriate members of the defense team, with two exceptions inapplicable in the instant case). Trial counsel was also able to use the State's expert, Dr. Sabir, to elicit helpful information to explain Davila's risks for gang involvement.  Additionally, although Davila's Aunt Ethel Jones did provide an affidavit, she refused cooperate with trial counsel and did not want to testify at the time of trial. State Habeas Rep. R. (vol. 2) 113-114.  Keene also noted that both she and Ford talked with Lisa Wallace and sought her trial testimony, however, Wallace did not want to participate in the trial.  *Id*. at 115.  The Court finds that trial counsel's performance did not fall below a constitutionally acceptable

level; thus, Davila's claim fails. *See Strickland*, 466 U.S. at 716. However, even if trial counsel's performance were deficient, Davila still cannot establish prejudice under prong two.

2.     <u>*Strickland* Analysis - Prong 2</u>

Here, as the trial court appropriately found, most of the evidence set forth in Davila's habeas petition was cumulative of the evidence presented at trial. During the sentencing phase, the jury heard that Davila did not form a normal bond with Olivas, and that Olivas treated Davila and his sister Emily in a neglectful and abusive manner. This was established through testimony regarding (1) Olivas being "sold" to Davila's father when she was thirteen and raising Davila and Emily without their father; (2) the role Davila and Emily had to pay in helping to financially support the family; (3) the bouts of physical violence between Emily and Olivas; (4) the fact that Olivas advised Davila and Emily at an early age that they were conceived through sexual assault; (5) the alcohol abuse and incarceration of Davila's father early in Davila's life; (6) Olivas kicking Emily and Davila out of the home when they were young teenagers; (7) Olivas failing to keep Davila properly medicated and not requiring him to wear his eyeglasses despite his poor vision; and (8) an extended family culture of crime and incarceration. To the extent new evidence from Olivas's relatives suggests that Olivas minimized her wrongdoing before the jury, the jury heard Dr. Fallis's testimony, which had the same effect. The jury was adequately informed of the abusive, neglectful, and manipulative environment in which Davila lived as a child. As a result, Davila failed to make the requisite showing that the additional mitigation evidence undermines confidence in the verdict. Courts must be "particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009).

28

Further, not all of the witnesses discovered through the state habeas investigation would have provided helpful testimony at trial. Two of the individuals whom Knox identified—Rosa Nash Jones and Sandra Kay Vargas—refused to provide an affidavit to Knox. In fact, when Knox's associate attempted to meet with Jones and Vargas to secure their affidavits, he was threatened by their male family members and told that Jones and Vargas would not provide an affidavit for fear of gang retaliation. Furthermore, Ethel Fay Jones-Silvero described Davila's gang activity when he lived in her home. She stated she came home to find red scarves hanging all over her apartment. She confronted Davila and his then live-in stripper girlfriend, stating that they could no longer stay with her because she feared retaliation from a rival gang.

In addition, whatever mitigating impact the additional information may have had on the jury would have been overwhelmed by the State's aggravating evidence. The jury learned that Davila posed a security threat to detention officers on several occasions when he was incarcerated. In fact, while he was incarcerated in the time leading up to trial, he and three other inmates attempted to escape from jail by brutally beating two guards and a maintenance worker. Each of the guards spent a considerable amount of time off of work as a result of the injuries they sustained in the attack. Additionally, the jury learned of Davila's violent criminal history including an instance where he and two of his cohorts robbed two individuals at gun point in the week prior to the capital murder. Other witnesses also testified about the cold-blooded murder of Darrell Ford committed only days prior to the instant capital murder. One witness noted the dead look in Davila's eyes after he shot and killed Ford.

The minimal impact the additional mitigating evidence may have had on the jury would have also been overshadowed by the brutal facts of the murder. *See Jones v. Johnson*, 171 F.3d 270, 277

(5th Cir. 1999). Brandishing a high-powered SKS semiautomatic weapon, Davila opened fire into a group of several women and fifteen children who were celebrating a child's birthday party. Davila shot and killed a grandmother and a five-year-old girl. He injured three other children and an adult, who, through no act of Davila's, managed to survive. Comparing the mitigating and aggravating evidence, the Court finds that there is no "reasonable probability that, absent the error, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Sonnier v. Quarterman*, 476 F.3d 349, 356-57 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 695).

Defense counsel's closing argument to the jury revolved around Davila's capacity to change for the better. However, further evidence of how bad Davila's childhood was may have only cemented in the jury's mind his inability to change and would have run counter to the chosen defense theory. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1244 (2013) (concluding counsel's decision not to offer evidence of a defendant's troubled, impoverished, and disadvantaged background was reasonable because the evidence could suggest he was a product of his environment and therefore likely to be dangerous in the future). Further, the facts that Emily was raised under the same circumstances as Davila and yet managed to live her life differently, would dilute the mitigating impact of any additional "difficult-childhood" evidence. *Guevara v. Stephens*, No. 13-7003, 2014 WL 3894303, at *5 (5th Cir. 2014) (holding that any information about Guevara's difficult life in El Salvador would have been undermined by, among other things, his brother's clean record despite their shared childhood).

In sum, considering all of this evidence in its totality, the Court's confidence in the verdict is not undermined. *Cf. Wiggins*, 539 U.S. at 535 (reciting "powerful" overlooked mitigation evidence

of severe privation and abuse while in care of an alcoholic, absentee mother; physical torment, sexual molestation, and repeated rape while in foster care; periods of homelessness; and diminished mental capacities); *Escamilla v. Stephens*, No. 12-70029, 2015 WL 680405, at *5 (5th Cir. 2015) (affirming denial of ineffective assistance of counsel claim after finding no prejudice in case where no mitigation investigator was hired).  The Court finds that the CCA's determination did not result in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; nor did it result in a decision based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Claim Three is denied.  *See id.*

### D.    State Habeas Counsel's Performance (Claim 4)

In Claim Four, Davila argues that state habeas counsel was ineffective during the state habeas proceedings by failing to properly litigate the ineffective assistance of trial counsel claim.  Am. Pet. 91-102, ECF No. 17.  Specifically, he states that counsel was "ineffective for failing to subpoena any of the witnesses (other than Toni Knox) to testify at the state writ hearing," and was "further ineffective for failing to gain anything more than a passing familiarity with the facts, hoping instead to 'wing it' by parroting Ms. Knox's report."  *Id.* at 91-92.  He appears to assert that, under *Martinez v. Ryan*, state habeas counsel's ineffectiveness precludes AEDPA deference and, perhaps, allows this Court to consider new evidence not presented in state court.[8]  *See Martinez v. Ryan,* 132 S. Ct. 1309 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

The ineffective assistance of trial counsel claim was previously adjudicated on the merits in state court.  The "new" evidence presented to this Court  in the form of an additional affidavit from

---

[8] To the extent Davila may be asserting the ineffective assistance of state habeas counsel as a substantive claim for relief, it is barred by Section 2254(i). 28 U.S.C. § 2254(i) (providing that the ineffectiveness or incompetence of counsel during state collateral post-conviction proceedings shall not be a ground for relief).

Toni Knox does not render the claim unexhausted. *Ward v. Stephens*, 777 F.3d 250, 258 (5th Cir. 2015). Because the claim is exhausted, there is no procedural bar asserted, and *Martinez* does not apply. *Brown*, 684 F.3d at 489 & n.4. Moreover, the Court's review of the state court decision must be based only on the evidence that was before the state court. *Pinholster*, 131 S. Ct. at 1398. For the reasons previously discussed, the Court finds that the state court's rejection of the ineffective assistance of trial counsel claim was not unreasonable. *See supra* Part IV.C. The Court denies Claim Four.

## V.     ASSISTANCE OF APPELLATE COUNSEL (CLAIMS 3 & 4)

Through appellate counsel Mary Thornton ("Thornton"), Davila filed a direct appeal with the CCA. In the appeal, Davila raised fourteen points of error. After reviewing the merits of Davila's claims, the CCA affirmed Davila's conviction and sentence in an unpublished, unanimous opinion. *Davila v. State*, No. AP-76,105, 2011 WL 303265 (Tex. Crim. App. Oct. 3, 2011).

In Claim Three, Davila now contends that Thornton failed to recognize and raise the claim that Davila was convicted through the use of an improper jury instruction. Am. Pet. 81-90, ECF No. 17. Respondent argues that the claim against Thornton is unexhausted, procedurally defaulted, and meritless because the jury instruction was proper. Davila asserts that any default may be excused because appellate counsel and state habeas counsel were both ineffective. *Id.* at 89-92, 97.

### A.     Procedural Bar

Generally, a federal court will not review the merits of a claim that a state court declined to hear as a result of the petitioner's failure to abide by state procedural rules. *Martinez*, 132 S. Ct. at 1316. This general rule is "designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."

*Id.* An exception exists to the general rule, however, if the petitioner can establish a showing of cause and prejudice. *Id.*

Here, Davila claims that the exception set forth in *Trevino*, 133 S. Ct. 1911, excuses his procedural default of the ineffective assistance claim against Thornton. *See* Am. Pet. 89-92, ECF No. 17. The Court previously determined that Davila's third claim appeared to be unexhausted and procedurally barred under *Coleman v. Thompson* because Texas's subsequent writ bar would prevent him from presenting the claim now in state court. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); Mem. Op. & Order, Nov. 10, 2014, ECF No. 35. The Court also rejected his assertion that *Trevino* has been extended to excuse the default of claims against appellate counsel. *See Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014). Finally, the Court held that ineffective assistance of appellate counsel cannot excuse the procedural default of a claim against said appellate counsel for the simple reason that such claims do not exist to be raised on appeal. They are logically raised, as Davila asserts, in state habeas proceedings.

Thus, the ineffective assistance claim against Thornton is barred, and *Trevino* does not provide an avenue for excusing the procedural default. Assuming, however, that Davila can avoid procedural default, the claim against Thornton is denied on the merits for the reasons discussed below. *See* 28 U.S.C. § 2254(b)(2) (stating that habeas relief may be denied on the merits, notwithstanding petitioner's failure to exhaust).

### B.   Appellate Counsel's Representation

Davila argues that Thornton was ineffective because she failed to challenge an improper statement of law given in response to the jury's question about transferred intent.

#### 1.   The Instructions

At trial, the jury was given the following instructions regarding capital murder:

> A person commits an offense of "capital murder" if he commits murder and murders more than one person during the same criminal transaction.  A person commits an offense of "murder" if he intentionally or knowingly causes the death of an individual.
> . . .
> A person acts "intentionally," or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.
>
> A person acts "knowingly," or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
> . . .
> Now, if you find from the evidence beyond a reasonable doubt, that Erick Daniel Davila, in Tarrant County, Texas, on or about the 6th day of April 2008, did intentionally or knowingly cause the death of an individual, Queshawn Stevenson, by shooting her with a deadly weapon, to wit: a firearm, and did intentionally or knowingly cause the death of an individual, Annette Stevenson, by shooting her with a deadly weapon, to wit: a firearm; and both murders were committed during the same criminal transaction, then you'll find the Defendant guilty of the offense of capital murder.

Trial Tr. vol. 20 (Court's Charge) at 5-8, ECF No. 11-22.  During their deliberations, the jury sent

a note to the trial court and asked the following:

> We need a clarification of the capital murder charge.  In a capital murder charge, are you asking us did he intentionally murder the specific victims, or are you asking us did he intend to murder a person and in the process took the lives of 2 others.

Clerk's R. vol. 9 (Jury Note 2) 1931, ECF No. 10-44.  The trial court responded first with the following

supplemental instructions:

> MEMBERS OF THE JURY:
>
> With regard to the charge of capital murder, the definitions of "intentionally" and "knowingly" on page 1 define the mental states referred to in the application paragraph on the top of page 2.  These portions are repeated below:
>
> A person acts "intentionally," or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.
>
> A person acts "knowingly," or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

34

Now, if you find from the evidence beyond a reasonable doubt, that Erick Daniel Davila, in Tarrant County, Texas, on or about the 6th day of April 2008, did intentionally or knowingly cause the death of an individual, Queshawn Stevenson, by shooting her with a deadly weapon, to wit: a firearm, and did intentionally or knowingly cause the death of an individual, Annette Stevenson, by shooting her with a deadly weapon, to wit: a firearm, and both murders were committed during the same criminal transaction, then you will find the defendant guilty of the offense of capital murder.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty of capital murder as charged in the indictment and next consider the lesser included offenses of murder.

Clerk's R. vol. 9 (Resp. Note 2) 1932, ECF No. 10-44. The trial court also sent a second supplemental response to the jury (of which Davila now complains). It read:

The Court gives the additional charge on the law as follows:

"A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that: a different person was injured, harmed, or otherwise affected."

*Id*. at 1933. Trial counsel objected to the second supplemental charge and asked the trial court to instead "send the original response the Court had regarding intentionally and knowingly . . . [a]nd wait . . . until the jury indicates they can't reach . . . a resolution. And then at that point, submit the other special charge, if it's called for." Trial Tr. vol. 20 at 53, ECF No. 11-22. The trial court overruled the objection and sent the instruction to the jury. *Id*.

2.    Analysis

In reviewing an ineffective assistance of appellate counsel claim, a court must determine (1) whether appellate counsel's performance was deficient, and (2) whether appellate counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish deficient performance, a petitioner must show that "counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith v. Robbins*, 528 U.S. 259, 287 (2000). To show prejudice, the

petitioner must establish "a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Id*. "Counsel need not raise every nonfrivolous ground of appeal, but should instead present '[s]olid, meritorious arguments based on directly controlling precedent.'" *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (citing *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999)).

Davila argues that the trial court's second supplemental charge "contained an incorrect statement of the law because it failed to recognize that in Texas one must have the specific intent to murder at least two people to be guilty of capital murder; it is not enough that a person attempted to murder a single person, and accidentally killed two." Am. Pet. 82-83, ECF No. 17. Davila asserts Thornton was ineffective for failing to raise this issue on direct appeal.

The language given in the trial court's second supplemental instruction is taken from section 6.04 of the Texas Penal Code, which reads "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . a different person or property was injured, harmed, or otherwise affected." Tex. Penal Code Ann. § 6.04 (West 2013). Trial counsel objected to this instruction on the basis that the trial court should delay the charge until after the jury deliberated further, not on the basis that the instruction was an incorrect statement of law.

Respondent argues that this failure to object waived any error for appeal and that Thornton cannot be ineffective for failing to raise a claim that was not preserved for appeal in the first instance. Resp. 61, ECF No. 29. Davila argues that trial counsel's failure to object does not preclude appellate review of jury charge error, but only increases the degree of harm necessary for reversal. Am. Pet., 85. Specifically, Davila argues that, under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App.

36

1985), jury charge error that is not preserved requires "egregious harm" for reversal, as opposed to a "some harm" standard when the error is preserved. As explained below, the Court finds no error in the charge and that any alleged error did not result in harm under either *Almanza* standard.

A Texas trial court may instruct the jury on the law of transferred intent as applied in a capital murder prosecution. *See Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008). Davila argues that the second supplemental instruction in this case was erroneous only because it violated the rule in *Roberts* that a defendant convicted of multiple-murder capital murder must have the necessary mental state (intent or knowledge) with respect to the number of victims killed. To ascertain whether the jury instruction was error, the Court examines the "charge as a whole instead of a series of isolated and unrelated statements." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). The "transferred intent" instruction was not given to the jury in isolation; it was given to the jury along with the language taken from the court's charge that repeated the statutory definitions for "intentionally" and "knowingly" as well as the application paragraph for capital murder. Clerk's R. vol. 9, 1932-33, ECF No. 10-44. In Texas, the application paragraph is the portion of the charge that authorizes conviction. *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013). The application paragraph for capital murder clearly required that the jury find Davila caused two intentional or knowing deaths in the same criminal transaction. In the event the jury found that Davila killed only one person, the application paragraph did not allow the jury to convict Davila of capital murder. Thus, the jury charge, taken as a whole, does not violate the rule in *Roberts.*

More to the point, the CCA specifically distinguished the facts of this case from *Roberts*, where the victim was a woman who, unknown to the defendant, was pregnant. The CCA noted that, in contrast, Davila intended to kill "the fat dude in the middle of the street" and three "guys on the porch,"

37

or, in other words, "four males, not two females." *Davila*, 2011 WL 303265, at *4. Any error in the charge was, therefore, harmless, because *Roberts* is not implicated: Davila intended to kill more people than he actually did.

Given the foregoing, the record does not show that Thornton unreasonably failed to discover a non-frivolous issue for appeal and does not show that the issue would have prevailed on direct appeal. Claim Three and Four are denied.

## VI.   FOURTH & FOURTEENTH AMENDMENTS - ADMISSION OF WRITTEN STATEMENTS (CLAIMS 5 & 6)

Davila next contends that the trial court erroneously admitted three of his written statements admitting to the commission of the capital murder offense and another of his statements admitting to the commission of an extraneous murder offense. Am. Pet. 103, ECF No. 17. Davila contends that the admission of these statements was erroneous under the standard set forth in *Franks v. Delaware*, 438 U.S. 154 (1978), and against his rights under the Fourth and Fourteenth Amendments to the United States Constitution. *Id*. In response, Respondent argues that this Court is prevented from reviewing such alleged error under *Stone v. Powell*, 428 U.S. 465 (1976), because Davila had a "full and fair opportunity to litigate his Fourth Amendment claim [in state proceedings] and exercised the opportunity to do so." Resp. 68-69, ECF No. 29. In reply, Davila contends that *Stone* does not apply. Reply 26-31, ECF No. 33.

### A.   Applicable Law

In *Stone v. Powell*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure

was introduced at his trial." 428 U.S. 465, 494 (1976). Davila argues that the Supreme Court's holding in *Stone* does not apply in capital cases, and that the Supreme Court has exclusively applied the rule in non-capital cases. Reply 27, ECF No. 33. However, the Fifth Circuit has applied *Stone* to capital cases involving the death penalty and determined that it was prevented from reviewing a petitioner's Fourth Amendment claim as a result. *See ShisInday v. Quarterman*, 511 F.3d 514, 524-25 (5th Cir. 2007) ("The Fifth Circuit applies the [*Stone*] bar as long as the state gives the defendant an opportunity to litigate the issue, whether or not the defendant takes advantage of the opportunity.") (citing *Janecka v. Cockrell*, 301 F.3d 316, 320-21 (5th Cir. 2002)); *Busby v. Dretke*, 359 F.3d 708, 722 (5th Cir. 2004) (noting Fourth Amendment claims are not cognizable in federal habeas corpus proceedings pursuant to *Stone*); *Jones v. Johnson*, 171 F.3d 270, 278 (5th Cir. 1999) ("The state provided an opportunity for full and fair litigation of [petitioner's] fourth amendment claim prior to trial; we cannot reexamine this claim on federal *habeas* review."). The Court now turns to a review of the state court proceedings to determine whether Davila received a full and fair opportunity to litigate the Fourth Amendment issues of which he now complains.

B.    **Analysis**

The Supreme Court in *Franks v. Delaware* held that a defendant may challenge an affidavit supporting a search warrant on Fourth Amendment grounds if the defendant establishes that (1) misrepresentations within the affidavit are the product of "deliberate falsehood or deliberate disregard for the truth," and (2) that the statements were necessary to establish probable cause. 438 U.S. 154, 171-72 (1978). Here, during the state court proceedings, Davila moved to suppress "any and all oral and written statements of the Defendant in this cause, which were made to agents of the State." Clerk's R. vol. 1 (Mot. Suppress Statements), ECF No. 10-3. Davila further moved to suppress "the arrest

39

warrant in this cause based on the affiant's knowing or intentional false statements or based on the affiant's disregard for the truth in making false statements." Clerk's R. vol. 9 (Mot. Suppress Arrest Warrant), ECF No. 10-44 (emphasis removed).  The state trial court held a hearing and heard evidence regarding the validity of the arrest warrant and the voluntariness of the statements Davila gave while in custody.  Trial Tr. vol. 16 at 170-288, ECF No. 11-18.  The state trial court overruled each of Davila's motions regarding the validity of the arrest warrant and the voluntariness of his statements.  *Id*. at 244:19-21, 299:2-6.  Later during his trial, Davila again objected to the validity of his arrest warrant. *Id*. at 37:9-16.  The state court provided an alternative basis for its original ruling denying Davila's motion to suppress.  *Id*. at 37:20-25, 38:1-20.  The issue was then submitted to the jury.  The jury was instructed that, if they had a reasonable doubt about whether the affidavit for arrest contained sufficient probable cause to support Davila's arrest, they could not consider the arrest or any evidence derived from it.  Clerk's R. vol. 9, 1923-24, ECF No. 10-44.  The trial court's ruling was affirmed on appeal.

Because Davila was afforded a full and fair opportunity to litigate the Fourth Amendment issue, and did in fact litigate the issue, the Court finds that *Stone* applies to bar this Court's review of the issue in the instant federal habeas proceedings.  *Stone*, 428 U.S. at 494.  As a result, the Court denies Claims Five and Six.  *See id.*

## VII.   FIFTH, SIXTH, & FOURTEENTH AMENDMENTS - ADMISSION OF WRITTEN STATEMENTS (CLAIMS 7 & 8)

Davila next contends that the trial court erroneously admitted all four of his written statements because they were made involuntarily, in violation of the Fifth, Sixth, and Fourteenth Amendments. Am. Pet. 111, ECF No. 17.  He argues that the statements were not given voluntarily because, as he

was interrogated for seven hours, he did not have anything to eat or drink and did not use the restroom. *Id*. at 114-115. Respondent maintains that the statements were not coerced and were instead offered voluntarily. Resp. 76, ECF No. 29. Alternatively, Respondent states that even if the statements were obtained in violation of Davila's Fifth Amendment rights, "the Court must still deny relief because the admission did not have a substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 77. This claim was raised and rejected on direct appeal; thus, AEDPA deference applies.

### A.    Applicable Law

In determining the voluntariness of a confession under the Fifth Amendment, a reviewing court applies the "totality of the circumstances" approach. *Rogers v. Quarterman*, 555 F.3d 483, 491 (5th Cir. 2009). That is, the court considers "the suspect's age, experience, education, background, intelligence, and whether the suspect has the capacity to understand the warnings given to him, the nature of his rights, and the consequences of waiver." *Id*. The court further considers "[t]he circumstances of the interrogation, such as its length, location, and continuity." *Id*. "A statement is involuntary if there existed official, coercive conduct that made it unlikely the statement was a product of the individual's free choice." *Id*. The Supreme Court has opined that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

"The voluntariness of a confession is ultimately a legal determination . . . [that] may also involve subsidiary factual determinations and mixed issues of law and fact." *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998). As a result, this Court will defer to the state court's determination of voluntariness as long as it was not "contrary to, or involved an unreasonable application of, clearly

41

established Federal law, as determined by the Supreme Court of the United States." *Id*.; 28 U.S.C.

§ 2254(d)(1).

**B.      The Interrogation**

In its analysis, the CCA set forth the following facts surrounding Davila's written confessions:

Detective Johnson testified that [Davila] was arrested and brought to the police station at about 1:40 p.m. on April 8th. Detectives Johnson and Boetcher met with him in an interview room where [Davila's] handcuffs were removed and he was placed in leg cuffs. He began the interview by asking [Davila] if he wanted "anything to eat or drink or anything like that. He said no. I do it that way every time. And then I advised him of his Miranda rights." [Davila] told Detective Johnson that he understood his rights and that "he freely, intelligently and voluntarily waive[d] those rights" and agreed to talk with the officers. "He was very relaxed. Just sat there kind of casual." [Davila] gave his first statement beginning at 4:00 p.m. and ended it at 4:25. He gave the second statement beginning at 6:47 p.m. and completed it at 7:22. The officers began taking the third statement at 7:38 p.m. and concluded it at 8:12. Detective Johnson said that he did not do anything to deny [Davila] his basic needs, did not prevent him from having liquids or food, and did not prevent him from going to the restroom. He took a picture of [Davila] lounging casually in his chair in the interview room. [Davila] does not appear to be under any stress or duress.

On cross-examination, Detective Johnson again said that [Davila] appeared very relaxed; "[t]he whole thing was extremely friendly." [Davila] "never asked to go to the bathroom"; he never asked for fluids or food. Detective Johnson reiterated that he had offered, but [Davila] turned him down.

Detective Boetcher also testified and said that [Davila] gave his fourth statement beginning at 8:45 p.m. and completed it at 9:06. He said that [Davila] had used the restroom, but he did not specify when.

The trial judge entered oral findings into the record and stated, inter alia,

[Davila] was offered nothing in exchange for these three statements. There was no force, threats, or coercion made by the police. He was lucid. Did not appear intoxicated. Never asked for a—food or for anything to drink.

The court finds that the statements are freely and voluntarily made and are admissible.

*Davila*, 2011 WL 303265, at *7-8.

### C.    Analysis

Here, both state courts determined that Davila's confession was made voluntarily and knowingly without threats or coercion. The Court defers to those determinations unless Davila can prove otherwise by clear and convincing evidence. In his briefing, Davila again argues that because he was questioned for seven hours and "did not ask to use the restroom and was not given anything to eat or drink" his confession was involuntary. Am. Pet. 113, ECF No. 17. He fails, however, to establish how those facts demonstrate the involuntariness of his confession or offer any additional evidence of coercive or improper activity. Davila simply asks this Court to disagree with the state court's ruling by rearguing the issues. The state trial court determined that Davila was offered nothing in exchange for the first three statements he gave; that the police did not force, threaten, or coerce Davila's confessions; that he was lucid and did not appear intoxicated; and that he never asked for food or anything to drink. Trial Tr. vol. 16 at 302:22-25, 303:1-3, ECF No. 11-18. Regarding the fourth statement, the state trial court found that Davila "[a]gain during that period of time, . . . requested nothing" and that the statement was given freely and voluntarily. *Id.* at 303:12-13, 16-18. A state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Because Davila has failed to establish that the state court unreasonably rejected his claim that police coercion rendered his confession involuntary, Claims Seven and Eight are denied. *See* 28 U.S.C. § 2254; *Shisinday v. Quarterman*, No. H-06-814, 2007 WL 776680, at *23 (S.D. Tex. 2007).

## VIII.   CONSTITUTIONALITY OF TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071 (CLAIM 9)

Davila contends that the trial court erred by denying Davila's motion to preclude the death penalty as a sentencing option and declare Texas Code of Criminal Procedure Article 37.071 unconstitutional. Am. Pet. 116, ECF No. 17. Specifically, he argues that Article 37.071 is unconstitutional because it "allows for a death sentence without grand jury review of the punishment special issues in violation of the Fifth and Fourteenth Amendments." *Id.* In response, Respondent states that the Constitution does not require Texas's special sentencing issues to be presented in the indictment before the grand jury. Resp. 77, ECF No. 29. The state court rejected this claim on the merits on direct appeal.

### A.    Analysis

The Fifth Amendment to the United States Constitution provides, in relevant part, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. amend. V. In *United States v. Robinson*, the Fifth Circuit held that, with respect to federal cases, "the government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty, and its failure to do so . . . is constitutional error." 367 F.3d 278, 284 (5th Cir. 2004).

Davila argues that the *Robinson* holding extends to state-court prosecutions and requires that the aggravating and mitigating factors that a jury must consider in the sentencing phase of trial must be alleged in the indictment. Am. Pet. 117-18, ECF No. 17. Davila further asserts that "[r]elying on the Supreme Court's decision in *Ring v. Arizona*, the court in *Robinson* held that the Fifth Amendment demands that aggravating factors that render a defendant eligible for the death penalty are, in fact, elements of the offense," thus, "the government is required to charge, by indictment, those statutory aggravating factors." *Id.* at 116-17. In turn, Respondent contends that the *Robinson* holding

44

only applies to federal-court prosecutions. Resp. 78, ECF No. 29. Further, "[t]he special issues addressed at the punishment phase have nothing to do with the eligibility determination [to receive the death penalty], but instead are designed to narrow the jury's discretion in making the ultimate decision whether to impose a death sentence." *Id*. at 80.

As the CCA correctly stated, the Fifth Amendment right to an indictment in felony cases has yet to be extended to the states through the Fourteenth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 272 (1994). The Fifth Circuit has additionally noted that "in *Robinson*, [the court] addressed only the requirement of a grand jury indictment in a federal prosecution." *Kerr v. Thaler*, 384 F. App'x 400, 403 (5th Cir. 2010). Neither the Fifth Circuit nor the Supreme Court has extended the requirement to the states. *Id*.

Further, in Texas, the eligibility determination regarding the death penalty is made at the guilt phase of trial according to the elements that were alleged in the indictment. *See Lowenfield v. Phelps*, 484 U.S. 231, 245-46 (1988). Texas Penal Code Section 19.03 sets forth the elements to establish capital murder, which are the aggravating factors that could render an individual eligible for the death penalty. The special issues addressed during the punishment phase of trial do not apply to the eligibility determination, but rather apply to narrow the jury's discretion in making the ultimate decision whether to impose a death sentence. *Jurek v. Texas*, 428 U.S. 262, 276 (1976) ("By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function."). As such, special issues are not an element of the offense that must be included in the indictment. *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006); *Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005); *Anderson v.*

45

*Quarterman*, 204 F. App'x 402, 409 (5th Cir. 2006). For these reasons, the Court finds that the CCA's

determination was not an unreasonable application of Supreme Court precedent and this claim is denied

on the merits. *See* 28 U.S.C. § 2254(d).

## IX. CONSTITUTIONALITY OF TEXAS'S "10-12"[9] RULE (CLAIM 10)

Davila next argues that the trial court erred by overruling his objection to the constitutionality

of Texas's "10-12 Rule." Am. Pet. 130, ECF No. 17. Specifically, Davila maintains that Texas's

capital sentencing scheme violates the Sixth, Eighth, and Fourteenth Amendments. *Id.* In response,

Respondent contends that Davila fails to demonstrate that the CCA's determination resulted in an

unreasonable application of clearly established Supreme Court precedent. Resp. 81, ECF No. 29.

### A. Applicable Law

Article 37.071 of the Texas Code of Criminal Procedure provides, in relevant part:

(e)(1) The court shall instruct the jury that if the jury returns an affirmative finding
to each issue submitted under Subsection (b), it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances
of the offense, the defendant's character and background, and the personal moral
culpability of the defendant, there is a sufficient mitigating circumstance or
circumstances to warrant that a sentence of life imprisonment without parole rather
than a death sentence be imposed.

. . .

(f) The court shall charge the jury that in answering the issue submitted under
Subsection (e) of this article, the jury:
(1) shall answer the issue "yes" or "no";
(2) may not answer the issue "no" unless it agrees unanimously and may not
answer the issue "yes" unless 10 or more jurors agree

Tex. Code Crim. P. art. 37.071 § 2(e)-(f).

---

[9] The "10-12" Rule, as used in the parties' briefing and throughout this Order, refers to Article 37.071,
§ 2(f)(2) of the Texas Code of Criminal Procedure.

### B.      Risk of Arbitrariness - Eighth & Fourteenth Amendments

Davila first argues that "[t]he 10-12 Rule affirmatively creates confusion in the minds of the jurors" because they "are first told that the jury as a whole 'shall' answer 'yes' or 'no' to each issue presented" then they "are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another."  Am. Pet. 132, ECF No. 17.   The statute provides, however, that the jury's inability to answer a special issue shall result in a life sentence.  Tex. Code Crim. P. art. 37.071, § 2(g).  And, section 2(a)(1) prohibits the court or counsel from informing the jury of the effect of a failure to agree on the special issues submitted. Tex. Code Crim. P. art. 37.071, § 2(a)(1).  As a result, jurors are not informed that a single juror could prevent the imposition of the death penalty, which is in violation of his Eighth and Fourteenth Amendment rights.  *Id*.

The Supreme Court has rejected this argument in *Jones v. United States*. 527 U.S. 373, 381-83 (1999) ("In light of the legitimate reasons for not instructing the jury as to the consequences of deadlock, and in light of congressional silence, we will not exercise our supervisory powers to require that an instruction of the sort petitioner sought be given in every case.").  In *Jones*, the Court held that a jury need not be told what happens procedurally when a verdict cannot be reached.  *Id*.  Although the jury cannot be "affirmatively misled regarding its role in the sentencing process," a court is not required to instruct the jury "as to the consequences of a breakdown in the deliberative process." *Id*. at 381-82. The instruction in Davila's case accurately recited the governing law.  This sub-claim is denied on the merits.  28 U.S.C. § 2254(d).

### C.      Right to Individualized Sentencing - Eighth Amendment

47

Davila next contends that he was denied his Eighth Amendment right to individualized sentencing because the 10-12 Rule misleads jurors regarding their individual ability to give effect to their belief on mitigating circumstances.  Am. Pet. 140-44, ECF No. 17.  Specifically, "[b]y instructing the jury that ten jurors are required in order to give a 'yes' answer, the Texas statutes . . . prevent individual jurors from having a meaningful opportunity to consider mitigating factors." *Id*. at 144.  In support, Davila cites to *Mills v. Maryland*, 486 U.S. 367 (1998).  In *Mills*, the Supreme Court determined that the jury instructions violated the Eighth Amendment because they may have prevented the jury from considering mitigating evidence unless the jurors unanimously agreed that a particular circumstance was supported by the evidence.  *Id*. at 384.  The Supreme Court has since explained that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 422-43 (1990).  Further, the Fifth Circuit has determined that *Mills* is not applicable to the capital sentencing scheme in Texas.  *See Druery v. Thaler*, 647 F.3d 535, 542-43 (5th Cir. 2011) (noting that the Fifth Circuit has refused to invalidate the Texas sentencing scheme based on the *Mills* decision); *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000); *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994) ("Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable.").  As a result, the Court denies this sub-claim on the merits. *See* 28 U.S.C. § 2254(d).

### D.      Right to Fair and Impartial Jury - Sixth Amendment

Finally, Davila argues that the 10-12 Rule "forces the jury to wonder what would happen were they . . . unable to answer the special issues, possibly leads them to believe that an unacceptable third

alternative other than life and death would follow, and then leaves them to draw upon their own preconceived notions in coming to a verdict." Am. Pet. 146, ECF No. 17. Davila appears to extend the arguments advanced with respect to the Eighth Amendment to the instant argument. Davila fails to offer any new case law or arguments apart from those that he previously offered. The Court previously found that Davila's arguments under the Eighth Amendment were without merit. *See* Part IX.C. Consequently, Davila has failed to carry his burden under 28 U.S.C. § 2254(d), and Claim Ten is denied.

## X. JURY INSTRUCTION - BURDEN OF PROOF ON MITIGATION SPECIAL ISSUE (CLAIM 11)

Davila argues that the trial court erred by denying his motion seeking to instruct the jury regarding the burden of proof on the mitigation special issue. Am. Pet. 148, ECF No. 17. Davila contends that the court should have instructed the jury that the burden regarding the mitigation issue lies with the State. *Id.* In response, Respondent maintains that there is no constitutional requirement for the State to prove an absence of mitigating evidence. Resp. 85, ECF No. 29.

### A. Applicable Law

Under Texas law, once a defendant is found guilty of capital murder, the jury is tasked with answering two special issues to determine whether the defendant will receive the death penalty. Specifically, the jury must answer the special issues unanimously to impose a death sentence. Tex. Code Crim. Proc. Ann. art. 37.071 § 2. The first of the two special issues requires the jury to assess the future dangerousness of the defendant. *Id.* § 2(b). The State must prove this issue beyond a reasonable doubt. *Id.* § 2(c). After answering the first special issue, the jury then addresses the issue of mitigation. *Id.* § 2(e)(1). The mitigation issue assigns no burden of proof. *Id.*

### B.     Analysis

Davila states that "[b]ecause [a negative answer to] the mitigation issue in the Code of Criminal Procedure Art. 37.071 § 2 (Special Issue Number Two) increases the maximum penalty for the crime of capital murder, Texas' statutory scheme is unconstitutional for not requiring this issue to be submitted, proved, and found by the jury beyond a reasonable doubt." Am. Pet. 149, ECF No. 17. The Fifth Circuit has addressed this issue and determined that "no Supreme Court or Circuit precedent requires mitigation to be proved beyond a reasonable doubt." *Kerr*, 384 F. App'x at 403; *Rowell*, 398 F.3d at 378. As a result, this claim is denied on the merits.

## XI.     REQUEST FOR HEARING

This Court previously denied without prejudice Davila's request for a hearing on Claims 2, 3 and 4 and stated that it would *sua sponte* consider whether a hearing is appropriate after a more thorough evaluation under the AEDPA. This Court has discretion to grant an evidentiary hearing if one is not barred under § 2254(e)(2). *Landrigan*, 550 U.S. at 473. In exercising that discretion, the Court considers whether a hearing could enable Davila to prove the petition's factual allegations which, if true, would entitle him to relief. *Landrigan*, 550 U.S. at 474. The Court also must consider the deferential standards in § 2254(d), which limit the Court's ability to grant habeas relief. *Id*. In practical effect, if the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing. *Id*.; *Pinholster*, 131 S. Ct. at 1399.

Claim 2 was adjudicated on the merits and the state court's ruling was determined to be reasonable. 28 U.S.C. § 2254(d). Claim 3 is procedurally barred, with no available avenue excusing the default, and Davila fails to allege any facts that, if true, would entitle him to relief on that claim. Davila also failed to demonstrate that the ineffective assistance of state habeas counsel alleged in Claim

4 is relevant to the procedural or substantive viability of Claims 2 and 3.  Habeas relief is therefore precluded by § 2254(d) and § 2254(b), rendering a hearing on these claims inappropriate.  *See Pinholster*, 131 S. Ct. at 1400-01; *Reed*, 739 F.3d at 778 n.16.

## XII.   CONCLUSION

Based on the foregoing, the Court **DENIES** Davila's petition for a writ of habeas corpus. In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court denies Davila a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2). If Davila files a notice of appeal, he may proceed in forma pauperis on appeal.  18 U.S.C. § 3006A(7).

**SO ORDERED** on this **21st day** of **April, 2015**.

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**